# United States District Court
## Middle District Of Florida
### Orlando Division

**UNITED STATES OF AMERICA**

**VS.**                                          **CASE NO: 6:17-cr-15-Orl-37KRS**

**JARVIS WAYNE MADISON**

_____

## Report and Recommendation

**TO THE UNITED STATES DISTRICT COURT:**

### INTRODUCTION.

Jarvis Wayne Madison is charged by Indictment with kidnapping his wife and that the commission of the crime resulted in his wife's death.   Doc. No. 1.   The defense asks the Court to determine that Madison is presently not competent to proceed to trial.

After considering Defendant's Motion Under 18 U.S.C. § 4241 For Order Committing The Defendant To The Custody Of The Attorney General For Hospitalization And Treatment To Determine Competency (Doc. No. 68), I committed Madison to the custody of the Attorney General for evaluation of his competency to stand trial (Doc. No. 76).   There was a significant delay by the Bureau of Prisons in transporting Madison to a federal facility for evaluation due, in part, to hurricanes that passed through Florida and other states.

Madison arrived at the Federal Detention Center in Miami, Florida on October 10, 2017. He was evaluated by Rodolfo A. Buigas, Ph.D., a forensic psychologist.   On December 14, 2107, Dr. Buigas opined that Madison has the following mental disorders:   Paranoid Personality Disorder; and, Other Specified Personality Disorder (with mixed Schizotypal, Obsessive,

Narcissistic, and Antisocial features).   Dr. Buigas concluded, for reasons discussed in more detail below, that Madison was competent to stand trial.

Counsel for Madison requested a competency hearing.   Accordingly, I conducted an evidentiary hearing on the issue of competency on January 10 and 12, 2018.   The following professionals testified at the hearing:   Dr. Buigas, an expert in forensic psychology and neuropsychology; Joseph C. Wu, M.D., a neuropsychiatrist with expertise in neurocognitive imaging; Dr. Robert Ouaou, Ph.D., a psychologist with expertise in clinical psychology, neuropsychology and forensic neuropsychology; and, Valerie McClain, Psy.D., a psychologist with expertise in clinical and forensic psychology and neuropsychology.   Exhibits were admitted into evidence without objection.   Counsel for the parties also made argument and submitted legal authority for the Court's consideration at the conclusion of the hearing.

### LEGAL STANDARD.

Section 4241 provides that if, after a hearing, the Court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General for such a reasonable time as is necessary to determine whether there is a substantial probability that in the foreseeable future he will be restored to competency.   18 U.S.C. § 4241(d).   Section 4241 codifies the standard for competency set forth by the United States Supreme Court in *Dusky v. United States*, 362 U.S. 402 (1960).   Counsel for the parties agree that Madison bears the burden of proving that he is presently not competent to stand trial.   *See United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011)(citing *Medina v.*

*Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995))(stating that a party raising a substantive claim of incompetency must demonstrate his incompetence by a preponderance of the evidence).

As discussed herein, there is no dispute that Madison presently suffers both from a mental defect (traumatic brain injury) and mental diseases.   Nevertheless, "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges."   *Medina*, 59 F.3d at 1107 (quoting *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1985)).

"The determination of whether a defendant is mentally competent to stand trial is a question left to the sound discretion of the district court, with the advice of psychiatrists [or other mental health professionals].   The medical opinion of experts as to the competency of a defendant to stand trial is not binding on the court, since the law imposes the duty and responsibility for making the ultimate decision of such a legal question on the court and not upon medical experts."   *United States v. Abernathy*, No. 08-20103, 2009 WL 982794, at *3 (E.D. Mich. Apr. 13, 2009)(quoting Fed. Proc. § 22:549 (Hearing and Determination as to Competency)).

### SUMMARY OF THE EVIDENCE.[1]

<u>Dr. Joseph Wu</u>.

Dr. Wu reviewed PET scans and a quantitative MRI of Madison's brain.   These tests revealed that Madison has a very abnormal pattern of brain metabolism in a number of areas.   These abnormalities are consistent with individuals with a high likelihood for developing chronic traumatic encephalopathy ("CTE").   CTE generally includes impairments in judgment and dysregulation of impulse control.   Some of the abnormalities also correlate with poor performance on executive

---

[1]  I have considered all of the evidence presented, including evidence that I have not discussed in this summary.   The complete transcript of the evidentiary hearing had not been prepared when this Report and Recommendation was written.   Therefore, I do not include citations to the record.

function tests[2] and impairments in verbal memory.   These findings may be indicative of a neuropsychiatric disorder, such as epilepsy spectrum disorders (including personality disorders), psychotic spectrum disorder (including schizophrenia and delusional disorders), affective disorders and PTSD.   From the imaging studies, Dr. Wu could not render an opinion about whether Madison has any particular mental impairment diagnosis.

<u>Dr. Rodolfo Buigas.</u>

Dr. Buigas conducted (and supervised) the mental status examination of Madison, talked to the staff in the facility about Madison's daily functioning, obtained information from medical staff about Madison's physical condition, and reviewed documents listed in his report.   Madison was cooperative throughout the evaluation overall.   Madison was able to communicate effectively, although not all of his statements were credible.   Correctional staff reported that Madison exhibited no difficulty in communication, interactions, self-care, feeding, sleeping and other activities of daily living.

Dr. Buigas found that Madison was a marginal historian and that he exaggerated his accomplishments.   Madison reported that he completed high school and obtained a bachelor's degree in "Police Science," but his high school transcript reflects that he did not graduate.   Madison disputed the accuracy of the transcript.   Madison also reported that he served for several years in the Army and that he trained as an Army Ranger.   He contended that military records which show that he did not serve for such an extended period and that he ultimately received an administrative discharge were inaccurate.

---

[2] Executive functioning involves cognitive flexibility, such as the ability to plan, initiate, program, sequence, and maintain goal directed behavior, especially under novel circumstances.

Madison denied having any mental health problems or treatment, and there were no records that Madison had a psychiatric history.   Madison did report that he was sexually abused when he was an adult.

Madison reported being involved in a number of motor vehicle accidents ("MVA") in which he suffered head injuries.   Dr. Buigas was aware of findings after PET scan suggesting diffuse damage to Madison's neocortex.   Dr. Buigas also testified that Madison's medical history of a reported heart attack and diagnoses of coronary artery disease and uncontrolled hypertension could contribute to a neuro-cognitive impairment.

During mental status evaluations, Madison did not display any psychomotor agitation or retardation.   He was oriented to his environment.   His range and intensity of emotional expression was normal.   His mood was euthymic overall, with some periods of mild dysphoria (depression). His insight into his legal status was intact and his judgment to cause and effect relations appeared to Dr. Buigas to be adequate.   Madison exhibited coherent, organized, goal-oriented, and sequential thought processes.   His speed of information processing and recall for immediate, recent, and remote memory were grossly intact.   Attention and concentration were also intact.   Madison's speech was normal, but he tended to overelaborate in his responses.   Dr. Buigas estimated Madison's intelligence to be in the low average to average range based on his vocabulary and fund of knowledge.

Dr. Buigas noted in his report that Madison had some paranoid, odd, and religious themes which did not appear to be of delusional quality.   In testimony, Dr. Buigas acknowledged that Madison stated that God talks to him.   Nevertheless, Dr. Buigas did not observe any signs of perceptual disturbances (hallucinations).

As for the nature of the legal proceedings, Madison stated that he is charged with stalking, kidnapping and murdering his estranged wife.   He described his version of the facts of the case in significant detail, summarized in Dr. Buigas' report as follows:

> Mr. Madison explained that his wife went to stay with her aunt Joy (referred to as Joyce in legal documents) for a few weeks in Florida.   The defendant indicated that his wife's aunt was not fond of him and that she was in communication with his wife's ex-husband.   Mr. Madison indicated that the aunt did not want his wife to have contact with him.   Mr. Madison indicated that the wife called her friend for a bag of makeup that she left behind.   The defendant added that he ended up talking to his wife and agreed to bring the makeup to her instead.   As the aunt did not approve of his wife and the defendant meeting, the two agreed to meet at the beach. The defendant indicated he waited for her at the beach and watch[ed] his wife from afar with binoculars to verify that her aunt did not follow her.   Mr. Madison indicated that his wife greeted him pleasantly and the couple conversed as they walked along the beach.   According to the defendant, his wife indicated she was unhappy due to finances and lack of custody/visitation with her children from a previous relationship.   The couple reportedly walked back to the defendant's car to retrieve the makeup bag.   The wife agreed to go get coffee with the defendant, but as they were driving, the neighbor's car approached their vehicle.   Mr. Madison turned the car to a side road.
>
> They reportedly continued the conversation when the wife told the defendant to "shoot her . . . as she didn't have a life." And that "I'd be better off to die.   I will never see my kids." Mr. Madison stated that he refused to shoot his wife, adding "I told her she would have to do it herself."
>
> Mr. Madison gave inconsistent statements across interviews.   During one interview he stated, "I handed her a gun and she went to grab it and it went off;" however, during another interview, the defendant stated "I took the gun. I told her 'I can't shoot you, you want it there it is.'   Before I could blink, she grabbed the gun and it went off and shot her."   Mr. Madison reportedly considered taking her to a hospital, but since he did not know the locations of the local hospitals, he decided to drive to a friend's house in Tennessee as his wife "always wanted to be buried in the mountains."   The defendant described his wife becoming malodorous during the drive so he "asked the Lord to help me so I made a grave and put a cross. I bought a tarp to lay her in. Cried on my knees, prayed to God. She's in his hands. I laid the Bible she liked . . . on her chest with her hands holding [it]."

Dr. Buigas also found that Madison understood the adversarial nature of the proceedings. He described the role of the judge, the jury and the prosecutor.   He knew that he faced a possible sentence of incarceration and capital punishment.   He knew the role of his attorneys and indicated that he trusted them.   He stated that he would take his attorneys' advice and stated, "I firmly believe

they'll do their jobs and keep me from the death penalty and maybe life in prison over something I haven't done."

Dr. Buigas testified that studies show that a professional's subjective clinical judgment alone is very flawed. Therefore, he administered a number of objective psychological tests that were validated (proven to be true) to differentiate between having or not having a particular condition.

Dr. Buigas administered three tests to evaluate cognitive impairment, as follows:

The Booklet Category Test ("BCT") looks at predominantly frontal lobe, executive functioning impairment. This test asks the examinee to figure out patterns from visual stimuli. Madison's scores reflected moderate to severe impairment. These results suggested that Madison attempted to portray false neurocognitive impairment. However, because the test results showed that Madison did not give good effort, Dr. Buigas did not give much weight to the results of this test.

The Validity Indicator Profile ("VIP") is designed to look specifically at the examinee's effort on cognitive testing. This test indicated that Madison was providing good effort. Dr. Buigas ultimately concluded that Madison was not malingering.

The CVLT-II test is a measure of auditory learning and memory. The test results showed that Madison tended to learn at a below average rate, but he did not experience any significant difficulty retaining learned information after a twenty-minute period. His immediate recall was average.

Dr. Buigas administered two tests of psychiatric functioning. The results of the MMPI-2-RF test were invalid due to an elevated L-Scale, which reflected that Madison endorsed an unrealistic level of moral virtue and lack of human frailties. The results of the Personality Assessment Inventory ("PAI") were also invalid based on Madison's selection of responses

infrequently made by examinees.   Dr. Buigas testified that these selections could have been made due to carelessness, poor comprehension, an elevated level of exaggeration, or because of not claiming realistic human frailties.

Because both of these tests were invalid, Dr. Buigas relied on his subjective judgment in rendering his opinion in this functional area, stated in his report as follows:

> The defendant's view of his environment is realistic overall, but he is pessimistic, idiosyncratic, and suspicious.   He tends to rely on denial, somatization, deception, and rationalization for defense mechanisms.   His mistrust of others and his paranoia is pervasive.   He will question the motives and behaviors of others, often without sufficient basis.   He suspects that others are exploiting or deceiving him.   The defendant tends to be guarded in his disclosure and he will entertain doubts concerning the loyalties of associations.   His interpersonal relationships tend to be strained and he is unforgiving with perceived insults.   In addition, the defendant entertains hyper-religious beliefs.   His self-concept is variable, somewhat inflated at times.   Affectively, the defendant may be quick to react to perceptions of disparaging behaviors.   Behaviorally, the defendant can be preoccupied, impulsive and possibly controlling.

Finally, Dr. Buigas administered two tests validated to address the legal question of competency as defined by *Dusky*.   On the Georgia Court Competence Test, Mississippi State Hospital Version ("GCCT-MSH"), a screening test, a score of 70 or above is associated with a finding of competence.   Madison scored 94 on that test.

He then administered the Evaluation of Competency to Stand Trial-Revised Test ("ECST-R").   This test measures factual understanding of the legal proceedings, the ability to consult with counsel, and the ability to assist in your defense, resulting in a final score.   Madison's score was in the normal to mild impairment range, which Dr. Buigas testified was the highest, non-impaired, level on the test.

Dr. Buigas was also aware of opinions of other defense experts, although he had not reviewed the raw data or reports of these experts when he prepared his report.   He summarized that information in his report, as follows:

[T]he defendant underwent a neuropsychological evaluation by a defense expert. Although the report was not available, legal documents indicated the defendant "suffers from significant brain damage. Neuropsychological testing revealed that Mr. Madison scores in the lowest 1-4% of the populations in reasoning abilities and has damage of the frontal lobe, the area of the brain responsible for executive decision-making. These findings are consistent with multiple head traumas suffered [by] Mr. Madison over his life and possible coal ash contamination." It was reported that Mr. Madison has a "full scale IQ (intelligence quotient) [of] 84, among the lowest 14% of the population." In addition, the legal documents submitted by the defense state that "Mr. Madison suffers from a schizoaffective disorder, bipolar type, with delusions. And that the defendant has exhibited symptoms that over time (and to this day) include entrenched delusions, confabulations[3], paranoia, disorganized speech, difficulty in mental processing of information, flawed perceptions, hyper-religiosity, and an inability to engage in meaningful introspection." Finally, legal documents also suggest that the defendant was diagnosed with some form of "significant brain damage" and Pica. Legal documents indicated that the defendant was opined as incompetent to stand trial for the current case, presumably by defense expert.[4]

Based on all the information before him, Dr. Buigas opined that Madison's primary diagnosis was a Paranoid Personality Disorder. People with this disorder are suspicious of the motives of others, misread statements as demeaning, can be argumentative, and can bear grudges, affecting all areas of life. Madison also had an inflated sense of accomplishments. Dr. Buigas also opined that Madison had a mixture of other personality disorders, with Schizotypal, Narcissistic, Obsessive and Antisocial Features. Schizotypal is an oddity in expressing emotions, in interpersonal relationships and in perceptions (which could include perceptual disturbances). These mental diseases have symptoms of being suspicious of the motives of others, being

---

[3] Confabulation is the confusion of imagination with actual memories or the formation of false memories due to a psychological or neurological disorder. PsychCentral, *Confabulation*, https://psychcentral.com/encyclopedia/confabulation/ (last visited Jan. 22, 2018).

[4] During the hearing, Dr. Buigas heard the testimony of Dr. Wu and Dr. Ouaou. He also had an opportunity to review the reports of the defense experts and Dr. Ouaou's raw data. While counsel for Madison questioned whether Dr. Buigas' opinion would have been better informed if he had the opinions of the defense experts, counsel for Madison did not call Dr. Buigas to testify regarding whether his opinion changed after hearing testimony and reviewing reports and data from defense experts.

argumentative, having oddities in interpersonal relationships and perceptions (such as being hyper-religious), and believing that one associates with important people.[5]

Dr. Buigas concluded that Madison did not have a psychotic disorder.   He did not observe the classic four impairments of schizophrenia:   significant impairments in affective functioning; autistic behavior; grossly disorganized speech, thought process or behavior; and, perceptual disturbances or irrational thought.[6]   He also opined that Madison did not have a schizoaffective disorder.   He testified that a person with this disorder would have had a "psychotic break" and would not go through his life, as Madison had, without contact with mental health professionals. Dr. Buigas also testified that Madison did not exhibit symptoms of PTSD, such as flashbacks or regression.

Based on all of the information before him, Dr. Buigas opined that Madison is competent to stand trial.

### Dr. Robert Ouaou.

Dr. Ouaou met with Madison three times and reviewed documents listed in his report.   He conducted mental status interviews and administered psychological tests.   During the interviews, Madison was tangential and circumstantial and had significant difficulties staying on topic.   He reported having problems with sleep.   He denied having received any mental health treatment during his life.   Dr. Ouaou opined that Madison had anosognosia, which occurs when an individual

---

[5] Dr. Buigas also diagnosed Madison with Pica due to Madison occasionally ingesting a non-nutritious substance, in this case coal ash and the ends of burnt matches.   Pica is not a mental disorder or disease.

[6] With respect to irrational thought in the context of Madison's hyper-religiosity, Dr. Buigas explained that a person's religious beliefs must be evaluated in the context of his cultural norms.   For example, in the Catholic faith people believe that a man died and came back to life three days later.   If a person's religion did not include this belief, then this belief would be a delusion.   Dr. Buigas had the impression that Madison's reports that God talked to him were more symbolic expressions than actual auditory hallucinations.

has no insight into his own condition and does not perceive that he has an illness.   Dr. Ouaou indicated that this is a common symptom of psychotic disorders, head trauma and dementia.

Dr. Ouaou opined that during the interviews Madison provided information, which he had consistently provided to others, that was inaccurate or distorted.   Specifically, Madison reported that he graduated from Eastern Kentucky University when, in fact, he did not finish high school. He also indicated that he has received specialized training in the Army, but records did not support those reports.   Rather, they reflected that Madison was discharged from the Army for being AWOL twice.   When confronted with contrary evidence, Madison contended that authorities had changed the documents to hide the truth about his successes and accomplishments, that the real records were unavailable, and other reasons to explain why his version of the facts was correct.

Madison also told Dr. Ouaou about Mr. B, whom he identified as very powerful and rich friend associated with organized crime.   Madison reported that Mr. B had assisted him in the past and would likely assist him in the future.   Dr. Ouaou did not believe that there was a Mr. B, and he testified that Madison's information about Mr. B verges on bizarre.

Dr. Ouaou wrote that Madison also demonstrated bizarre behaviors when reviewing discovery.   He opined that Madison's "voluminous personal notes" conveyed manic and possible psychotic behavior.[7]

Dr. Ouaou indicated that Madison was also hyper-religious.   Madison stated that he "talks to the lord," receives signs that guide his behavior and had seen visions (such as "souls of lost people") leading up to the death of his wife.   He also reported that during an MVA in 1978 he "saw Jesus Christ" who told him, "It wasn't time to go."   Madison also believed that he had special

---

[7] These notes were not presented at the hearing.

powers to heal people, which Dr. Ouaou opined is characteristic of hyper-metabolism in the temporal lobe of the brain and consistent with an epileptic spectrum type disorder.

Madison also told Dr. Ouaou that three men raped him sometime in the 1990s.   Further, he stated that one of the men was arrested.   Madison reported that this man was "released because of a conspiracy related to cocaine and 'dirty police.'"

Dr. Ouaou administered a battery of neuropsychological tests to assess multiple domains of cognition:   intelligence; attention; concentration; learning; memory; language; executive function; visual-spatial functioning; and, processing speed.   He also administered multiple measures of effort or symptom validity.   He concluded that Madison gave maximum effort on all tests and, therefore, that he was not malingering.

The Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV") was used to measure Madison's IQ.   His full scale IQ was 84, which is low average (14th percentile).   Submeasures in this test reflected that Madison's verbal comprehension was borderline (7th percentile).   His perceptual reasoning, working memory and processing speed were all average (ranging from the 25th to 34th percentile).   Based on other testing, Dr. Ouaou did not see a decline in Madison's IQ as a result of neurological disease or trauma.

On other tests, Madison's ability to process information and to hold auditory and visual-spatial information in "temporary storage" in his memory were average, and better than 34% of people his age.   His auditory memory and immediate memory were low average (14th and 29th percentile, respectively), which Dr. Ouaou testified addressed the ability to learn information and repeat it.   Madison's ability to recall details of two stories after a twenty to thirty-minute delay was impaired (5th percentile).   Tests also showed that Madison rapidly forgot newly learned material, although when provided with cues his recall was better but still low average.

On a test of attention/concentration, Madison's ability to perform complex tasks and switch between tasks was relatively impaired (7th percentile).   Dr. Ouaou described this as mental flexibility, which is a task related to frontal lobe functioning.   Dr. Ouaou testified that Madison did very well on tasks related to visual-spatial functioning.   But when Madison was asked to switch mental sets – such as from connecting numbers in order to connecting letters in order – he had significant difficulty switching back and forth during a timed test.

On tests of language abilities, Madison's verbal comprehension was borderline (7th percentile) and his lexical verbal fluency (asking someone to produce words that start with a certain letter) was significantly impaired (5th percentile).   Dr. Ouaou testified that limitations in these areas are consistent with a frontal lobe impairment of the brain.   Madison's performance on other verbal fluency tasks was high average (91st percentile).   Dr. Ouaou testified that these differences arise from impairment, or lack thereof, in different parts of the brain.

In tests of reasoning/problem solving/executive function, Madison scored in the 1st and 2d percentile on measures of verbal reasoning and abstraction verbal fluency.   Dr. Ouaou testified that Madison was very concrete and had difficulty with verbal reasoning and abstraction.   This indicated to Dr. Ouaou a problem in the left hippocampus and left temporal lobe of the brain.   Dr. Ouaou testified that his findings of brain impairment correlated with Dr. Wu's findings.

Dr. Ouaou did not perform any tests of legal competence.   He testified that he saw no reason to repeat the tests in this area that had been administered by Dr. Buigas.   He was also unsure that legal tests of competency addressed an individual's ability to provide accurate personal information.

Dr. Ouaou also testified that Army records reflect that Madison had some type of head injury and an emotional breakdown in 1977.   He conceded that there were no details about the seriousness of the head injury or about the type of emotional breakdown.   Nevertheless, Dr. Ouaou testified

that a serious head injury when Madison was 18 or 19 years old might help explain his frontal lobe problems on testing.   Dr. Ouaou also addressed Madison's scores on two armed forces qualification aptitude tests.   Madison scored in the 73d percentile in 1975 but only in the 31st percentile in 1976. Dr. Ouaou opined that the differences in these scores indicated that a change of some sort occurred during that time.

Based on all of the information, Dr. Ouaou opined that Madison suffered brain damage over time.   In his report, Dr. Ouaou wrote as follows:

> [Mr. Madison] has a serious psychiatric illness with psychotic features, with persecutory and grandiose features.  The mental illness appears to have begun to emerge during adulthood and has possibly been worsened by multiple head injuries. There is ample evidence in interview, formal testing, and third party sources that supports a diagnosis of Delusional Disorder.  Patients often have little insight and impaired judgment regarding their pathology (i.e. anosognosia).   They often present with functioning and behavior that is not markedly impaired, nor odd or bizarre, aside from the delusions.   Key to persecutory delusions is that the individual believes that they are being conspired against, cheated, spied on, harassed, etc. In grandiose delusions, the individual conveys that they have great talents, connections with important others, or accomplishments.

Dr. Ouaou testified that individuals with delusional disorders have beliefs that they apply regardless of documentary evidence to the contrary.   In comparing his opinion with the opinion of Dr. Buigas, Dr. Ouaou testified that schizotypal and delusional disorders are on the same spectrum, but these diseases are not necessarily psychotic disorders.[8]

Dr. Ouaou opined that Madison understands the charges against him, the roles of the judge, the prosecutor and the defense, and the potential consequences he is facing.   However, he opined that Madison could not meaningfully assist counsel in providing details of his life history because he has delusions about what he has done and he reports relationships with people that do not appear

---

[8] Dr. Ouaou testified that he did not have sufficient information to determine whether Madison had a schizoaffective disorder.

to exist.[9]   Accordingly, Dr. Ouaou opined that Madison could not accurately assist in his own defense.   For this reason, he concluded that Madison was not competent to stand trial.   In response to questions about whether Madison could be restored to competency, Dr. Ouaou testified that there is some possibility that anti-psychotic medication might help Madison.

<u>Dr. Valerie McClain.</u>

Dr. McClain interviewed Madison on four dates over approximately one year.   Counsel for Madison and their investigator were present at her last two meetings with Madison.   She also conducted interviews with Madison's brothers and his paternal uncle and reviewed documents and tangible items listed in her report.   Additionally, she reviewed raw data and the reports of Dr. Buigas and Dr. Ouaou, the PowerPoint presentation of Dr. Wu, and she spoke to Dr. Wu by telephone.   Dr. McClain did not perform any psychological testing.

During her meetings with Madison, he was oriented to person, place, purpose and time, but his thought processes were tangential and hypomanic.   She did not detect any malingering.   His affect was variable, alternating, sometimes very quickly, between expansive mood and depressive periods with tearfulness and deep sighing.   His speech and language were mildly pressured.   He denied any history of auditory or visual hallucinations.   Over the year that Dr. McClain met with Madison, she observed that his presentation had become depressive with a flattened and vacant affect and that it required more prompting to get him to interact.

Dr. McClain summarized Madison's medical history, which includes coronary artery disease and hypertension.   Madison also exhibited symptoms of Pica as a child when he consumed non-edible substances including coal ash.   Dr. McClain also summarized records of MVAs in

---

[9] Dr. Ouaou testified that he did not know whether Madison could otherwise assist in his defense. He testified that if, for instance, a tactical decision required Madison to accept information that went against his delusional beliefs, Madison could not set aside his delusional beliefs to make the decision.

which Madison was involved in 1978 and 2004 in which Madison suffered head injuries.   She reported that Madison had a sleep disturbance documented by one treatment note in which Trazadone was prescribed.

As for psychological history, Madison reported a history of mood swings alternating between depression and manic periods with racing thoughts and insomnia.   Madison stated that he had been raped in the past, which he attempted to block from his memory because it caused him emotional distress.   Madison reported having counseling in 2013 with a licensed mental health counselor related to a charge of domestic battery.   The focus of the counseling was on anger management and addressing Madison's history of sexual assault.   Madison reported that during the period leading up to his arrest, he drove for days in a row without sleeping except for a brief stop at a rest area, where he became paranoid that he was being watched by an SUV parked nearby.

Regarding family history, Madison stated, among other things, that his father was an alcoholic.   Madison reported that he had married multiple times and had eight children.   He stated that he owned a multi-million dollar company, but Madison's family members told Dr. McClain that after the military Madison had not been able to adapt and hold a job.   Madison also referred to a friend, "Mr. B," who had mafia associations and who would assist him in the case.   Madison's family members did not believe that Mr. B existed.

Madison told Dr. McClain that he was a high school graduate and that he had been an above average student.   He also reported that he had a college degree from Eastern Kentucky University. Records Dr. McClain reviewed, however, showed that Madison's high school grades were average at best and that Madison did not have a college degree.   Madison also stated that he served two enlistments in the Army in which he had special combat training as a Ranger.   He reported that he was honorably discharged.   However, Madison's brother told Dr. McClain that Madison had gone

AWOL twice and that family had driven him back to the base.   Additionally, records Dr. McClain reviewed showed that Madison was discharged from the Army for being AWOL.   Dr. McClain opined that Madison's beliefs about his academic and military history were delusional.

Dr. McClain opined that Madison had delusions, sometimes with perceptual disturbances (visual or auditory hallucinations), related to his hyper-religiosity.   Madison's brother stated that Madison believed that hurricanes were God's wrath for him being held in custody.   Madison reported to Dr. McClain that during the time he met with his wife before her death she was surrounded by a spiritual aura, that he heard God talk to his wife, that he spoke to God and that God spoke to him (including directing him where to bury his wife), and that Jesus divined certain things to occur.   Dr. McClain opined that Madison's religious beliefs are all consuming and color every aspect of his life.   She testified that Madison's hyper-religiosity is consistent with Dr. Wu's brain imaging studies suggesting that Madison may suffer from an epileptic spectrum disorder.   She also testified that her opinion regarding Madison's hyper-religiosity is supported by the elevated L value on the MMPI-2-RF test, which test result is consistent with a person believing that he is good and could not be bad despite evidence to the contrary

During her last two meetings with Madison, Dr. McClain observed his interaction with counsel.   She wrote, "Each time his delusions were challenged he would respond with grand conspiracy theories, that evidence was untrue or fabricated, or that records were consistently wrong."

Dr. McClain also observed that Madison had difficulty with temporal sequencing, that is, putting events in context within a time frame.   When counsel tried to lead Madison through a timeline, he had no independent recollection of dates and context of events.   Dr. McClain opined that this difficulty is the result of both short term and remote memory deficits.   She also observed

that Madison fixated on certain evidence and information to the point that it was difficult to redirect him to the broader topic being discussed.   For example, when shown a document written by his wife, Madison had a complete breakdown to the point that Dr. McClain feared he might completely decompensate.

Dr. McClain diagnosed Madison with a number of mental impairments.   She opined that Madison suffers from a schizoaffective disorder, bipolar type.   This is a mood disorder that includes specific periods of psychotic break in which a person is experiencing delusional beliefs, with auditory or visual hallucinations.   Symptoms of this disorder include his belief that he could hear and see God directing his actions and an underlying paranoia about the accuracy of information presented to him.

When pushed to identify a period of psychotic break, Dr. McClain relied on the Army record that showed that Madison had an emotional breakdown and Madison's family reports that Madison's personality was different after he left the military.   She also referred to the change in Madison's performance on the Army aptitude tests which, she opined, suggested that some acute trauma occurred between the two tests.   She acknowledged, however, that there were no details about the type or severity of the breakdown and that lower results on the second aptitude test could also be the result of non-traumatic factors, such as fatigue.

Dr. McClain also diagnosed a delusional disorder based on Madison's grandiose beliefs concerning his accomplishments, his affiliations with important people (such as Mr. B) and his conspiracy theories.   She further opined that Madison has PTSD as a result of the sexual assault. Finally, she opined that Madison had a mild neurocognitive disorder from diffuse brain damage, which is in the beginning stages of a dementia-type process.

Dr. McClain testified that her opinions were consistent with the opinions of Drs. Ouaou, Wu and Buigas.  She indicated that individuals with schizotypal and paranoid mental diseases present as odd and eccentric.  Schizoaffective disorder applies when these presentations are a daily occurrence with mood swings (which are not part of a personality disorder) and psychotic episodes (auditory and visual hallucinations).  When questioned about whether Madison presently had present auditory or visual hallucinations, Dr. McClain testified that Madison did not experience actual hallucinations during her interaction with him.

Regarding Madison's competency, Dr. McClain addressed six elements in her report: appreciation of the charges; appreciation of the range and nature of possible penalties; understanding the adversarial nature of the legal process; capacity to disclose to attorney pertinent facts; ability to manifest appropriate courtroom behavior; and, capacity to testify relevantly.  She opined that Madison's abilities in all categories except appreciation of the charges, capacity to disclose to attorney pertinent facts, and the capacity to testify relevantly were acceptable.

In the category of appreciation of the charges, Dr. McClain testified that Madison's impairment in the ability to rationally process information and evidence raised a concern about his ability to understand the possibility that he could be convicted at trial.  Therefore, she found that his ability to appreciate the charges against him was marginal.

In the categories of the capacity to disclose pertinent facts to attorneys and to testify relevantly[10], Dr. McClain found that Madison's abilities were unacceptable due to his inability to set aside delusional beliefs which, when challenged, caused him to not be able to focus on anything else.  On cross-examination, however, Dr. McClain acknowledged that she had watched a video-

---

[10]  Dr. Buigas and Dr. McClain testified that the ability to testify relevantly was not a component of the *Dusky* standard.  Dr. McClain testified that she included this category in her report at the request of defense counsel.

recording of a law enforcement interview of Madison after he was arrested in which he did change his position after being presented with alternative facts.[11]   Specifically, Madison initially stated that his wife was fine and with Mr. B but, after being presented with other information, he admitted that his wife was dead, and he led law enforcement officers to her burial site.

Dr. McClain also opined that Madison's capacity to provide information to his attorneys and to testify relevantly was impaired by his difficulty processing information.   Dr. McClain testified that as a result of Madison's limited verbal skills and impaired executing functioning, his ability to process information and respond to questions from counsel would be impeded.   Specifically, she testified that it would be difficult for Madison to actively process testimony, retrieve information stored in his memory and provide that information to counsel to help in cross-examination of witnesses.

When asked about the results of the ECST-R test of legal competency, Dr. McClain testified that the test addressed Madison's rational and factual understanding in the context of a hypothetical set of facts, not the facts underlying his case.   She testified that the competency finding on that test would be undermined by Madison's responses to the facts at issue, which trigger his delusions and breakdowns.   However, she did not administer a test of legal competence using the facts in the case to determine whether her hypothesis that the objective competency finding would change if the test were based on the facts of the case could be proven.

For all of these reasons, Dr. McClain opined that Madison is not competent to stand trial. She testified that the prognosis that Madison could be restored to competency with medication and counseling was guarded.   In her experience, people with head injuries and an intractable belief in

---

[11] The video-recording was not shown or entered into evidence at the hearing.

facts that can be objectively disproved do not have sufficient insight to permit progress in cognitive therapy.

### ANALYSIS.

A defendant is incompetent if (1) he is presently suffering from a mental disease or defect that results in his (2) inability understand the nature and consequences of the proceedings against him or (3) to assist properly in his defense.   Stated differently, the question is whether, due to a mental disease or defect, "the defendant had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he had 'a rational as well as factual understanding of the proceedings against him.'"   *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986)(quoting *Dusky*, 362 U.S. at 402).

As to the first factor, all of the experts agree that Madison is presently suffering from a mental disease or defect.

As to the third factor, Dr. Buigas and Dr. Ouaou testified that Madison has a rational and factual understanding of the proceedings against him.   Dr. McClain considered Madison's ability in this area to be marginal because she was concerned that Madison did not understand that he could be convicted at trial.   Other evidence in the record alleviates Dr. McClain's concern.   In discussions with Dr. Buigas, Madison stated his understanding that he faced the possibility of life imprisonment and the death penalty.   Therefore, the record as a whole establishes by a preponderance of the evidence that Madison has a rational as well as factual understanding of the proceedings against him and the consequences he faces.

As to the second factor, Dr. Buigas opined that Madison has the present ability to consult with his lawyer with a reasonable degree of rational understanding.   Dr. Ouaou opined that Madison did not have this ability to the extent that it required him to provide accurate information about his

life history or to make tactical decisions that required him to set aside his delusional beliefs.   Dr. McClain testified that Madison did not have the ability to assist properly in his defense due to his delusional beliefs and his impairment in processing information.   Therefore, the Court must determine which of these competing opinions to credit.

Dr. Buigas was the only professional to administer tests of legal competency.   On both tests, Madison's scores indicated that he was competent, and the ECST-R test reflected that Madison had the present capacity to assist in his defense.   Dr. Ouaou did not disagree with the outcomes of those tests except to note that he did not know whether the tests addressed Madison's ability to provide accurate information about his life history.   While Dr. McClain speculated that the ECST-R could not accurately gauge Madison's ability to assist counsel because the test was based on hypothetical questions rather than the facts of the case that trigger Madison's delusional thinking, she did not administer any objective test to prove this hypothesis.   Moreover, Dr. Buigas's report reflects that Madison was able to provide specific details about his view of the facts underlying his case without decompensating.

Dr. Ouaou and Dr. McClain also opined that Madison's inability to set aside his delusional beliefs undermined his ability to assist properly in his defense.   However, the testimony about the video-recording of Madison's post-arrest interview is compelling evidence that Madison has been able to set aside delusional beliefs when presented with alternative facts.

Dr. McClain also opined that Madison's information processing impairment would undermine his ability to assist properly in his defense.   Dr. Ouaou testified that on some tests of executive functioning, Madison was impaired but on other tests of executive functioning Madison scored in the average range.   Dr. Ouaou also testified that focus and flexible attention tasks are related to visual-spatial functioning, on which Madison scored very well (high average).

Madison's processing speed, working memory and visual memory were average.   Madison's ability to hold auditory and visual-spatial information in "temporary storage" in his memory were also average.   And, while testing revealed that Madison rapidly forgot newly learned material, his scores improved with cues to help him recall the information.[12]   Therefore, Dr. Ouaou's test results do not provide objective support for Dr. McClain's opinion that Madison's impairment in processing information deprives him of the present capacity to assist his counsel properly at trial.

Furthermore, I give little weight to Dr. McClain's opinions generally because they are not adequately supported by the record.   Dr. McClain relied on mere wisps of facts in the record to support her opinions that Madison's mental impairments were more severe that those identified by Dr. Buigas and Dr. Ouaou.   For example, to support her conclusion that Madison had a psychotic break, she pointed to a military record that Madison had an emotional breakdown and to his poorer performance on the second Army aptitude test than the first.   On cross-examination, however, she acknowledged that there was no evidence of the nature and degree of the reported emotional breakdown, and she agreed that Madison's poor performance on the second aptitude test could have been the result of factors other than a psychotic break.   She also did not address the video-recording of Madison's post-arrest interview when she testified on direct examination.   When cross-examined about that recording, she conceded that it showed that Madison changed his position after being presented with alternate facts.

Dr. McClain's opinions also reflect a defense bias.   She appears to credit many of Madison's reports of his actions and beliefs uncritically.   For example, she relied on Madison's reports of seeing auras and hearing God as actual hallucinations, rather than symbolic statements of

---

[12] Such cues are available during a trial, including real-time or expedited transcripts of the trial and copies of the exhibits introduced at trial.

his religious beliefs, even though she testified that that she did not observe Madison experience hallucinations during her interaction with him.   She also credited Madison's report that he had not slept for days after his wife's death by citing one prescription for Trazadone, without acknowledging evidence that Madison had not had any sleep difficulties while held at the Federal Detention Center in Miami, Florida.   Finally, she included the ability to testify relevantly in her competency evaluation because counsel for Madison asked her to do so, even though she testified that this factor is not a specific consideration set forth in *Dusky*.

In sum, Dr. Buigas's opinion that Madison is able to assist properly in his defense is supported by his subjective observations and objective testing.   Dr. Ouaou's objective tests show that Madison is not impaired in all aspects of the ability to process information and the video recording of Madison's post-arrest interview establishes that Madison has the capacity to set aside delusional beliefs when presented with alternative facts.[13]   Dr. McClain's opinions to the contrary are not credible.   For these reasons, the preponderance of the evidence establishes that Madison has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and, therefore, to assist properly in his defense.

For these reasons, I **RESPECTFULLY RECOMMEND** that the Court find that Madison is competent to stand trial.[14]

A party waives the right to challenge on appeal a finding of fact or conclusion of law adopted by the district judge if the party fails to object to that finding or conclusion within fourteen days

---

[13]  Dr. Ouaou did not list this video recording in his report as information he was given to review.

[14]  Should the Court conclude that Madison is not presently competent to stand trial, the Court must commit Madison to the custody of the Attorney General for hospitalization for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable further he will attain the capacity to permit the proceedings to go forward.   18 U.S.C. § 4241(d)(1).

after issuance of the Report and Recommendation containing the finding or conclusion.   **A party objecting to this Report and Recommendation must file a copy of the complete transcript of the evidentiary hearing simultaneously with the filing of the objection.**

Recommended in Orlando, Florida on January 22, 2018.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy