**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

**VS.**                                                **CASE NO: 6:17-cr-15-Orl-37KRS**

**JARVIS WAYNE MADISON**

---

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

### INTRODUCTION.

On August 10, 2017, counsel for Defendant, Jarvis Wayne Madison, filed a motion for the Court to have Madison examined to determine if he was competent to stand trial pursuant to 18 U.S.C. § 4241. Doc. No. 68. Following the competency evaluation, I held an evidentiary hearing on the issue of competency on January 10 and 12, 2018. Doc. Nos. 163, 178. After consideration of the evidence, I recommended that the Court find Madison competent. Doc. No. 189. Defense counsel objected to the Report and Recommendation. Doc. No. 205. On March 6, 2018, the Court adopted the Report and Recommendation and found Madison competent to stand trial. Doc. No. 225.

On July 24, 2018, counsel for Defendant filed a renewed motion for a competency determination. Doc. No. 339. They presented a report from Bushan S. Agharkar, M.D., a psychiatrist, who examined Madison on June 26, 2018 and determined that Madison was not competent to stand trial. Doc. No. 339-1. Accordingly, the defense asked for another competency hearing. Doc. No. 339. On July 31, 2018, the Court again committed Madison to the custody of the Attorney General pursuant to 18 U.S.C. §§ 4241(b) and 4247(b) for a competency evaluation,

which was conducted at a Federal Correctional Institution in Butner, North Carolina ("FCI Butner I"). The Court required me to hold a competency hearing within fourteen days after receipt of the examiner's report. Doc. No. 348.

Justin Rigsbee, Ph.D., Psy.D., examined Madison at FCI Butner I. Dr. Rigsbee issued a report on September 24, 2018, which the Court ultimately considered in redacted form. Doc. Nos. 403, 404, 407. While in transit to the Middle District of Florida, Madison was hospitalized in Oklahoma City, Oklahoma. After Madison was returned to the Middle District of Florida, Dr. Agharkar examined him again on October 10, 2018, and Robert H. Ouaou, Ph.D., a neuropsychologist, examined Madison on October 11, 2018.[1] Tr. 126, 191.[2]

I held an evidentiary hearing on competency on October 15, 2018. Dr. Rigsbee, Dr. Agharkar and Dr. Ouaou testified at the hearing, and their respective reports of examination were admitted into evidence (with Dr. Rigsbee's report redacted as ordered by the Court). Records of medical treatment of Madison from September 22 to September 25, 2018 at Integris Southwest Medical Center, Oklahoma City, Oklahoma ("Integris Medical Center") were also admitted into evidence. Finally, declarations of Todd Doss, Esq., Larry Henderson, Esq., and Lesley White, a clinical social worker employed by the Office of the Federal Defender, were admitted into evidence under seal. Doc. Nos. 411, 412.

Accordingly, the issue of competency is ripe for review.

## LEGAL STANDARD.

Section 4241 of the United States Code provides that if, after a hearing, the Court "finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or

---

[1] Dr. Ouaou had previously examined Madison in connection with the original competency determination.

[2] I cite to the transcript filed at Doc. No. 412, as "Tr." followed by the page number.

defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General" for such a reasonable time as is necessary to determine whether there is a substantial probability that in the foreseeable future he will be restored to competency.   18 U.S.C. § 4241(d).   Section 4241 codifies the standard for competency set forth by the United States Supreme Court in *Dusky v. United States*, 362 U.S. 402 (1960).   Madison bears the burden of proving that he is presently not competent to stand trial.   *See United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011)(stating that a party raising a substantive claim of incompetency must demonstrate his incompetence by a preponderance of the evidence)(citing *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995))).

As discussed herein, there is no dispute that Madison presently suffers both from a mental defect (traumatic brain injury) and mental diseases.   Nevertheless, "'[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.'"   *Medina*, 59 F.3d at 1107 (quoting *Card v. Singletary*, 981 F.2d 481, 487–88 (11th Cir. 1992)).

"'The determination of whether a defendant is mentally competent to stand trial is a question left to the sound discretion of the district court, with the advice of psychiatrists [or other mental health professionals].   The medical opinion of experts as to the competency of a defendant to stand trial is not binding on the court, since the law imposes the duty and responsibility for making the ultimate decision of such a legal question on the court and not upon medical experts.'"   *United States v. Abernathy*, No. 08-20103, 2009 WL 982794, at \*3 (E.D. Mich. Apr. 13, 2009) (first quoting Fed. Proc. § 22:549 (Hearing and Determination as to Competency); then citing *United States v. Davis*, 365 F.2d 251, 256 (6th Cir. 1966)).

**SUMMARY OF THE EVIDENCE**.

With agreement of counsel, I have considered the evidence submitted at the first competency hearing, which evidence is summarized in a Report and Recommendation. Doc. No. 189. I will summarize some of the testimony and evidence from the October 15, 2018 competency hearing in this Report and Recommendation.[3]

### Dr. Rigsbee.[4]

Dr. Rigsbee evaluated Madison at FCI Butner I from August 9 through September 18, 2018. Tr. 7, 15. He met with Madison 16 times for a total of 14.36 hours. Tr. 17. He interviewed Madison and administered psychological tests. *Id.* He also reviewed records provided to him by the United States and by defense counsel. Tr. 18.

The results of an MCMI-IV test were consistent with individuals who get involved in difficult interpersonal relationships, have unrealistic expectations of others, and who may be unwilling to self-examine their role in difficult situations of prolonged distress and may react by behaving in an erratic manner. Tr. 32-33. Dr. Rigsbee opined based on the MCMI-IV test results that Madison can present as animated at times and belligerent at other times. He explained that Madison exhibits preoccupation with fantasies of success, and he takes liberties with objective reality. Tr. 33-34. On the Thurstone Word Fluency test, which is a screening measure of executive functioning,[5] Madison scored in the average range. Tr. 35-37. This result was

---

[3] I have considered all of the evidence presented, including evidence that I have not discussed in this summary.

[4] Dr. Rigsbee obtained a bachelor's degree in psychology from Florida Atlantic University and a Ph.D. and Psy.D. in clinical psychology with concentration in forensics from Nova Southeastern University. He has worked in a number of positions at the Bureau of Prisons. *See* Gov't Ex. 1 (Dr. Rigsbee's CV). I found Dr. Rigsbee qualified as an expert in forensic psychology. Tr. 14.

[5] The frontal lobe of the brain controls executive functioning. Executive functioning deals with cognitive abilities such as judgment, planning and decision-making. Tr. 36.

consistent with the observations of Dr. Rigsbee and staff at FCI Butner I that Madison was able to function well in the open prison compound, including playing chess and teaching others to play chess.   Tr. 38, 47.   Finally, the Validity Indicator Profile ("VIP"), which assesses a person's effort or motivation on cognitive measures, showed that Madison was putting forth good effort.   Tr. 38-39.

With respect to legal competency, Dr. Rigsbee administered the MacArthur Competence Assessment Tool for Criminal Adjudication ("MacCAT-CA"), which tests understanding, reasoning and appreciation of legal circumstances.   Tr. 58-60.   Test results suggested that Madison had minimal/no impairment in understanding and reasoning.   He knew the roles of the participants in criminal proceedings, and he was able to discern facts that were relevant from a vignette.   Tr. 60-62.   Madison's score regarding appreciation of his legal circumstances was lower in part because he provided contradictory answers.   For example, he stated that he was less likely to be treated fairly than others, but he stated that he was likely to receive less punishment than others. Accordingly, Dr. Rigsbee concluded that Madison had a mild impairment in appreciation of his legal circumstances.   Tr. 62-64.   Dr. Rigsbee administered the Georgia Court Competency Test – Mississippi State Hospital ("GCCT-MSH"), which assesses legal knowledge.   Madison scored consistently with individuals who are competent to stand trial.   Tr. 65-67.   Dr. Rigsbee also administered the Inventory of Legal Knowledge Test ("ILK"), which demonstrated that Madison put forth sufficient effort during the testing of his knowledge of the legal system.   Tr. 67-68.

Dr. Rigsbee's assessment was that Madison suffered from a paranoid personality disorder and other specified personality disorder (schizotypal, antisocial, and narcissistic features).   Tr. 39-41.   He explained that a personality disorder was consistent with Madison's pervasive distrust and his suspicion of the motives of others.   He testified that paranoia was consistent with Madison's

belief, without a sufficient basis in fact, that others intended to do him harm.   Dr. Rigsbee's other specified personality disorder assessment is based on Madison's overelaboration in his answers to Dr. Rigsbee's questions.   It is also based on Madison's idiosyncratic beliefs or magical thinking. Madison also displayed deceitfulness, which was consistent with a diagnosis of antisocial personality disorder, but Dr. Rigsbee noted that he did not have sufficient information to conclusively establish that diagnosis.   Tr. 41-44.

Although other professional opinions rendered in connection with the original competency evaluation addressed schizoaffective disorder, Dr. Rigsbee opined that Madison did not have a schizoaffective disorder.   He explained that this diagnosis would require evidence of an uninterrupted illness during which there is a major mood episode, which could be manic or depressive.   Tr. 46-47.   Dr. Rigsbee did not observe characteristics of this disorder, such as disorganized speech and auditory or visual hallucinations.   Tr. 46-49.   Dr. Rigsbee also opined that Madison did not have a delusional disorder[6] because, when pressed, Madison would acknowledge some leeway in some of his beliefs.   For example, after Madison reported that his wife's stepfather had altered certain records, he later admitted that he did not know that for a fact.   Tr. 27-28, 44-45. Finally, Dr. Rigsbee opined that Madison did not suffer from PTSD even though he had been the victim of sexual assault because he did not display the additional symptoms necessary to support that diagnosis.   Tr. 49-50.

In sum, Dr. Rigsbee opined that Madison was competent to stand trial, including being meaningfully able to provide information and confer with his counsel.   Tr. 68-69.   Dr. Rigsbee testified that he had not examined Madison since he left FCI Butner I, and that his opinion on

---

[6] Dr. Rigsbee defined a delusion as a fixed belief or set of beliefs that a person holds contrary to evidence.   Tr. 26.   He explained that paranoia is a belief that someone or some entity intends to cause a person harm.   Tr. 40.

Madison's competence was limited to the period of his evaluation of Madison at FCI Butner I.   Tr. 112.

Intervening Medical Event.

After Madison left FCI Butner I and was being transported back to this District, he experienced chest pains.   Def's Ex. 1, at D00247.   He was admitted to Integris Medical Center on September 22, 2018.   *Id.* at D00217.   Medical records reflect that at the time of his admission, Madison had some mild weakness and mild left facial droop.   *Id.* at D00281.   A treatment note reflects that Madison had left leg weakness likely from a small remote infarct in the subcortex of the right cerebral hemisphere of his brain.   *Id.* at D00239.   A CT scan of Madison's head revealed "a small hypodensity in the posterior limb of the internal capsule that could be a new acute stroke or related to small vessel disease."   *Id.* at D00240.   An MRI of the brain showed small vessel ischemic changes and changes in the right cerebral hemisphere that might represent a remote infarct. *Id.* at 00239.

Treatment notes also reflect that Madison's intelligibility of speech was reduced; he had short-term memory deficits and reduced planning skills; he was mildly disorganized; and his processing speed was delayed.   *Id.* at D00283, D00414-15.   He also had mildly impaired vision. *Id.* at D00403.   Madison was given mandatory stroke education.   *Id.* at D00462.

A speech-language pathologist ("SLP") examined Madison on September 24, 2108 and asked him to complete tasks of thought recognition, sequencing, problem solving, immediate and delayed recall, and confrontation naming.   Madison required additional processing time for all tasks, and he required some cues to complete the short-term memory task.   The tasks were completed adequately when given additional time.   The SLP observed that Madison's speech intelligibility was decreased secondary to moderately decreased vocal intensity and Madison could

not increase the volume of his speech.  *Id.* at D00452.  The notes reflect reduced planning skills, delayed processing speed and deficits in short-term memory.  *Id.* at D00454.

Madison was discharged on September 25, 2018.  *Id.* at D00268.

### Dr. Agharkar and Dr. Ouaou.

Dr. Agharkar and Dr. Ouaou testified after review of the Integris Medical Center records that Madison suffered a mini-stroke.  Tr. 126, 194.  Dr. Agharkar consulted with a neurologist who saw deterioration in the newest scans of Madison's brain, which was significantly different from previous scans, indicating deterioration in the frontal and temporal lobes of the brain.  Tr. 130-31.  Both Dr. Agharkar and Dr. Ouaou testified about the differences in Madison's functional capacity based on their evaluations of him before the mini-stroke and after the mini-stroke, as summarized below.

### Dr. Ouaou.[7]

In May and December 2017, Dr. Ouaou examined Madison and administered various psychological tests.  The results of his examination are summarized in my previous Report and Recommendation addressing competency.  Doc. No. 189.  Dr. Ouaou examined Madison again on October 11, 2018, at which time he administered a comprehensive battery of tests to assess Madison's intelligence, executive functioning, memory, grip strength, fine motor speed and coordination.  Tr. 191, 195-98.

Dr. Ouaou noted that Madison was less attentive, more difficult to follow and more tangential in conversation on October 11.  He would forget questions Dr. Ouaou asked, and Dr.

---

[7] Dr. Ouaou has a bachelor's degree with honors in psychology from Temple University.  He was awarded a master's degree and Ph.D. from Palo Alto University, which is affiliated with Stanford University. He completed a two-year post-doctoral fellowship in neuropsychology and behavioral neuropsychology.  He testified that he had worked on the stroke unit at a hospital in Naples, Florida evaluating both acute and more chronic patients.  I found him qualified as an expert in forensic psychology and neuropsychology.  Tr. 189-90, 192.

Ouaou was often unable to redirect him to the topic of the question. Madison was almost unable to answer some questions due to "thought blocking," that is, an inability to complete a thought mid-sentence. Madison also had an appreciable difference in his ability regarding word retrieval; he could describe something but not name it. Tr. 205-06.

Testing conducted by Dr. Ouaou confirmed that Madison had significant decline in functioning following his mini-stroke. Madison's grip strength on the left was below the 1st percentile, which correlated with a mini-stroke in the right hemisphere of the brain. Tr. 199-200. His working memory and processing ability dropped from the 34th percentile to the 23rd percentile, indicating that he would think more slowly and his attention and concentration may be diminished. Notably, his immediate memory was reduced from the 32nd percentile to the 1st percentile, reflecting that Madison was not absorbing information as efficiently as he had previously. Tr. 200-02. On the Delis-Kaplan Executive Functioning test, which assesses organizing, processing, speed, planning, sequencing and linear thought, Madison showed consistent decline except in the area of verbal fluency. In the domains of organizing thoughts, inhibition and planning, Madison's scores ranged from low average to severely impaired. Tr. 202-03. Nevertheless, Dr. Ouaou believed that Madison understood the nature and consequences of the proceedings against him. Tr. 214.

In 2017, Dr. Ouaou noted that Madison's main problem was the ability to provide truthful and accurate information. Tr. 209. Dr. Ouaou opined that, following the mini-stroke, Madison now has difficulty processing information and conveying information. His ability to focus is also diminished. Tr. 210-12. These limitations would make it difficult for him to testify relevantly and process questions from his lawyers and the prosecutors. Dr. Ouaou did not believe that proceeding more slowly or repeating questions would help. Tr. 213-14. Based on the October 11 examination and testing, Dr. Ouaou opined that Madison is suffering from a mental disease or defect that renders

him presently unable to assist properly in his defense.   Therefore, Dr. Ouaou concluded that

Madison was not competent to stand trial.   Tr. 209.

Dr. Agharkar.

Dr. Agharkar first examined Madison on June 26, 2018 for approximately 2.25 hours.[8]   His

report of the results of this initial examination is contained in the record.   Doc. No. 339-1.

During his initial examination, Dr. Agharkar observed that Madison's affect was restricted.

Madison's thought processes were extremely tangential, and he required frequent redirection.   He

was over-inclusive of detail (often referred to as poverty of content) and he would often perseverate

on topics (that is, getting "stuck" on an idea and returning to it repeatedly and out-of-context).

These symptoms are consistent with thought disorder in psychotic conditions and often observed in

people with brain dysfunction.   Madison also related historical information that was not supported

by records and that was delusional in nature, including his education, his military service and his

relationship with "Mr. B."   Madison insisted that these facts were true despite being shown

evidence to the contrary.[9]   Dr. Agharkar observed that this reflects paranoia, grandiosity and

disorganization.   Madison also reported seeing visions of dead spirits and Satan, but he denied

visual or auditory hallucinations.   He described periods of elevated mood, decreased need for sleep,

increased energy and distractibility.   Dr. Agharkar also noted that Madison was unable to

---

[8] Dr. Agharkar is a psychiatrist with degrees from Case Western University and Emory University. He has treated patients in private practice.   He has worked in student health centers and community health centers; he was also the director of a residential treatment facility.   He is on the teaching faculty of two universities.   Dr. Agharkar has testified as a forensic and adult psychiatrist 80 to 90 times.   He regularly conducts competency assessments and has completed approximately 1100 such assessments in his career.   I found him qualified as an expert in adult and forensic psychiatry.   Tr. 123-25.

[9] When cross-examined about a post-arrest interview in which Madison first told law enforcement officers that his wife was with Mr. B, but then later revealed that she was not with Mr. B, Dr. Agharkar observed that Madison never abandoned his delusional belief that Mr. B existed.   The recording of this video interview was not introduced during the competency hearing.   Tr. 169-71.

understand the concept of kidnapping under the facts of his case because he believed that a husband could not kidnap his wife.   *Id.* at 3-4.

Dr. Agharkar opined that Madison most likely suffers from a schizoaffective disorder, bipolar type and a minor neurocognitive disorder.   It is also possible that Madison has a psychotic and mood disorder from brain damage rather than a primary psychotic disorder based on his history of traumatic brain injuries and uncontrolled high blood pressure.   He opined that these physical problems "likely [have] resulted in brain damage/strokes which [have] fueled his delusional beliefs."

*Id.* at 5.   He wrote in his report,

> MRI imaging confirms significant vascular damage in Mr. Madison's brain and both imaging and neuropsychological testing confirm frontal and temporal lobe brain damage.   Damage in these areas results in problems with memory and retention of new information as well as difficulties in executive functioning.   Problems in executive functioning result in difficulties in impulse inhibition, rational weighing and deliberating options, freedom from perseveration, understanding the future consequences of behaviors, and organizing and sequencing thoughts and behaviors. Paranoia is often a sign of frontal lobe damage as well.

*Id.*

Dr. Agharkar concluded that Madison was not competent to stand trial.   While Madison showed a factual awareness of the charges against him, "he could not be educated or moved off his false understanding of what constitutes kidnapping" and, therefore, he "does not have a rational understanding of the charges nor the ability to engage in a rational dialogue about his case or the facts and charges."   *Id.* at 6.   Dr. Agharkar also opined based on information provided by defense counsel that Madison could not rationally assist in his defense.   *Id.*

Dr. Agharkar examined Madison again on October 10, 2018 for 2 hours.   Tr. 126, 132.   He observed that Madison became disorganized in his thinking after about 10 minutes.   Madison could not remember Dr. Agharkar's questions.   Madison exhibited thought-blocking by stopping mid-sentence because he could not recall what he was going to say.   He also had difficulty finding words

to express his thoughts.   Tr. 133.   Dr. Agharkar asked open-ended questions.   Madison was not able to logically respond to those questions, quickly devolving to side topics.   Tr. 134.

Madison continued to express grandiose beliefs and paranoid delusions and to present demonstrably false information as fact.   Dr. Agharkar testified that false memory is a sign of brain damage.   Tr. 135-36.   Madison reported that God talked to him, including telling him that he would not receive the death penalty.   Dr. Agharkar opined that Madison experienced these communications from God as auditory hallucinations.   Madison also reported that he asked God to send his wrath on Florida and North Carolina through hurricanes, and God did so.   Dr. Agharkar testified that this representation was both delusional and psychotic.   Tr. 137-38.

As for Madison's ability to comprehend the nature and consequences of the proceedings against him, Dr. Agharkar testified that Madison was able to correctly explain the nature of the proceedings in 2017, but on October 10, 2018, Madison was no longer able to distinguish between the roles of the judge and the jury.   He indicated that the job of both the judge and jury was to hear evidence and make decisions.   He also stated that the jury could find a person guilty or not guilty beyond a reasonable doubt.   In addition, Madison could not explain why witnesses would be called to testify.   Rather, he indicated that the role of a witness was to answer whatever questions were asked.   Madison still did not have a rational understanding of kidnapping, continuing to assert that a husband could not kidnap his wife.   Tr. 140-142.   Dr. Agharkar opined that Madison was not malingering.   Tr. 142-44.

Dr. Agharkar opined that it was likely that damage to Madison's brain caused psychosis, that is, a break with reality.   His diagnoses continued to be schizoaffective disorder and a minor neurocognitive disorder.   Tr. 146-47, 154.   He observed that the term "minor" was a misnomer because the diagnosis was not insignificant.   It reflects that although a person can engage in

activities of daily living, the person is brain damaged.   Tr. 155.   Madison's thoughts were disorganized, he could not redirect himself even when prompted to do so, and the information he provided was overinclusive of detail.   Tr. 147-52, 155-56.

With respect to Madison's understanding of the nature and consequences of the proceedings against him, Dr. Agharkar testified that Madison can state the charges against him, but he does not understand how a husband could be found guilty of kidnapping his wife.   Because he believes that evidence against him is fabricated, Madison does not believe that he could be convicted at trial.   Tr. 161-62.

With respect to assisting properly in his defense, Dr. Agharkar opined that Madison's ability was significantly impaired.   Due to his delusional beliefs, he cannot provide accurate information to his attorneys.   He cannot distinguish relevant from irrelevant information.   Because he believes that he does not have a mental illness, he would not want his mental health to be used in his defense. He would not be able to testify in an intelligent, coherent and relevant manner.   Tr. 161-65, 175, 186-88.   Dr. Agharkar opined that these deficits were the result of Madison's mental defect and diseases, not voluntary choices by Madison.   Tr. 159-60.   Accordingly, Dr. Agharkar opined that Madison is not presently competent to stand trial.   Tr. 165.

In response to questions about whether Madison could be restored to competency, Dr. Agharkar testified that Madison's brain damage could not be reversed.   However, Dr. Agharkar suggested that Madison could be treated with mood stabilizers and anti-psychotic medication that might help slow the progression of his mental disease.   Tr. 180, 184-85.   Nevertheless, Dr. Agharkar opined that Madison has a progressive brain disease that will likely worsen over time. Tr. 185.

**ANALYSIS**.

A defendant is incompetent if (1) he is presently suffering from a mental disease or defect that results in his (2) inability to understand the nature and consequences of the proceedings against him or (3) the inability to assist properly in his defense.   Stated differently, the question is whether, due to a mental disease or defect, "the defendant [has] 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he [has] 'a rational as well as factual understanding of the proceedings against him.'"   *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986) (quoting *Dusky*, 362 U.S. at 402).

As to the first factor, all of the experts agree that Madison is presently suffering from a mental disease or defect.   Therefore, the issues to be resolved by the Court are whether Madison *presently* has a rational as well as factual understanding of the proceedings against him and the ability to consult with his lawyers with a reasonable degree of rational understanding.

Dr. Rigsbee candidly testified that his opinions are limited to the time Madison was at FCI Butner I, which was before Madison suffered the mini-stroke.   Therefore, Dr. Rigsbee's opinions carry little weight regarding Madison's current competency.

Both Dr. Ouaou and Dr. Agharkar examined Madison before and after his mini-stroke. Their opinions are consistent with one another with respect to Madison's ability to consult with his lawyers with a reasonable degree of rational understanding, and their opinions are supported by the battery of tests administered by Dr. Ouaou.   Therefore, I find that their opinions carry great weight.

With respect to whether Madison has a rational as well as factual understanding of the proceedings against him, the evidence showed that his capacity in this area diminished after he suffered the mini-stroke.   He can state the charges against him, but he does not rationally understand how he could be found guilty of kidnapping his wife.   He has a basic understanding of

the proceedings, but he has a delusional belief that will not receive the death penalty because God

told him so.   Nevertheless, Dr. Ouaou opined that Madison still has an understanding of the nature

of the charges and the proceedings against him.   Therefore, this factor may not support a finding of

incompetency.

As for whether Madison has a sufficient present ability to consult with his lawyers with a

reasonable degree of rational understanding, I consider the factors identified by the Court in *United*

*States v. Giraldo*, which this Court cited in its original competency order (Doc. No. 225, at 7).

> In determining whether the defendant has sufficient present ability to consult with
> [his] lawyer, courts have considered the following factors: 1) the state of the
> defendant's memory, since he should be able to relate pertinent facts, names and
> events to his attorneys (although the defendant need not remember every fact that
> trial might encompass); 2) the extent to which relevant evidence could be
> reconstructed from communications made by the defendant to his counsel or from
> independent sources; 3) an adequate ability to review and evaluate documents and
> other written evidence bearing on the case; 4) an appreciation of the Government's
> evidence against him; 5) the ability to consider the wisdom of taking a course other
> than standing trial on the merits; 6) the ability to decide objectively whether to
> exercise his constitutional right to take the stand, and if he does take the stand, the
> ability to testify in an intelligent, coherent and relevant manner; 7) the ability to
> remain sufficiently alert and responsive so as to follow and recognize any
> discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony
> with his attorneys and to postulate questions to the witnesses through counsel.

*United States v. Giraldo*, No. 2:09-cr-85-FtM-36SPC, 2011 WL 7946037, at *14 (M.D. Fla. Oct.

24, 2011) (citations omitted), *report and recommendation adopted,* 2012 WL 1890508 (M.D. Fla.

May 23, 2012).

The evidence presented by Dr. Ouaou and Dr. Agharkar establishes by a preponderance of

the evidence that Madison does not presently have the ability to consult with his lawyers with a

reasonable degree of rational understanding.   He has problems communicating (thought blocking

and word retrieval problems) that limit his ability to provide information to his counsel and to

discuss the testimony of witnesses and questions that should be posed.   His delusional beliefs and

perseveration prevent him from determining what facts are true and relevant to his case.   He cannot appreciate the Government's evidence against him in some respects because he believes that evidence has been altered or fabricated.   Accordingly, he cannot rationally weigh his choices to plead guilty or stand trial or decide whether to testify at trial.   If he testified at trial, he would not be able to do so in a relevant, coherent and intelligent manner due to his delusional beliefs, perseveration and the limited ability to redirect him to relevant testimony.   His limited ability to focus and short-term memory impairment would significantly reduce his ability to follow the trial proceedings.

For these reasons, I **RESPECTFULLY RECOMMEND** that the Court find that Madison presently is not competent to stand trial.   If the Court accepts this recommendation, 18 U.S.C. § 4241(d)(1) requires the Court to commit Madison to the custody of the Attorney General for hospitalization for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward.   I further **RECOMMEND** that the Court direct the Attorney General to commit Madison to a Federal Medical Center at which he can receive both medical and psychiatric/psychological treatment.

## Notice to the Parties.

A party has fourteen days from the date of this Report and Recommendation to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to

factual finding or legal conclusion the district judge adopts from the Report and Recommendation.

*See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on October 19, 2018.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy