# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                     **CASE NO: 6:17-cr-15-Orl-37LRH**

**JARVIS WAYNE MADISON**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This case is before the undersigned regarding the competency of Defendant Jarvis Wayne Madison.  For the reasons explained below, I find by a preponderance of the evidence that Jarvis Wayne Madison currently possesses a factual and rational understanding of the proceedings against him and a sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding.   I therefore **RESPECTFULLY RECOMMEND** that the Court find that Madison's competency has been restored and that he is competent to stand trial.

### I.   *Procedural Background*

On March 8, 2017, the grand jury returned a three-count superseding indictment charging Madison with:  (1) kidnapping in violation of 18 U.S.C. § 1201(a)(1); (2) interstate domestic violence in violation of 18 U.S.C. §§ 2261(a)(1) and (b)(1); and (3) interstate stalking in violation of 18 U.S.C. §§ 2261A(1), and 2261(b).  (Doc. 45).   On February 14, 2018, the grand jury returned a Second Superseding Indictment charging Madison with the same three offenses.  (Doc. 211).

Madison's counsel first raised the issue of his competency on August 10, 2017.  (Doc. 68). On August 15, 2017, the Court committed Madison to the custody of the Attorney General pursuant to 18 U.S.C. § 4241(b), for hospitalization and treatment to determine competency.  (Doc. 76).

Thereafter, on January 22, 2018, after conducting a two-day evidentiary hearing pursuant to 18 U.S.C. §§ 4241(a) and (c), Magistrate Judge Karla R. Spaulding issued a Report and Recommendation ("Report") recommending that Madison be found competent to proceed to trial. (Doc. 189).   Defense counsel objected to the Report (Doc. 205), and on March 6, 2018, United States District Judge Roy B. Dalton overruled the objections, adopted the Report, and found Madison competent to stand trial.   (Doc. 225).

On July 24, 2018, Madison's counsel filed a renewed motion for a competency determination and hearing.   (Doc. 339).   On July 31, 2018, the Court granted the request, and again committed Madison to the custody of the Attorney General pursuant 18 U.S.C. §§ 4241(b) and 4247(b) for a competency evaluation.   (Doc. 348).   Madison was transferred to the Federal Correctional Institution in Butner, North Carolina ("FCI Butner") and was evaluated at that facility.   While in transit back to the Middle District of Florida, Madison suffered a medical event and was hospitalized in Oklahoma City, Oklahoma.   He was ultimately returned to this District, was examined by two additional experts upon his return, and Judge Spaulding conducted an evidentiary hearing on Madison's competency to proceed on October 15, 2018.

On October 19, 2018, Judge Spaulding issued a Report recommending that the Court find Madison presently not competent to stand trial.   (Doc. 417).   That same day, the United States moved for an additional independent competency examination by a court-appointed expert.   (Doc. 414).   Judge Dalton granted the United States' motion on November 13, 2018, and the court-appointed expert conducted an examination, testing, and evaluation of Madison.   (Doc. 428). Judge Spaulding subsequently held a continuation of her October 15, 2018 competency hearing on December 12, 2018.   (Doc. 442).   That same day, Judge Spaulding issued a supplement to her

October 19, 2018 Report (Doc. 417), which renewed her original recommendation that the Court find Madison presently not competent to stand trial.   (Doc. 444).

Defense counsel raised partial objections to the Report (Doc. 453), and on December 28, 2018, Judge Dalton overruled the objections, adopted the Report, and committed Madison to the custody of the Attorney General pursuant to 18 U.S.C. §§ 4241(d) and 4247(b) for a reasonable period, as is necessary to determine whether there is a substantial probability in the foreseeable future that Madison will attain the capacity to permit the proceedings to go forward.   (Doc. 457).

Madison was transferred to the Federal Medical Center in Butner, North Carolina ("FMC Butner") in late February 2019, and he remained at FMC Butner until March 2020.   Madison's lengthy stay was due, in large part, to Madison's health issues, which included uncontrolled hypertension and cardiovascular surgery.   In early March 2020, the Court received a report from FMC Butner, dated March 5, 2020, which opined that Madison's competency had been restored. As a result, Madison was returned to the Middle District of Florida in late March 2020, and the case was referred to me to conduct a competency restoration evidentiary hearing.   *See* Docs. 486, 490.

On May 4, 2020, I established a competency litigation schedule, which set a deadline of July 31, 2020 for completion of all further testing, evaluations, and filing of expert reports, and an evidentiary hearing date of September 1-2, 2020.   (Doc. 514).   I later extended the expert report deadline to August 31, 2020 and rescheduled the evidentiary hearing to September 30 and October 1, 2020.   (Doc. 563).

Both sides timely submitted their respective expert reports, and the competency restoration hearing took place over three (3) days on September 30, 2020 and October 1-2, 2020.   (Docs. 626, 629, 631).[1]   The following professionals testified on behalf of the United States:   Kristina P. Lloyd,

---

[1]   At the commencement of the hearing, Madison's counsel renewed all objections

Psy.D., ABPP, a board-certified forensic psychologist employed at FMC Butner; Tracy O'Connor Pennuto, J.D., Ph.D., a neuropsychologist and licensed psychologist also employed at FMC Butner; and Patricia A. Zapf, Ph.D., a forensic psychologist and licensed psychologist. The following professionals testified on behalf of Madison: Jason Demery, Ph.D., ABPP, a board-certified clinical neuropsychologist; Travis Snyder, D.O., a licensed and board-certified neuroradiologist; Robert H. Ouaou, Ph.D., a licensed neuropsychologist; Valerie R. McClain, Psy.D., a licensed clinical psychologist with postdoctoral training in neuropsychology; and Bushan S. Agharkar, M.D., a licensed psychiatrist and forensic psychiatrist. Reports of examination from each of these professionals were admitted into evidence without objection. (Docs. 632, 633).[2] In addition, declarations from Todd Doss, Esq., and Lesley White, a clinical social worker employed by the Office of the Federal Defender, were admitted into evidence *ex parte* and under seal without objection. (Docs. 632-9, 632-10). I have also considered the previous Reports and Orders on Madison's competency, as well as the underlying evidence and testimony, all of which are part of the record of this case. (Docs. 189, 225, 417, 444, 457). Counsel for the parties also submitted legal authority for the Court's consideration both before and after the hearing. (Docs. 610, 612, 660, S-662, 663). This Report follows.

## II.    *Legal Standard*

"A defendant has a due process right not to be tried or convicted while incompetent." *United States v. Ramirez*, 491 F. App'x 65, 71 (11th Cir. 2012)[3] (citing *Drope v. Missouri*, 420 U.S.

---

previously raised relating to the competency restoration proceedings (from April 2020 to present). As stated on the record, all such objections are deemed reinstated and preserved for purposes of maintaining the record for possible appeal.

[2] These reports were originally filed under seal, however, they were admitted into evidence during the competency proceeding, which was open to the public, and discussed and quoted in depth during the hearing as well as in the parties' pre-hearing and post-hearing briefing.

[3] Unpublished opinions of the Eleventh Circuit are cited as persuasive authority. *See* 11th

162, 171-72 (1975)).   The federal competency standard is set forth in 18 U.S.C. § 4241, which

provides:

> If, after [a] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d).

Section 4241 codifies the standard for competency set forth by the United States Supreme

Court in *Dusky v. United States*, 362 U.S. 402 (1960): "whether [the defendant] has sufficient

present ability to consult with his lawyer with a reasonable degree of rational understanding—and

whether he has a rational as well as factual understanding of the proceedings against him."   *See*

*also United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011) (quoting *United States v. Hogan*,

986 F.2d 1364, 1371 (11th Cir. 1993)).

During the prior competency proceedings, the Court held that Madison bore the burden of

proving that he is presently not competent to stand trial.   (*See* Doc. 189, at 2; Doc. 225; Doc. 417,

at 3; Doc. 457).   *See also Bradley*, 644 F.3d at 1268 (stating that a party raising a substantive claim

of incompetency must demonstrate his incompetence by a preponderance of the evidence (citing

*Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995))).   The parties initially disputed whether

the burden of proof has now shifted to the United States to establish by a preponderance of the

evidence that Madison's competency had been restored.   (*See* Doc. 610, at 6; Doc. 612, at 4-6).

However, at the conclusion of the evidentiary hearing on October 2, 2020, the United States

conceded that the burden rested with it to prove, by a preponderance of the evidence, that Madison's

---

Cir. R. 36–2.

competency has been restored.   (Tr., Vol. 3, at 248).[4]   *See also United States v. Cabrera*, No. 07-20760-CR, 2008 WL 2374234, at *6 (S.D. Fla. June 6, 2008) ("[I]f there is an adjudication of incompetency, and the defendant is committed to the Attorney General . . . the burden of persuasion shifts; *i.e.*, the court must find by a preponderance of the evidence that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense.").

The parties dispute to some extent whether Madison presently suffers from a mental disease or defect.   However, as discussed herein, I find that the evidence preponderates in favor of finding that Madison does presently suffer from a mental disease or defect (brain damage and vascular dementia).   Nevertheless, "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges."   *Medina*, 59 F.3d at 1107 (quoting *Card v. Singletary*, 981 F.2d 481, 487–88 (11th Cir. 1992)).   "Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial."   *Id.* (citing *McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976)).   "Incompetency to stand trial is not defined in terms of mental illness.   As such, a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill."   *United States v. Williams*, No. 5:06-cr-36-Oc-10GRJ, 2007 WL 1655371, at *5 (M.D. Fla. June 7, 2007) (internal citations, footnote, quotation marks, and alterations omitted).

---

[4] The transcript from the September 30, 2020 through October 2, 2020 competency hearing is located at Docs. 638, 646, and 648.   The transcripts will be cited herein as (Tr. Vol. #, at #), with # respectively denoting the volume and page of the transcript cited.

"The determination of whether a defendant is mentally competent to stand trial is a question left to the sound discretion of the district court, with the advice of psychiatrists [or other mental health professionals].   The medical opinion of experts as to the competency of a defendant to stand trial is not binding on the court, since the law imposes the duty and responsibility for making the ultimate decision of such a legal question on the court and not upon medical experts."   *United States v. Abernathy*, No. 08-20103, 2009 WL 982794, at *3 (E.D. Mich. Apr. 13, 2009) (alteration in original) (quoting Fed. Proc. § 22:549, *Hearing and Determination as to Competency*; *United States v. Davis*, 365 F.2d 251, 256 (6th Cir. 1966)).   Moreover, when "faced with diametrically opposite expert testimony, a district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion."   *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005) (citations and internal quotations omitted).   "Absent a showing that an evaluation by an expert was professionally inadequate, a court does not err by relying on an expert's report."   *United States v. Deruiter*, 2:14-cr-46-FtM-38MRM, 2017 WL 3308967, at *3 (M.D. Fla. Aug. 3, 2017) (citing *Bradley*, 644 F.3d at 1268).   I have reviewed the evidence in this case with these standards in mind.

### III.   *Summary of the Evidence*[5]

    A.    *The January 2018 Competency Proceedings (Docs. 187, 189, 200, 225).*[6]

---

[5] I have considered all of the evidence and testimony presented (including any materials filed *ex parte* and under seal) regardless of whether I discuss it in detail in this Report and Recommendation.

[6] While I did not expressly address with the parties the extent to which I should consider the evidence presented at the prior competency hearings, that evidence was discussed throughout the most recent hearing.   Moreover, the prior Reports were referenced on several occasions during the hearing, and counsel for Madison discussed the prior hearings and Reports extensively in his pre-hearing briefing.   (*See* Doc. 612, at 7-12).   Accordingly, I have also considered the evidence presented at the January 2018 and October 2018 hearings, and will summarize some of that evidence in this Report.

For the first round of competency proceedings in this case, Madison was evaluated by Rodolfo A. Buigas, Ph.D., a forensic psychologist employed by the Federal Bureau of Prisons at the Federal Detention Center in Miami, Florida ("FDC Miami").   (Doc. 189, at 1).    Dr. Buigas opined that Madison had the following mental disorders:   a primary diagnosis of Paranoid Personality Disorder, with a mixture of other personality disorders, with Schizotypal, Obsessive, Narcissistic and Antisocial features.   (*Id.* at 1-2, 9).   Dr. Buigas concluded that Madison did not have a psychotic disorder.   (*Id.* at 10).   Dr. Buigas noted that Madison exaggerated his accomplishments, did not always make credible statements, tended to overelaborate in his responses, and had some paranoid, odd, and religious themes, but was not delusional or suffering from hallucinations.   (*Id.* at 4-5).   Dr. Buigas further noted that Madison had pervasive paranoia, entertained hyper-religious beliefs, and could be preoccupied, impulsive, and possibly controlling.   (*Id.* at 8).    Dr. Buigas also administered the Evaluation of Competency to Stand Trial-Revised Test ("ESCT-R"), a recognized test of legal competency, and Madison's score was in the normal to mild impairment range.   (*Id.* at 8).   Dr. Buigas ultimately opined that Madison was competent to stand trial.   (*Id.* at 10).

Madison was also evaluated by Joseph C. Wu, M.D., a neuropsychiatrist with expertise in neurocognitive imaging, Dr. Ouaou, and Dr. McClain.   (*Id.* at 2).   Dr. Wu was not able to render an opinion about whether Madison had any particular mental impairment diagnosis, but he did note that Madison had a very abnormal pattern of brain metabolism, which was consistent with a high likelihood for developing chronic traumatic encephalopathy ("CTE").   (*Id.* at 3).   Dr. Wu further stated that his findings may be indicative of a neuropsychiatric disorder (including personality disorders), psychotic spectrum disorders (including delusional disorders), affective disorders, and Post Traumatic Stress Disorder ("PTSD").   (*Id.* at 4).   Dr. Wu testified that his neuroimages

corresponded with Dr. Ouaou's finding of significant verbal memory impairments uncovered during neuropsychological testing.   (Doc. 187, at 141, 147).

Dr. Ouaou interviewed Madison and found some of his beliefs, particularly with respect to a "Mr. B," to be bizarre, and that Madison exhibited hyper-religiosity.   (*Id.* at 11).   Dr. Ouaou also administered a battery of neuropsychological tests to assess multiple areas of cognition.   (*Id.* at 12). Based on Madison's test results – many of which placed Madison in the low average or impaired categories – Dr. Ouaou opined that Madison suffered brain damage over time.   (*Id.* at 12-14).   He also diagnosed Madison with Delusional Disorder – a disorder where an individual has fixed beliefs that they apply even in the face of documentary evidence to the contrary.   (*Id.* at 14).   Dr. Ouaou further opined that Madison was not competent to stand trial because he could not meaningfully assist his counsel or assist in his own defense.   (*Id.* at 14-15).

Dr. McClain interviewed Madison on several occasions and observed his interactions with his attorneys.   (*Id.* at 15).   She opined that Madison suffered from schizoaffective disorder, bipolar type.   (*Id.* at 18).   She also diagnosed Madison with a delusional disorder, PTSD, and a mild neurocognitive disorder from diffuse brain damage.   (*Id.*)   Dr. McClain did not administer any tests to Madison but found his abilities to assist in his defense and testify relevantly to be impaired because he could not set aside his delusional beliefs and had difficulty in processing information. (*Id.* at 19-20).   Dr. McClain opined that Madison was not competent to stand trial.   (*Id.* at 20).

While noting that Madison "presently suffers from both a mental defect (traumatic brain injury) and mental diseases," Judge Spaulding ultimately recommended that Madison be found competent to proceed.   (*Id.* at 3, 24).   In so doing, Judge Spaulding found that the record as a whole established by a preponderance of the evidence that Madison had a rational and factual understanding of the proceedings against him and the consequences he faces.   (*Id.* at 21).   Judge

Spaulding also gave more weight to the opinions of Dr. Buigas with respect to Madison's ability to assist in his defense because Dr. Buigas was the only professional to administer tests of legal competency.  (*Id.* at 22).  Judge Spaulding also found compelling testimony about the video-recording of Madison's post-arrest interview,[7] and otherwise gave little weight to the opinions of Dr. McClain.  (*Id.* at 23-24).

Judge Dalton accepted Judge Spaulding's credibility determinations as to all expert testimony, as well as the weight she assigned to each expert's opinions.  (Doc. 225, at 5-7).  Judge Dalton also found that Madison's post-arrest interviews established that his interactions with law enforcement and responses to questions were consistent with Dr. Buigas' opinion and supported a determination that Madison is able to provide historical information, act appropriately in a judicial setting, and testify in a way that is intelligent, coherent, and relevant.  (*Id.* at 7, 9).

B.      *The October 2018 Competency Proceedings (Docs. 417, 412)*

During the second round of competency proceedings, Madison was evaluated by Justin Rigsbee, Ph.D., Psy. D., a forensic psychologist employed at FCI Butner.  (Doc. 417, at 2).  Dr. Rigsbee interviewed Madison and administered psychological tests and reviewed records.  (*Id.* at 4).  Dr. Rigsbee diagnosed Madison with paranoid personality disorder and other specified personality disorder (schizotypal, antisocial, and narcissistic features).  (*Id.* at 5).  He opined that Madison did not have a schizoaffective disorder and did not suffer from PTSD.  (*Id.* at 6).  Madison also did not suffer from a delusional disorder because, when pressed, Madison would acknowledge some leeway in his beliefs.  (*Id.*).  Dr. Rigsbee ultimately opined that Madison was

---

[7] This video recording was not admitted into evidence in any prior court proceeding, including the most recent competency restoration hearings.  Therefore, I have not viewed the recording and my consideration is limited to the testimony about the recording.

competent to stand trial.   (*Id.*).   However, Dr. Rigsbee did not examine Madison after his September 22, 2018 intervening medical event.   (*Id.* at 6-7).

Both Dr. Agharkar and Dr. Ouaou evaluated Madison before and after his intervening medical event, and they both testified that Madison suffered a mini-stroke on September 22, 2018. (*Id.* at 8).   Dr. Ouaou noted that Madison was more tangential in conversation, more difficult to follow, and less attentive.   (*Id.*).   Madison had a significant decline in his functioning following the mini-stroke, he had more difficulty processing and conveying information, and his ability to focus had diminished.   (*Id.* at 9).   Dr. Ouaou opined that Madison was not competent to stand trial, and that Madison would have difficulty testifying relevantly and processing questions from lawyers and prosecutors.   (*Id.* at 9–10).

Dr. Agharkar noted Madison's tangential thought process, over-inclusivity of details, and getting "stuck" on an idea and repeating it out of context.   (*Id.* at 10).   Dr. Agharkar also noted Madison's delusions, including his education, military service, and relationship with "Mr. B." (*Id.*).   Dr. Agharkar opined that Madison suffered from a schizoaffective disorder, bipolar type, and a minor neurocognitive disorder.   (*Id.* at 11).   He further opined that Madison's history of traumatic brain injuries and uncontrolled high blood pressure may have resulted in brain damage which fuels his delusional beliefs.   (*Id.*).   Specifically, Dr. Agharkar opined that neuroimaging confirmed Madison suffered significant vascular damage in his brain and frontal and temporal lobe brain damage.   (*Id.*).

Dr. Agharkar concluded that Madison was not competent to stand trial because he could not rationally understand the charges or assist in his defense.   (*Id.*).   Dr. Agharkar noted that after the mini-stroke, Madison's impairments only worsened.   (*Id.* at 11-13).   He further opined that it was likely that damage to Madison's brain caused psychosis, and that Madison's ability to assist in his

defense was significantly impaired.   (*Id.* at 13).   Dr. Agharkar further opined that Madison's brain damage could not be reversed, and that he suffers from a progressive brain disease that will likely worsen over time.   (*Id.*).

Based on the testimony and evidence submitted, Judge Spaulding again found that Madison "presently suffers from a mental defect (traumatic brain injury) and mental diseases."   (*Id.* at 3). Judge Spaulding assigned little weight to Dr. Rigsbee's opinions because they were limited to the time period before Madison suffered his mini-stroke.   (*Id.* at 14).   Instead, Judge Spaulding assigned great weight to the opinions of Dr. Ouaou and Dr. Agharkar, both of whom examined Madison before and after his mini-stroke.   (*Id.*).   Judge Spaulding found their opinions to be consistent with each other and supported by the tests Dr. Ouaou administered.   (*Id.*).

Judge Spaulding found, based on the evidence presented, that Madison did not presently have the ability to consult with his lawyers with a reasonable degree of rational understanding.   (*Id.* at 15-16).   Judge Spaulding found that Madison had problems communicating, he could not determine what facts were true and relevant to his case, he could not appreciate the prosecution's evidence because he believed some of it has been altered or fabricated, he would not be able to testify in a relevant, coherent, and intelligent manner due to his delusional beliefs, and his short term memory impairment would significantly reduce his ability to follow trial proceedings.   (*Id.*).

C.     *The December 12, 2018 Continued Proceedings (Docs. 444, 451, 457)*

The court-appointed expert, Dr. Jason A. Demery, examined Madison and administered various psychological tests.   (Doc. 444, at 1).   Dr. Demery ultimately concluded that Madison suffered from a Delusional Disorder, which rendered him incompetent because he would not be able to testify relevantly or coherently at trial and would not be able to communicate pertinent facts to his counsel to develop a defense strategy.   (*Id.*).

Because Dr. Demery, Dr. Ouaou, and Dr. Agharkar all concurred that Madison was presently suffering from a mental disease or defect that rendered him incompetent to the extent that he was unable to assist properly in his defense, Judge Spaulding renewed her recommendation that Madison be found presently not competent to stand trial.   (Doc. 444, at 2).   Neither side lodged objections to this portion of Judge Spaulding's Report, and Judge Dalton adopted the recommendation on December 28, 2018.   (Doc. 457).[8]

D.     *The September 30 – October 2, 2020 Competency Restoration Proceedings*

1.     *Dr. Kristina P. Lloyd*[9]

The first witness to testify for the United States was Dr. Lloyd, a board-certified forensic psychologist employed at FMC Butner.   Dr. Lloyd obtained her Bachelor of Arts degree in criminal justice and psychology from Buena Vista University.   (Tr. Vol. 1, at 23).   She obtained her Master's degree in clinical mental health from Springfield College, and her Doctorate in clinical psychology from Loyola University.   (*Id.*).[10]   Dr. Lloyd has been employed by the Federal Bureau of Prisons since November 2011; first as a staff psychologist and later chief psychologist at Federal Correctional Institute-Schuylkill, in Minersville, Pennsylvania, and, since August 2014, as a forensic psychologist at FMC Butner.   (Doc. 633-2, at 1-2).   Dr. Lloyd routinely conducts competency and sanity evaluations, as well as violence risk assessment evaluations.   (Tr. Vol. 1, at 24).   While at FMC Butner, Dr. Lloyd has completed approximately 220 competency evaluations,

---

[8] In adopting the Report, Judge Dalton overruled defense counsel's partial objection (Doc. 453) regarding a request to mandate that the Federal Medical Center notify defense counsel in advance of prescribing Madison medication with a list of prescriptions and treatment plan.   (Doc. No. 457, at 3).

[9] Madison moved, under seal, to strike Dr. Lloyd's testimony and report.   (Docs. S-643, S-644).   I denied that motion by separate orders filed today.   (Doc. S-665, Doc. 666).

[10] Dr. Lloyd's curriculum vitae was admitted into evidence without objection.   (Doc. 633-2).

including at least 30 competency restoration evaluations, and has previously testified as an expert approximately 68 times.   (*Id.* at 24-26).   Dr. Lloyd was admitted as an expert in forensic psychology without objection.   (*Id.* at 24).

Dr. Lloyd co-authored with Dr. Pennuto the March 5, 2020 report which opines that Madison's competency has been restored.   (Doc. 633-1).[11]   Dr. Lloyd was the primary author of the report, with Dr. Pennuto writing the sections related to neuropsychological evaluations and testing (*Id.* at 28-36), and Dr. Lloyd drafting the remainder.   (Tr. Vol. 1, at 32-33).   However, Drs. Lloyd and Pennuto each reviewed the entirety of the report, which was also peer reviewed by other FMC Butner staff.   (*Id.*).

In preparing her portions of the report, Dr. Lloyd reviewed all of Madison's then-available medical records, the 2017 and 2018 expert reports prepared by Dr. Buigas and Dr. Rigsby, as well as the 2018 forensic evaluations by Dr. Demery, Dr. Ouaou, and Dr. McClain.   (Doc. 633-1, at 5-7).   Dr. Lloyd also reviewed numerous collateral materials, including interview transcripts from the Federal Bureau of Investigation ("FBI"), video and audio interviews between Madison and law enforcement, and various legal documents from the case docket.   (*Id.*; Tr. Vol. 1, at 46-47).   Dr. Lloyd administered two legal competency tests to Madison, observed him throughout his stay at FMC Butner for a total of approximately 6-12 hours, and interviewed him for an additional 10-11 hours on multiple occasions over the course of nearly 12 months.   (Doc. 633-1, at 5-7; *see also* Tr. Vol. 1, at 31-32, 43-44, 52).

Dr. Lloyd described competency restoration as "an individualized process" with "some general approaches."   (Tr. Vol. 1, at 26; *see also* Doc. 633-1, at 28).   The first step is to conduct a

---

[11] Citations to the page numbers of Dr. Lloyd and Dr. Pennuto's report (Doc. 633-1) refer to the page numbers assigned via CM/ECF.

diagnostic evaluation to determine if the defendant has a mental disease or defect.   If the defendant suffers from mental illness, the defendant would be offered psychiatric medication, in consultation with FMC Butner's psychiatry staff.   (Tr. Vol. 1, at 27).   Defendants are then provided restoration services, which includes individualized restoration, where FMC Butner staff work with a defendant on specific case-related issues or areas of impairment.   In addition, defendants are typically enrolled in hour-long, weekly education classes, which Dr. Lloyd described as "an educational/instructional group aimed at increasing pretrial inmates understanding of the legal process, courtroom procedures, and roles and functions of the courtroom participants group designed to present information to inmates in an effort to prepare them to return to court." (Doc. 633-1, at 28).   The classes cover topics including:   "a) overview of the legal system; b) courtroom personnel; c) working with your attorney; d) role of the defendant; e) basic legal vocabulary; f) trial process; and g) rational decision-making." (*Id.*; *see also* Tr. Vol. 1, at 27, 53-54).   FMC Butner psychology and social work staff teach the classes.   (Tr. Vol. 1, at 28).   While at FMC Butner, Madison attended a total of 23 classes between June 2019 and January 2020.   (Doc. 633-1, at 28).   FMC Butner staff described Madison as an "active participant," who did not exhibit any signs of active psychosis or evidence delusional thought content, but rather "demonstrated a good understanding of the material presented." (*Id.*; *see also* Tr. Vol. 1, at 54-55).

Madison arrived at FMC Butner on February 26, 2019 and was assessed by medical, mental health, and unit team staff.   (Doc. 633-1, at 17).   Based on their assessment, Madison was placed in the least restrictive unit at FMC Butner, the open mental health, or general population unit.   (*Id.*). In this section of FMC Butner, inmates are housed typically two to a cell, they can come and go as they please within the facility, and they are responsible for arriving at appointments and classes on time.   Madison remained in the general population unit for the duration of his stay at FMC Butner.

(Doc. 633-1, at 17; Tr. Vol. 1, at 30, 33-34).   With one exception, it appears that Madison attended all of his required appointments.   (Doc. 633-1, at 27).

Madison met with Dr. Graddy, FMC Butner's chief psychiatrist, on March 6, 2019.   (Doc. 633-1, at 18; Tr. Vol. 1, at 39).   On March 13, 2019, Madison met for the first time with Dr. Lloyd and other psychiatry and psychology staff to discuss the course of his evaluation plan.   (Doc. 633-1, at 19).   At that meeting, Madison stated that he could not remember meeting with Dr. Graddy the week prior and reported that he periodically experiences memory impairments.   (*Id.*; Tr. Vol. 1, at 197-98).   Madison was advised of the procedures to request psychiatric medication, if needed, and Madison responded that all psychiatric mediation had to be approved by his attorneys.   (Doc. 633-1, at 19).   When FMC Butner staff advised Madison that such a request by his attorneys had been denied, Madison indicated that he had not been made aware of this development but did not request any medication.   (*Id.*).   Madison was never prescribed any psychotropic medication while at FMC Butner.   (*See id.* at 26-27; Tr. Vol. 1, at 60-62, 206).

Dr. Lloyd reviewed Madison's developmental, relationship, education, military, occupational, medical, substance abuse, mental health, and criminal histories.   (Doc. 633-1, at 7-15).   Dr. Lloyd obtained these histories both from reviewing the collateral records and procedures, and from her interviews with Madison himself.   Dr. Lloyd described Madison as an accurate historian as to broad aspects of his case, but his accuracy diminished as to the finer details.   (Tr. Vol. 1, at 108).   Madison's self-reporting of his past was also "generally consistent across forensic evaluations, but was not consistent with collateral sources."   (Doc. 633-1, at 7).[12]   For example, Madison reported that he graduated from both high school and college, and that he was an

---

[12] The histories that Madison self-reported mirror those discussed in Judge Spaulding's January 22, 2018 Report and Recommendation and will not be further repeated here.   (Doc. 189).

outstanding student.   (*Id.* at 10).   However, his public school records showed that Madison did not graduate from high school and he had some failing grades.   (*Id.*; Tr. Vol. 1, at 183-87).   In addition, Madison claimed to be a combat ranger in the Army, and that he received highly classified and sensitive military training.   (Doc. 633-1, at 11).   However, military records suggest that Madison was initially given an Honorable Discharge for medical reasons; he then re-enlisted, was absent without leave for 141 days, and was subsequently provided a General Discharge Certificate.   (*Id.*). With respect to his occupational and financial history, Madison reported that a friend of his father's, a "Mr. B," always took care of him.   (*Id.* at 12; Tr. Vol. 1, at 192).   Last, Madison minimized his criminal history, reporting that he had previously been arrested, but had no prior criminal charges. However, his criminal records show numerous arrests for varying charges, spanning several decades.   (Doc. 633-1, at 14-15; Tr. Vol. 1, at 191-92).

Dr. Lloyd noted that Madison would not alter his beliefs about his educational and military history, even when faced with evidence to the contrary.   For example, during a May 2, 2019 meeting with Madison, he refused to change his story about his educational background, and instead insisted that the federal government was altering his records.   (Doc. 633-1, at 22; Tr. Vol. 1, at 178).

Dr. Lloyd also discussed the course of medical treatment Madison received while at FMC Butner.   Specifically, Dr. Lloyd notes that throughout his stay, Madison suffered from extremely elevated blood pressure which was not controlled despite staff prescribing a variety of medications. (Doc. 633-1, at 18-20, 22-24, 26-27).   Madison also occasionally suffered from related symptoms, such as nausea, vomiting, light headedness, chest pain, and pressure in his head.   In addition, Madison underwent a renal angioplasty and stent placement at a community hospital on November 27, 2019.   (*Id.*).

With respect to legal competency, Dr. Lloyd administered two tests/instruments to Madison. The first was the Revised-Competency Assessment Instrument ("R-CAI"), which is a tool used to help guide and structure the interview process.   (Doc. 633-1, at 20).   It is a semi-structured interview that addresses fourteen competency related areas:   understanding of the charge, appreciation of penalties, appraisal of available defenses, appraisal of functions of courtroom participants, understanding the court procedures, motivation to help self in the legal process, appraisal of likely outcomes, planning of legal strategies, ability to cooperate rationally with counsel, capacity to disclose pertinent information to counsel, capacity to testify, capacity to challenge prosecution witnesses, ability to manifest appropriate courtroom behavior, and capacity to cope with the stress of incarceration awaiting trial.   (*Id.*; Tr. Vol. 1, at 75-76).   Dr. Lloyd utilized this test as a baseline for Madison, and to determine the areas for which he required education.   (Tr. Vol. 1, at 76-77).

Madison took the R-CAI test over two days:   April 16, 2019 and April 18, 2019.[13] Madison was able to identify that he was charged with "kidnapping/resulted in death, stalking," but could not recall the name of the third charge alleged against him.   (Doc. 633-1, at 20).   Madison disagreed with the charges, stating that a husband cannot kidnap his own wife, and refused to vary from that opinion.   (Tr. Vol. 1, at 106-07).   Madison was able to describe a superseding indictment as when the government can add more charges.   (Doc. 633-1, at 20).   He knew that prosecutors were seeking the death penalty, identified some conditions that a person may need to follow while on conditional release, and stated that "[t]he judge makes a decision on releasing me" when a defendant is found not guilty.   (*Id.*).   Madison was provided information as to what happens when

---

[13]  Dr. Lloyd ended the test early on April 16, 2019 because Madison was not feeling well. The test was completed on April 18, 2019.   (Doc. 633-1, at 20).

a defendant is found not guilty by reason of insanity, and when asked to explain that information, he was able to do so.   (*Id.*).[14]   Madison was also able to identify that a defendant can plead guilty, not guilty, or guilty by reason of insanity, and correctly explained the meaning of each.   (*Id.*).

Madison described the role of a public defender as someone who "represent[s] me" and talks to Madison about his case and tries to get the case dismissed.   (*Id.* at 20-21).   He described the role of the prosecutor as trying to make him look bad and trying to attain a guilty verdict.   (*Id.* at 21). He described the role of the jury as listening and observing the evidence from the attorneys, and making a decision on Madison's guilt, as well as the appropriate penalty (death penalty or imprisonment).   (*Id.*)   Madison also identified the term evidence and knew that witnesses answer questions posed by attorneys about the case or about Madison himself.   (*Id.* ).

Madison was aware that he did not have to testify at his trial, but that if he did testify, he would have to tell the truth.   (*Id.*).   He did not know who would question him first if he testified and did not know if the jury had to render a unanimous verdict.   (*Id.*).   When Madison was instructed on this point, he stated that he would not remember this information tomorrow and refused any offer of written material on the legal process.   (*Id.*).   Madison did, however, know the difference between a jury trial and a bench trial.   (*Id.*).

During the course of the R-CAI, Madison stated that he intended to plead not guilty, understood the concept of a plea bargain, and understood that in order to receive a plea bargain, he would have to enter a guilty plea.   (*Id.*).   Madison stated that he would not consider a plea bargain because he would not say that he did something he did not do.   (*Id.*).   Madison was unsure how he would proceed if his attorneys advised him to plead not guilty by reason of insanity; however,

---

[14]   Specifically, Madison responded "that if you are found guilty for reason of insanity, they can send you here, or Missouri.   I guess you all do tests on us or observe us to see, I don't know what y'all do.   To determine whether or not they are a danger to some."   (Doc. 633-1, at 20).

Madison indicated that he would not follow his attorney's advice to remain silent at trial, and made clear his intention to testify.   (*Id.*).

Madison expressed confidence in his attorneys and identified them by name.   (*Id.*).   He stated that while he may not always understand his attorneys' decisions, he has not disagreed with how they had handled his case to date.   Madison also stated that he did not anticipate any difficulties in providing his attorneys with case-related information.   (*Id.* at 21-22).   Madison knew that he should be calm, and act in a respectful manner in the courtroom, and that if a witness lied, he was to tell his attorney.   (*Id.* at 22).   Madison thought it was likely that his ex-wives, ex-girlfriends, or someone who holds a grudge against him, might lie in court, and that if he did not understand something a witness said, he was to ask his attorney for clarification.   (*Id*).

The second test Dr. Lloyd administered to Madison was the Evaluation of Competency to Stand Trial – Revised ("ECST-R"), which is a semi-structured interview to assess a defendant's factual understanding of court proceedings, rational understanding of the current legal circumstances, and ability to consult with counsel.   (Tr. Vol. 1, at 77).   This test also provides systematic screening for a defendant's feigned psychopathology.   (Doc. 633-1, at 38).   Dr. Lloyd testified that she specifically chose to administer the ECST-R test because it focuses on psychotic thought processes.   (Tr. Vol. 3, at 251).   Because other experts had opined that Madison may suffer from a delusional disorder, Dr. Lloyd administered the ECST-R to help elicit whether or not he in fact suffers from delusions.   (*Id.* at 251-52).   Dr. Lloyd determined that Madison was not delusional.   (*E.g.*, *id.* at 57).

Dr. Lloyd administered the ECST-R to Madison on March 2, 2020, after he had completed the competency restoration process and following his recovery from his cardiovascular surgery. (Doc. 633-1, at 38).   Madison's responses to interview questions were largely consistent with those

from the R-CAI, and Dr. Lloyd concluded that Madison's scores on the ECST-R were in the normal range on his factual and rational understanding of the proceedings, his ability to consult with counsel, and his overall rational ability.   (*Id.*; Tr. Vol. 1, at 77-78).   There was no evidence of any feigned incompetency or endorsement of atypical psychological experiences.   (Doc. 633-1, at 38).

With respect to Madison's factual understanding, he was able to identify the charges against him, pointed out details in the allegations that he believed were incorrect, understood the concept of a superseding indictment, knew that the prosecution was seeking the death penalty, and correctly explained the types of pleas available (guilty, not guilty, and not guilty by reason of insanity).   (*Id.*). Madison also described the roles of the jury, including that the jury determined if he received the death penalty or life in prison, and identified potential mitigation evidence.   Madison also correctly described the roles of the prosecutor, judge, witnesses, and evidence.   (*Id.* at 38-39).[15]

With respect to Madison's rational understanding, Madison acknowledged that he was facing serious charges that could result in the death penalty.   (*Id.* at 39).   He explained that he intended to plead not guilty, because he did not commit the offenses, and that if he pleaded guilty, it would be a lie.   (*Id.*).   Madison then stated that a critical factor in his case would be his own testimony, as he was on the only one there, and he has nothing to hide.   (*Id.*).   He also explained that he would not follow the advice of his attorneys not to testify in his case because the only people who know what happened are Madison, his wife Rachel, and God.   (*Id.*).   Madison was aware that he could not be compelled to testify against himself, and that he would have to tell the truth if he did testify.   (*Id.*).

---

[15] Madison did incorrectly state that the judge decides whether or not he would receive the death penalty, however he later self-corrected his answer.   (Tr. Vol. 1, at 215, 217-18).

Madison was aware of the concept of a plea bargain, although he was initially unsure of the rights he would lose if he accepted a plea bargain.   (*Id.*).   Citing his religious beliefs and his faith in God, Madison also stated that he would not accept a plea bargain because he would have to say he did something he did not do.   (*Id.*).   With respect to witness testimony, Madison anticipated that his ex-wives would not testify truthfully, because they "hold a grudge."   (*Id.*).   He also stated that if he knew a witness was lying, he would pass a note to his attorney.   (*Id.*).   Madison was aware of how to behave in court.   (*Id.*).   He identified that if he is found guilty, it will have significant consequences for him because his "brain is dying slowly.   I am slowly dying.   If I see 3 good years, I'll be a fortunate man.   They said it won't get back to normal."   (*Id.* at 40).   Madison also mentioned that twenty years (in prison) "is still like life to me.   I will be in my 80s."   (*Id.*).

With respect to his ability to work with counsel, Madison correctly identified his attorneys by name,[16] stated he has confidence in them, and that to date he does not disagree with how they have handled his case.   (*Id.*).   Madison stated that he can help his attorneys by telling them the truth and providing them with information about the alleged offenses.   (*Id.*).   He also stated that while he understands his attorneys' legal advice, sometimes it is hard to follow, but that he has followed their advice so far.   (*Id.*).   Madison also correctly described the meaning of attorney-client privilege.   (*Id.*).

In addition to administering the R-CAI and ECST-R, Dr. Lloyd met with Madison on several occasions, during which they discussed various aspects of the legal process and Madison's case. For example, during an interview with Dr. Lloyd on May 24, 2019, Madison again explained his understanding of the role of the judge and jury, understood that he was facing the death penalty or

---

[16] Specifically, Madison identified two of his attorneys, one by first name only, and the mitigation specialist.   (Tr. Vol. 1, at 208-09).

life in prison if convicted, described that the jury would also hear mitigation evidence during the sentencing phase, and identified examples of potential mitigation evidence and defense evidence. (Doc. 633-1, at 23-24).   Madison was also able to adequately explain the concept of a plea bargain, although he had forgotten the precise term.   (*Id.* at 24).   Madison reiterated that he was unwilling to consider a plea bargain, in part due to his age.   (*Id.*).   Madison also re-emphasized his desire to testify at his trial, even if his attorneys advised against testifying.   (*Id.*)   According to Dr. Lloyd, Madison's answers indicated that "his spiritual beliefs influence his decision" as to whether or not to testify at trial.   (*Id.*).

During another interview with Dr. Lloyd on August 9, 2019, Madison did not answer a question about the role his video-taped police interview might play at his trial.   Instead, Madison provided a narrative about his interactions with his wife and reiterated his desire to testify at trial. (*Id.* at 25).   On October 28, 2019, Dr. Lloyd again met with Madison, and he was able to describe his interview with the police, discussed a defense strategy he was considering, explained the role of the jury and prosecutor, stated that he had to testify "to tell the truth about what happened," and identified potential trial witnesses.   (*Id.* at 27).

Dr. Lloyd noted that Madison's responses to questions can at times be verbose, embellished, and tangential, and that this assessment was also noted by Dr. Demery in his prior evaluation.   (Doc. 633-1, at 40; Tr. Vol. 1, at 55, 68).   However, Dr. Lloyd does not attribute this tangentiality to any mental disease or defect, but rather believes it is a product of Madison's narcissism and desire to present himself in a positive light and control the conversation.   (*Id.*).   When Dr. Lloyd would redirect Madison back to the question asked, he would provide a relevant response.   (*Id.*).

Based on her evaluations, observations, and testing, as well as reviewing all available information, Dr. Lloyd diagnosed Madison with Narcissistic Personality Disorder, which Dr. Lloyd

testified is a "pervasive way of interacting with the environment based on an individual's choices about how he would want to interact interpersonally with other people or the decisions he might make about how to conduct his life. . . .   It's the way that you move through your life and through your world."   (Tr. Vol. 1, at 37; *see also* Doc. 633-1, at 36-37).   A personality disorder is "pervasive and inflexible," "is stable over time, and leads to distress or impairment."   (Doc. 633-1, at 37).   Narcissistic personality disorder is characterized by a pattern of "grandiosity, entitlement, lack of empathy, and need for admiration."   (*Id.*).   Individuals with this disorder "are frequently boastful," "have a grandiose sense of self-importance and routinely overestimate their abilities and inflate their accomplishments," and "may also be preoccupied with fantasies of unlimited success, power, brilliance, beauty, or ideal love."   (*Id.*).   Dr. Lloyd testified that a personality disorder is not a mental disease or defect.   (Tr. Vol. 1, at 59-60).

According to Dr. Lloyd, Madison fits the diagnosis of Narcissistic Personality Disorder because he "routinely exaggerates his accomplishments or provides an alternative version of events that if accurate, would reflect positively in his favor."   (Doc. 633-1, at 37).   Dr. Lloyd pointed to Madison's claim that he was an Army combat ranger, his claims of a college degree, and that the majority of his relationships end after the "honeymoon phase."   (*Id.*).   Dr. Lloyd also referenced Madison's statements that he was the only person trusted by law enforcement to install security systems in their homes, and that he was exploitative in his interpersonal relationships – both traits consistent with Narcissistic Personality Disorder.   (*Id.*; Tr. Vol. 1, at 71).   Dr. Lloyd noted again that Madison's responses to questions can be "long-winded and tangential," but that they always attempt to portray Madison in a positive light.   (Doc. 633-1, at 37).   In sum, Dr. Lloyd believes that Madison is able to "read the room," and choose how he interacts with others and how he appears to them.   (Tr. Vol. 1, at 81-82, 224).

Dr. Lloyd further opined that even though there appears to be brain damage and structural problems with Madison's brain, he does not suffer from a mental defect, does not suffer from any functional deficits with respect to his competency, and does not meet the criteria for a neurocognitive disorder.   (*Id.* at 37-38; Tr. Vol. 1, at 71-73).   Dr. Lloyd also testified that Madison's IQ, which is in the low average range (84), does not equate to incompetency, and that he is able to retain information over a substantial period of time.   (Tr. Vol. 1, at 81-82, 224).

Dr. Lloyd also concluded that Madison does not suffer from a mental illness – he is not experiencing perceptual disturbances or any symptoms of a mood disorder, exhibited no difficulties in engaging in basic daily activities, and does not appear to be holding onto any delusions.   (Doc. 633-1, at 37-38; Tr. Vol. 1, at 57-58).[17]   Dr. Lloyd considered Madison's statements about "Mr. B" to be "self-serving justifications for his actions, rather than delusions."   (Doc. 633-1, at 37-38; Tr. Vol. 1, at 66).[18]   And when Madison makes statements exhibiting persecutory beliefs (such as claiming that someone has tampered with his military or educational records), Dr. Lloyd believes that such statements are only made in response to a suggestion that Madison is not being forthright, or has engaged in malfeasance.   (*Id.*).   Dr. Lloyd specifically referenced the videotaped interview with police, during which Madison capitulated with respect to his assertions about "Mr. B's" involvement in Rachel's kidnapping and death when confronted with contradictory facts.   (*Id.*). Dr. Lloyd further noted that Madison is not impaired in his ability to work, socially interact, and practice self-care.   (*Id.*).

---

[17]   Dr. Lloyd also testified that there was no evidence that Madison had ever experienced a psychotic break, which would also be indicative of a mental illness.   However, on cross-examination, Dr. Lloyd noted that Madison had an "emotional breakdown" in March of 1977.   (Tr. Vol. 1, at 179).

[18]   However, Dr. Lloyd admitted that even though Madison would change his story with respect to "Mr. B" when pressed, he never admitted that "Mr. B" did not exist.   (Tr. Vol. 1, at 200).

Dr. Lloyd was the first expert to diagnose Madison with narcissistic personality disorder; Drs. Rigsbee and Buigas both diagnosed Madison with a different personality disorder. (Tr. Vol. 1, at 36-37, 193). Dr. Lloyd disagreed with Dr. Demery's 2018 diagnosis of delusional disorder. (*Id.* at 37, 87). According to Dr. Lloyd, a personality disorder is a chronic, unchanging condition and Madison has exhibited symptoms of his personality disorder going back to the 1970s. (*Id.* at 38, 88). A delusion, however, is a waxing and waning condition that is exhibited by "a fixed false belief that is not amenable to change despite the presentation of contrary information." (Tr. Vol. 1, at 59-60). Dr. Lloyd does not believe that Madison exhibits any delusions because he will back off from at least some of his beliefs when pressed, for example, his initial statements to law enforcement concerning "Mr. B's" involvement in Rachels' disappearance and death. (Tr. Vol. 1, at 64-65). In addition, Madison would at times discuss how he directly interacted with "Mr. B" and a person suffering from delusions would not interact with them. (*Id.* at 65-66).[19]

Dr. Lloyd also concluded that Madison's statements about his military record were not delusional because, if Madison truly believed he was a combat ranger, he would have taken steps to change his record to reflect this service, but he did not. (*Id.* at 67). Rather, Dr. Lloyd considered Madison's representations about himself to be "generally embellishing his accomplishments in life." (*Id.* at 70). Dr. Lloyd also discounted Madison's hyper-religiosity and claims that recent hurricanes or the pandemic were "God's wrath" for Madison's criminal charges, finding that his beliefs were "not out of the realm of the cultural norm," and were his "way of trying to understand this pandemic and the way that it [has] really changed our life." (*Id.* at 79-80). And with respect to Madison's assertions that he could not kidnap his own wife, Dr. Lloyd testified that disagreeing with a legal

---

[19] Dr. Lloyd noted that it was possible Madison chose not to reference "Mr. B" in his interviews with her, and instead shared more information about "Mr. B" with other examining experts. (Tr. Vol. 1, at 83-84).

statute or legal standard does not equate to a delusion.   (*Id.* at 225-26).   Last, Dr. Lloyd did not find Madison's insistence that he would testify at his trial to constitute a delusional thought process, but simply "his personal style."   (*Id.* at 230).

Dr. Lloyd also disagreed with Dr. McClain's diagnoses of schizoaffective disorder, PTSD, delusional disorder, and major neurocognitive disorder.   (*Id.* at 84).   Dr. Lloyd testified that delusional disorder and schizoaffective disorder are mutually exclusive pursuant to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"), and therefore Madison could not have both conditions at the same time.   (*Id.* at 84-85, 90-91).   However, Dr. Lloyd agreed that a person can simultaneously suffer from both a personality disorder and dementia, or from both a personality disorder and brain damage.   (*Id.* at 192, 194).

In summary, Dr. Lloyd opined that Madison does not currently suffer from a mental disease or defect that would preclude him from proceeding to trial, and that Madison is able to understand the nature and consequences of the proceedings against him and is able to assist properly in his defense.   (Doc. 633-1, at 40; Tr. Vol. 1, at 92-93).   Because Dr. Lloyd does not believe that Madison suffers from a severe disease or defect, she does not expect his competency to change over time.   (Doc. 633-1, at 40).   However, Dr. Lloyd recognized that Madison has a "pattern of maladaptive personality traits which can make him a difficult client with firm opinions about his best defense strategy."   (*Id.*).   Dr. Lloyd admittedly has not examined or interviewed Madison since March 2020, but testified that she has reviewed more recent testing of Madison, and based on that review, her opinion as to Madison's competency has not changed.   (Tr. Vol. 1, at 74-75).

### 2.    *Dr. Tracy O'Connor Pennuto*

The United States' second witness was Dr. Tracy O'Connor Pennuto.   Dr. Pennuto received her Bachelors of Science in psychology from the University of Maryland, and her Masters of Arts

in general/experimental psychology from the University of West Florida.   (Tr. Vol. 1, at 237).   She obtained a Juris Doctorate from Golden Gate University School of Law (although she has never practiced as an attorney), and her Ph.D. in clinical psychology with a focus in neuropsychology and forensic psychology from Palo Alto University.   (Doc. 633-3; Tr. Vol. 1, at 237).   Dr. Pennuto was a neuropsychology fellow at Duke University Medical Center, and in August 2010, she became the staff neuropsychologist at FMC Butner, a position she holds to date.   (*Id.*).   At FMC Butner, Dr. Pennuto conducts approximately three to four neuropsychological examinations per month.   (Tr. Vol. 1, at 238).   She has testified in federal court on 26 previous occasions, and has been qualified as an expert in neuropsychology, forensic psychology, and forensic neuropsychology.   (Tr. Vol. 1, at 238-39).   Dr. Pennuto was admitted without objection as an expert in neuropsychology.   (*Id.* at 239).

Dr. Pennuto authored the section of the March 5, 2020 BOP report entitled "Neuropsychological Consultation," and reviewed all other sections.   (Doc. 633-1, at 28-36; Tr. Vol. 1, at 242).   In preparing her portions of the report, Dr. Pennuto reviewed all of Madison's then-available medical records, as well as the 2017 and 2018 expert reports prepared by Dr. Buigas, Dr. Rigsby, Dr. Demery, Dr. Ouaou, Dr. McClain, and Dr. Agharkar.   (Doc. 633-1, at 28–30).   Dr. Pennuto also met with Madison in May 2019, and again on February 4-5, 2020, for a total of approximately 4 hours and 15 minutes and administered a battery of tests to assess Madison's neurocognitive functioning.   (*Id.* at 31-36; Tr. Vol. 1, at 240).

Madison presented himself at all three appointments on time.   His hygiene and grooming appeared excellent, he exhibited socially appropriate behavior and eye contact, and was cooperative throughout all testing.   (Doc. 633-1, at 30; Tr. Vol. 1, at 243).   Madison was alert and well-oriented, he was able to accurately provide identifying information such as name, date of birth,

housing unit, and the current date, and he provided biographical information that was broadly consistent with available records, with some discrepancies in his educational background.   (Doc. 633-1, at 30).   Madison noted that he is losing his memory, does not remember "a lot" since his arrest, and is "slow" due to his medical conditions.   (*Id.*).

Madison was soft spoken during his sessions with Dr. Pennuto, with no articulation or paraphasic errors noted.   (*Id.* at 31).   He occasionally had trouble finding the right word and would pause, but he was able to maintain his train of thought and ultimately give an appropriate response. (*Id.*; Tr. Vol. 1, at 243).   Madison did not require repetition or clarification of test questions or instructions, his expressive and receptive language abilities appeared functionally intact, and his thought processes were linear and logical.   (Doc. 633-1, at 30).   Madison did not express any overt delusional material and presented with a euthymic affect that was generally mood and content congruent.   (*Id.*; Tr. Vol. 1, at 243-44).   Although Madison wore eyeglasses and complained that the prescription was wrong, he did not exhibit any significant visual deficits during testing with visual stimuli.   (Doc. 633-1, at 31).    No hearing deficits were noted, and Madison demonstrated a normal pencil grip with no fine motor deficits noted.   (*Id.*).

Madison exhibited excellent concentration during testing, despite occasional auditory distractions from the hallway.   (*Id.*; Tr. Vol. 1, at 246).   Dr Pennuto did not observe any perseveration, repetition, confabulation, or confusion; however, Madison would occasionally answer a question "somewhat impulsively," and then change his answer.   (Doc. 633-1, at 31).   Dr. Pennuto concluded, based on his effort on all tests, behavioral observations, and test results, that Madison's test results likely provide an accurate reflection of his true cognitive functioning.   (*Id.*

at 31-32).[20]   However, Dr. Pennuto testified that Madison tried to present himself in a very positive light and does not want to be viewed as mentally ill.   (Tr. Vol. 1, at 264).

Given that Madison had previously undergone extensive psychological and neuropsychological testing over several years, Dr. Pennuto took a more focused approach to her examinations.   (Doc. 633-1, at 35).   She administered 16 different tests that assess competency-related abilities, as well as tests that addressed areas where Madison had previously scored poorly, and areas that could be affected by Madison's medical issues and surgical intervention.   (*Id.*; Tr. Vol. 2, at 28).[21]

Dr. Pennuto utilized the Wide Range Achievement Test-Fourth Edition ("WRAT-4") Word Reading subtest to assess Madison's reading ability as well as his premorbid intellectual functioning (meaning pre-traumatic brain injury).   (Doc. 633-1, at 32). His basic reading fell within the low average range, equal to an 8.9 grade level (Standard Score 84), which Dr. Pennuto found to be consistent with his prior reading assessments and intellectual testing.   (*Id.*).   Dr. Pennuto therefore concluded Madison's reading ability was stable over time.   (*Id.*).   Dr. Pennuto did not administer the full Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV") IQ test to Madison because he had already taken the test three times over the past 2.5 years with broadly consistent results demonstrating overall low average intelligence with indices ranging from average to borderline. (Tr. Vol. 1, at 247).   Specifically, Madison's overall IQ score ranged between 84 and 86, his verbal comprehension score was between 78 and 76, and his working memory[22] score was between 89 and

---

[20] Dr. Pennuto ended the February 4, 2020 testing early because Madison complained of head pain and lightheadedness and ultimately placed his head on the table.   (Doc. 633-1, at 31-32). Dr. Pennuto was able to complete her testing the following day.   (*Id.* at 32).

[21] For example, Dr. Pennuto did not administer any tests related to sensorimotor functioning, as she believed any deficits in that area would not impact competency.   (Tr. Vol. 2, at 28-29).

[22] Working memory is a person's ability to hold information temporarily in his or her

92.  (Doc. 633-1, at 32-33).  Madison's scores changed substantially in two areas:  his perceptual reasoning score was 90 in January 2018 and increased to 105 in December 2018; and his processing speed[23] was 94 in January 2018 and dropped to 81 in December 2018.  (*Id.* at 33).

Dr. Pennuto also administered five executive functioning tests, which assess higher level thinking skills, including speed of processing, divided attention, problem solving, planning, and benefiting from feedback.  (*Id.*; Tr. Vol. 1, at 248-49).  The first was the Trail Making Test which measures cognitive flexibility.  (Tr. Vol. 1, at 249).  Madison's basic sequencing skills on the Trails A test fell in the high average range, his complex sequencing skills on the Trails B test were average, and he did not exhibit any sequencing errors on the Trails B test.  (Doc. 633-1, at 33; Tr. Vol. 1, at 249; Tr. Vol. 2, at 22-25).

Madison's word reading speed and color naming speed on the second test – the Stroop Color and Word Test – were average, although his response inhibition on the color-word interference trial fell in the low average range.  (Doc. 633-1, at 33; Tr. Vol. 1, at 250).  He made a few errors on the third trial, but he self-corrected those errors.  (Tr. Vol. 1, at 250).  Dr. Pennuto opined that Madison's performance on these tests showed intact cognitive processing speed, with potential mild evidence of response disinhibition.  (*Id.*).

Dr. Pennuto next administered the WAIS-IV subtest called Digit Span, which measures the ability to recite numbers forwards, backwards, and in sequence.  (Tr. Vol. 1, at 250).  Madison scored 8 on the WAIS-IV derived Reliable Digit Span test and scored 9 on the Digit Span ACSS test – both scores fell above the cut score and were within an acceptable range.  (Doc. 633-1, at 32).  Madison's attention and working memory was average.  (*Id.* at 33).  Madison performed in the

---

memory for the purpose of using that information to perform a specific task.  (Doc. 632-4, at 6).

[23]  Processing speed is a person's ability to quickly and correctly scan, sequence, or discriminate simple visual information.  (Doc. 632-4, at 6).

low average range on the fourth test, a verbal abstract reasoning measure from the WAIS-IV called Similarities.   (*Id.*; Tr. Vol. 1, at 251).   For the fifth test, Madison was able to draw the face of a clock quickly and accurately, which provides information about a person's planning and organization.   (Doc. 633-1, at 33, 35; Tr. Vol. 1, at 251).   Madison was also able to copy geometric designs with mild imprecisions, but within normal limits.   (Doc. 633-1, at 35).

Madison was administered three tests to measure learning and memory and six tests to measure language functioning.   Madison scored within expectation on an embedded validity measure on the California Verbal Learning Test-3 ("CVLT-3), which measures auditory learning and memory.   He correctly identified 16 out of 16 words.   (Doc. 633-1, at 32).   However, his scores on the CVLT-3 tests (which he took five times) ranged from the average to low average range for verbal learning, specifically with respect to free recall and cued recall of words.   (*Id.* at 34).   On the Wechsler Memory Scale-IV ("WMS-IV"), Logical Memory test, Madison's verbal memory score was in the average range for both immediate and delayed recall, as well as for recognition memory.   (*Id.*).   With respect to visual learning, Madison scored in the superior range on the Brief Visuospatial Memory Test-Revised ("BVMT-R") for immediate recall.   (*Id.*)   And his score improved after each administration.   (*Id.*).   Madison scored in the high average range on recall of visual information, and in the expected range for nonverbal recognition memory.   (*Id.*).   Overall, Dr. Pennuto found Madison's learning and memory to be in the low average or better ranges, with strengths in visual learning and memory.   (*Id.*).

Dr. Pennuto also administered the Multilingual Aphasia Examination Token Test ("MAE"), which tests oral comprehension.   (*Id.*).   Madison scored in the high average range.   However, Madison scored in the borderline range for the MAE Aural Comprehension test, which examines more complex vocabulary ranges and visual recognition.   (*Id.*).   Madison knew all but one of the

words, but deliberately chose alternate responses that had personal meaning to him.   (*Id.*).
Madison also scored low average on the MAE Visual Naming subtest – he accurately named 24 out
of 30 objects but provided alternate responses to 4 of the remaining 6 objects.   (*Id.* at 35; Tr. Vol.
1, at 253; Tr. Vol. 2, at 39).

Madison scored in the low average range on lexical fluency (the ability to verbally produce
a series of words that begin with the same letter) and in the average range on semantic fluency
(animal naming).   (Doc. 633-1, at 35).   Comparatively, Dr. Pennuto found Madison to have
consistently low average reading ability, with verbal fluencies in the average to low average range.
(*Id.*).[24]

There was much discussion during Dr. Pennuto's testimony about the "practice effect" –
whereby a subject can increase his or her test scores the more times the subject takes the same test
in close succession.   (Tr. Vol. 1, at 247-48; Tr. Vol. 2, at 19-20).   In other words, it is possible that
an individual's scores can become artificially inflated the more frequently the individual takes the
test.   Dr. Pennuto acknowledged that "mild practice effects" of "just a few points" may be expected
following re-administration of certain tests, but opined that the drastic increase in Madison's
perceptual reasoning score was much higher than could be attributed to any practice effect.   (Doc.
633-1 at 33; Tr. Vol. 1, at 259-60; Tr. Vol. 2, at 20, 25).

Based on her review of available records and reports, as well as her own testing and
observations, Dr. Pennuto concluded that Madison had generally intact performance across
cognitive domains.   (Doc. 633-1, at 35; Tr. Vol. 1, at 254).   He performed in the low average to
average range or better on tests of executive functioning, learning and memory, language, and

---

[24]  Madison also completed two tests for emotional functioning.   He denied all symptoms of
depression and endorsed a minimal level of anxiety symptoms.   (Doc. 633-1, at 32; Tr. Vol. 1, at
253-54).

visuospatial/constructional skills, and his intellectual ability and reading level have remained consistent in the low average range.   (Doc. 633-1, at 35-36).   He had borderline performance on more complex oral comprehension tasks, but Dr. Pennuto attributed that result to Madison deliberately choosing alternate answers, and not to any comprehension deficit.   (*Id.* at 36).

Dr. Pennuto also addressed Madison's neuroimaging results, although she testified that she is not a medical doctor nor an expert in neuroradiology.   (*Id.*).   Dr. Pennuto found no significant structural changes in the neuroimaging, and opined that his test results demonstrated no significant functional compromises.   (*Id.*).   In reaching this finding, Dr. Pennuto only reviewed Madison's March 5, 2019 brain MRI that was performed at FMC Butner by a Dr. Choi and Dr. Choi's report. (*Id.*; Tr. Vol. 2, at 8-9).   Dr. Pennuto never reviewed any other images.[25]   She did not challenge any of Dr. Snyder's findings, but Dr. Pennuto testified that "the structure of the brain does not always equal the function of the brain, that one can have some structural changes or damage and still be able to function adequately."   (Tr. Vol. 2, at 17).

Overall, Dr. Pennuto opined that Madison's current cognitive profile was broadly intact, and he does not meet the criteria for a neurocognitive disorder.   Dr. Pennuto also disagreed with the prior opinions of Dr. McClain and Dr. Ouaou, both of whom diagnosed Madison with "mild" or "minor" neurocognitive disorder.   (Doc. 633-1, at 36).   According to Dr. Pennuto, Madison did not show even a "modest" cognitive decline, which is required to meet the criteria for a mild neurocognitive disorder.   (*Id.*).   With respect to Dr. Ouaou's findings, Dr. Pennuto noted that there were some scoring, or documentation errors, in his second report (the report from 2018).   (Tr. Vol

---

[25] Defense counsel sent a CD with all of Madison's images to FMC Butner, but the CD was not compatible with FMC Butner's computer software.   Neither Dr. Lloyd nor Dr. Pennuto contacted defense counsel to attempt to retrieve the images in a different format.   (Tr. Vol. 3, at 250-51).

1, at 256-59).   Dr. Pennuto further testified that in Dr. Ouaou's most recent 2020 report, he did not definitively state a diagnosis other than to note significant decline, which contradicted Madison's test scores – including from tests Dr. Ouaou administered in 2020 – which remained relatively stable over time and in some areas increased.   (Tr. Vol. 1, at 256-59, Tr. Vol. 2, at 55-60, 63).

Dr. Pennuto ultimately joined in the opinion of Dr. Lloyd that Madison is presently competent to stand trial.   (*Id.* at 40).

### 3.    Dr. Patricia A. Zapf[26]

The United States' third and final witness was Patricia A. Zapf.   Dr. Zapf obtained her Bachelor of Arts in psychology from the University of Alberta, and her Masters of Arts and Ph.D., both in clinical psychology with a specialization in forensics, from Simon Fraser University.   (Tr. Vol. 2, at 74).   She is a licensed psychologist in several states, has authored numerous books and book chapters, manuals, peer-reviewed journal articles, and received several awards in her field. (*Id.* at 80-85).   Dr. Zapf currently holds the position of Vice President for Continuing and Professional Studies at Palo Alto University and is employed with Park Dietz & Associates as a forensic expert.   (*Id.* at 72).   She has previously testified as an expert in state court on numerous occasions, and one time in federal court.   (*Id.* at 81-82, 86).   Dr. Zapf was admitted as an expert in forensic psychology without objection.   (*Id.* at 75, 87-89).

Dr. Zapf did not interview, evaluate, or observe Madison.[27]   Rather, her August 30, 2020 forensic evaluation report was limited to a review of Madison's available medical and psychological

---

[26] Madison moved to exclude Dr. Zapf from testifying (Doc. 604), which I denied by Order dated September 21, 2020.   (Doc. 611).   During the hearing, Madison renewed his objections to Dr. Zapf's testimony, and raised several other objections on a variety of grounds.   I overruled the majority of the objections and carried with the case Madison's arguments concerning the weight to be afforded to Dr. Zapf's opinions and testimony, which will be addressed in this Report below.

[27] The United States sought leave for Dr. Zapf to conduct an interview of Madison in August 2020 (Doc. 570), which I denied by Order dated August 13, 2020.   (Doc. 577).   The United States

records, all prior expert reports previously identified, the transcripts of the prior competency hearing and other documents from the court records, recorded interviews with Madison and law enforcement, and summaries of various FBI interviews.   (Doc. 633-4, at 1-2).   Dr. Zapf testified that best practices would be to conduct an interview of the person as part of a forensic evaluation, but the data in this case was sufficiently robust to support her conclusions.   (Tr. Vol. 2, at 93-95).

Based on her review and summary of these records, (*see* Doc. 633-4, at 2-8),[28] Dr. Zapf opined that Madison meets the diagnostic criteria for Narcissistic Personality Disorder, and Other Unspecified Personality Disorder (paranoid features).   (*Id.* at 8; Tr. Vol. 2, at 101-02).   Dr. Zapf found Madison to exhibit all of the symptoms of Narcissistic Personality Disorder, including:   (1) a pattern of routinely overestimating or exaggerating his accomplishments; (2) a pattern of idealized love, with a great deal of intensity and volatility; (3) a consistent pattern of threats, intimidation, lies, abuse, and manipulation by Madison towards his wives and intimate partners; (4) Madison's belief that he is superior, special or unique; (5) a pattern of interpersonal exploitation of multiple women; and (5) a pattern of feeling entitled and expecting special treatment by his intimate partners, work-related associates, and law enforcement.   (Doc. 633-4, at 9).   Dr. Zapf further opined that Madison demonstrated paranoid personality features, including a pervasive distrust and suspiciousness of others such that their motives are interpreted as malevolent.   (*Id.* at 10).   Because many of Madison's paranoid and persecutory beliefs were provided in response to inquiries about his involvement in criminal activities, and/or were self-serving in nature, Dr. Zapf concluded that

_____

did not appeal this ruling to the presiding District Judge or raise any objections during the hearing.

[28] The Court has carefully reviewed the entirety of Dr. Zapf's report, however, all of the records Dr. Zapf reviewed have previously been discussed and summarized either in this Report, or in Judge Spaulding's Reports, and in an effort (some would say in vain) to reign in the length of this Report, will not be further addressed herein.

Madison's paranoid personality features were secondary to his Narcissistic Personality Disorder. (*Id.*).

Dr. Zapf further opined that Madison's Narcissistic Personality Disorder does not meet the threshold qualification for a mental disorder or defect that renders him incompetent to proceed to trial.   (*Id.*).   Dr. Zapf also found Madison's cognitive functioning to be broadly intact, and that he does not meet the diagnostic criteria for a mental defect.   (*Id.*).   Dr. Zapf disagreed that Madison suffers from delusional disorder.   She opined that Madison's descriptions of his educational and military history were embellishments of something based in reality.   (Tr. Vol. 2, at 104-05, 177). She also opined that Madison's persecutory beliefs and references to "Mr. B" were merely self-serving justifications for his actions.   (Doc. 633-4, at 11; Tr. Vol. 2, at 102-03, 106, 175-76). Relying in large part on the videotaped police interrogation, Dr. Zapf noted that Madison will eventually capitulate when he is confronted with contradictory facts, therefore his beliefs do not qualify as delusions.   (Doc. 633-4, at 11; Tr. Vol. 2, at 107).   Dr. Zapf discounted the diagnoses of Dr. Ouaou, Dr. McClain, and Dr. Demery because these experts only evaluated Madison during a "snapshot of time," whereas the Bureau of Prisons' experts – Drs. Buigas, Rigsbee, and Lloyd – were each able to evaluate Madison repeatedly over an extended period of time.   (Doc. 633-4, at 11; *see also* Tr. Vol. 2, at 118-25, 129-31).

Dr. Zapf noted that all experts have found Madison to engage in tangentiality when answering questions, and to possess a storytelling communication style.   (Doc. 633-4, at 12). However, Dr. Zapf found Madison's tangential responses to be another example of his self-serving behavior and attempts to place blame for his actions on others.   (*Id.*)   According to Dr. Zapf, when all collateral sources are reviewed in conjunction with all other reports, records, and evaluations, it provides a "robust example of Mr. Madison's intact cognitive functioning, demonstrating no

impairment in his ability to understand factual information, to reason, make decisions, interact with interviewers for a lengthy period of time, follow the conversation, demonstrate an understanding of the personal importance of the information being discussed, and to engage in logical, reasonable, and rational communication and decision-making." (*Id.*; *see also* Tr. Vol. 2, at 164-65, 168, 172, 174-75). Dr. Zapf further stated that these collateral sources show an absence of any thought disorder or delusions. (Doc. 633-4, at 12). In sum, Dr. Zapf opined that Madison is competent to stand trial. (*Id.* at 13).

### 4. Dr. Jason A. Demery

The first witness Madison called to testify was Dr. Jason A. Demery, a licensed and board-certified clinical neuropsychologist. Dr. Demery obtained his Bachelors of Arts in psychology from the University of West Florida, his Masters of Arts in adult psychology from Southern Illinois University, and his Ph.D. in clinical and health psychology from the University of Florida. He currently works part-time as a clinical neuropsychologist at the Gainesville V.A. Medical Center, and has a private practice in Gainesville, Florida. (Tr. Vol. 1, at 128). He is a former assistant professor in the forensic psychiatry division of the University of Florida College of Medicine, and an associate editor of the American Academy of Psychiatry and the Law. (*Id.*). Dr. Demery has previously testified in competency proceedings approximately 80-90 times, and was appointed by the court in approximately 30% of the cases in federal court. (*Id.* at 129-30). Dr. Demery was admitted as an expert in forensic neuropsychology without objection. (*Id.* at 127).

Dr. Demery was originally appointed by Judge Dalton to conduct an independent competency examination of Madison, which Dr. Demery performed on November 20, 2018 and December 5, 2018. (Docs. 428, 444). Dr. Demery was subsequently retained by defense counsel for the present competency proceedings, however prior Court rulings precluded Dr. Demery from

testifying (or submitting any reports) from any more recent evaluations, interviews, or testing of Madison.  (*See* Docs. 611, 619).   Accordingly, Dr. Demery's testimony was limited to his prior 2018 evaluation and report, as well as to challenging Dr. Lloyd's earlier testimony during the course of the present hearing.

As part of his 2018 evaluation, Dr. Demery reviewed the brain imaging records from Dr. Wu, various medical records, the expert reports from Dr. Rigsbee and Dr. Agharkar, prior neuropsychological testing, and videotaped interviews between Madison and law enforcement. (Doc. 632-1, at 1; Tr. Vol. 1, at 132).   Dr. Demery also conducted numerous cognitive tests spanning 12 hours and two separate days.   (Tr. Vol. 1, at 137-38 *see also* Doc. 444).

At the conclusion of his 2018 evaluation, Dr. Demery opined that Madison possessed an adequate understanding of the nature and consequences of the proceedings against him but was not presently capable of assisting in his defense.   (Doc. 632-1, at 2).   Dr. Demery recommended that Madison be found incompetent due to a diagnosis of delusional disorder.   (*Id.* at 10; Tr. Vol. 1, at 145-46).   Dr. Demery found that Madison gave good effort and did not feign impairment with respect to any administered tests.   (Doc. 632-1, at 6, 10; Tr. Vol. 1, at 141-42).   However, Madison demonstrated a high level of "virtuous self-representation" and reported "significant persecutory ideation."   (Doc. 632-1, at 8).   Throughout his interviews, Madison also exhibited multiple persecutory beliefs, and distorted perceptions about the intentions of others which, in Dr. Demery's opinion, moved into a psychotic-level impairment.   (Tr. Vol. 1, at 147).   Dr. Demery also found Madison to be tangential; his responses to questions would meander and veer off into other areas, and he would elaborate on issues not proximate to the original question.   (*Id.* at 138, 149).

Dr. Demery testified that in 2018 Madison "ha[d] a good factual understanding of the criteria for competency to proceed."   (*Id.* at 151).   However, where Madison fell short was in "process-

oriented activities" – specifically cooperating with his defense and testifying on his own behalf. (*Id.*).   Madison's distorted perceptions about his entire history, as well as about the events of the day of the alleged crime were shaping his understanding of what happened, and as a result, Dr. Demery did not believe that Madison would be capable of testifying or helping form a defense.   (*Id.* at 151-52).   However, Dr. Demery also noted that all of Madison's cognitive testing results were "within expectations," and he did not diagnose Madison with any neurocognitive impairments.   (*Id.* at 162).

In considering the materials he reviewed in 2018, Dr. Demery testified that he gave more weight to information that was closer in time to the date of the competency evaluation because he is assessing the defendant's present ability to assist in his defense and present ability to factually and rationally understanding the proceedings.   (*Id.* at 132-34).   He would also weigh more heavily information obtained from a mental health expert as opposed to collateral sources.   (*Id.* at 133-34). Dr. Demery greatly discredited the police interviews with Madison – which Dr. Demery characterized as interrogations – and testified that those interviews would be "wholly inadequate" in informing about a mental health diagnosis.   (*Id.* at 134-35).[29]

Dr. Demery further testified that a delusional disorder is context-specific, meaning that a person would not evoke the delusions unless the person was directly questioned about that specific topic.   (*Id.* at 149).   Someone suffering from delusional disorder would therefore be able to navigate day-to-day living.   (*Id.*).   Dr. Demery also stated that tangentiality is not a diagnostic criteria in the DSM-V for narcissistic personality disorder, but is listed as a criteria for psychotic-level disorders.   (*Id.* at 150).

---

[29]  Dr. Demery testified that he reviewed and considered the police interviews but did not list them on his 2018 report as a source.   (Tr. Vol. 1, at 156, 160-61; Doc. 632-1).

5.      *Dr. Travis Snyder*

The second defense expert to testify was Dr. Travis Snyder, D.O.   Dr. Snyder obtained degrees in psychology, biology, and chemistry from Florida State University, and attended medical school at Touro University Osteopathic Medical School.   (Doc. 632-6; Tr. Vol. 2, at 197).   He is a licensed and board-certified Radiologist currently employed at SimonMed Radiology.   (Doc. 632-6, at 1).   Dr. Snyder is currently a clinical instructor at Michigan State University and is a prolific lecturer and author in the areas of radiology and neuroradiology.   (*Id.*).   He has testified as an expert in neuroradiology in approximately 10-15 prior cases.   (Tr. Vol. 2, at 198).   Dr. Snyder was admitted as an expert in neuroradiology without objection.   (*Id.* at 200).

Dr. Snyder prepared a report, dated August 24, 2020, in which he reviewed Madison's prior diagnostic images.   (Doc. 632-7).   Specifically, Dr Snyder reviewed Madison's brain and abdomen MRIs; brain Positron Emission Tomography ("PET") scans; chest x-rays; brain, head, neck, and chest CT scans; cerebral perfusion CT scans, and CTA head and neck CT scans, each of which were taken at varying dates between August 14, 2017 and July 18, 2020.   (*Id.* at 2-3).   Dr. Snyder also reviewed an MRI Brain Quantitative Volumetric Analysis of Madison's brain, which was originally conducted by Dr. Wu in August of 2017.   (Doc. 632-8).[30]

Based on his review of these images, Dr. Snyder concluded that Madison has a "very damaged brain" and suffers from several abnormal conditions.   (Tr. Vol. 2, at 201-02).   In particular, Dr. Snyder found that Madison suffers from:   (1) Left Parietal Hemorrhage, consistent with diffuse hemorrhagic axonal injury (head trauma);[31] (2) Relative Cerebellar and Frontal lobe

---

[30] Several of the images as well as the volumetric analysis were submitted into evidence without objection at the hearing.   (Doc. 632-8).

[31] The parietal lobe governs functions that include spatial cognition, sensorimotor control, and construction behavior.   Damage to the parietal lobe can cause deficits in these functions. (Doc. 632-7, at 8; Tr. Vol. 2, at 210-15).

hypometabolism on PET imaging (head trauma); (3) Abnormal progressive white matter findings throughout the brain, indicative of Vascular Dementia; (4) a Cyst or Mass in the posterior of the Pituitary gland, indicative of possible endocrine dysfunction; and (5) Abnormal brain volumes as compared to a normative database, indicative of head trauma, vascular dementia, or other disorders. (Doc. 632-7, at 9, 11; Tr. Vol. 2, at 229-30).

With respect to the PET imaging, Dr. Snyder found that Madison's brain – in particular his cerebellum and frontal lobe – did not process and metabolize sugar as quickly as that of a "normal brain" of an average 55-year old male.   (Doc. 632-78, at 5; Tr. Vol. 2, at 203-05, 207).   When these areas of the brain are not as metabolically active as they should be, a person's fine motor movements and personality can be impacted.   (Tr. Vol. 2, at 205-07).

With respect to the conclusion of vascular dementia, Dr. Snyder noted that Madison's brain images showed a consistent abnormal progression in the amount of white matter (dead brain cells) over time, which is markedly accelerated as compared to the normal expected aging process.   (Doc. 632-7, at 9; Tr. Vol. 2, at 216-18).   Dr. Snyder concluded that the increase in white matter represented areas of scarring from multiple small vessel strokes and is consistent with Madison's uncontrolled hypertension.   (*Id.*).   Dr. Snyder concluded that the areas of white matter represent permanent brain damage and are irreversible.   (Doc. 632-7, at 9).   According to Dr. Snyder, Madison's abnormal white matter findings are "highly correlated with cognitive decline and risk of dementia."   (*Id.*; Tr. Vol. 2, at 221-22).

With respect to the decrease in volume mass as analyzed previously by Dr. Wu, Dr. Snyder found that the volume of the corpus callosum – the largest white matter fiber tract of the brain and the only significant fiber tract connecting the right and left hemispheres of the brain – was abnormally reduced and atrophied.   (Doc. 632-7, at 10; Tr. Vol. 2, at 226, 239).   Without the

corpus callosum, the two hemispheres of the brain cannot communicate.  (Doc. 632-8, at 10; Tr Vol. 2, at 226-27).  Dr. Snyder opined that injury and atrophy to the corpus callosum correlates with poor outcome and cognitive deficits.  (Doc. 632-7, at 10; Tr. Vol. 2, at 228).[32]

Dr. Snyder further concluded that his findings are associated with multiple clinical symptoms and poor prognosis, and are consistent with the opinions of Dr. Wu, and the history provided by Dr. Ouaou and Dr. McClain.  (Doc. 632-7, at 11).  However, Dr. Snyder testified that a person cannot be diagnosed with any specific neurocognitive deficits solely from reviewing brain images, and that his conclusions only suggest clinical correlations which are consistent with the testing and opinions rendered by the neuropsychologists in this case.  (Tr. Vol. 2, at 227, 236).  Dr. Snyder did not conduct any psychological or neuropsychological testing of Madison and did not offer any opinion as to his competency to proceed to trial.  (*Id.* at 236-37).

### 6.   *Dr. Robert H. Ouaou*

The defense's third witness was Dr. Robert H. Ouaou.  Dr. Ouaou received his Bachelors of Arts in psychology from Temple University, and his Masters of Science in psychology from Palo Alto University.  (Doc. 194-5; Tr. Vol. 2, at 253).  He has a Ph.D. in clinical psychology from Palo Alto University, with a specialization in neuropsychological assessment.  (*Id.*).  Dr. Ouaou completed a two-year post-doctoral fellowship in neuropsychology and behavioral neuropsychology at the Baltimore V.A. Medical Center.  (Tr. Vol. 2, at 253).  He is a licensed psychologist with expertise in the areas of clinical psychology, neuropsychology, forensic neuropsychology.  (Doc. 194-5).  He has been published numerous times and holds several professional affiliations.  (*Id.*). Since 2008 he has held the position of President of Naples Neuropsychology, in Naples, Florida.

---

[32] There was some discussion during the hearing about the reliability of the volumetric analysis and its acceptance in the medical community.  (Tr. Vol. 2 at 225, 239-43).  I do not find this discussion to lessen the weight afforded to Dr. Snyder's opinions.

(*Id.*; Tr. Vol. 2, at 253).   Dr. Ouaou was admitted as an expert in neuropsychology without objection.   (Tr. Vol. 2, at 256).

Dr. Ouaou's involvement in this case dates back to May of 2017.   He has evaluated Madison five different times and has produced three expert reports.   (*Id.* at 257-58).   The most recent evaluation took place on August 28, 2020, and Dr. Ouaou issued his report on August 31, 2020.   (Doc. 632-4).   Dr. Ouaou met with Madison and examined him over the course of several hours.   (*Id.* at 2).   Dr. Ouaou also reviewed Madison's medical and education records, all prior expert reports, the March 5, 2020 report from Drs. Lloyd and Pennuto, Dr. Snyder's August 24, 2020 report, and Dr. McClain's August 26, 2020 report.   (*Id.*).   He also reviewed FBI discovery materials, and various court filings, rulings, and transcripts.   (*Id.*).   In addition, Dr. Ouaou administered to Madison approximately 18 different cognitive tests.   (*Id.* at 4-8).

In his prior evaluations, Dr. Ouaou found Madison to be tangential and circumstantial, and suffering from delusions and disordered thinking.   (*Id.* at 2).   That opinion has not changed.   To the contrary, Dr. Ouaou found that Madison continues to suffer from delusional thinking, he provided inaccurate and distorted histories, and these distorted and delusional thoughts have remained fixed and consistent over time.   (*Id.*).   Madison also continues to reject any evidence that is contrary to his beliefs.   (*Id.*; Tr. Vol. 3, at 34-35).   Dr. Ouaou found Madison to demonstrate increased bizarre behavior, grandiosity, and paranoia, and his answers are even more tangential than before.   (Doc. 632-4, at 3; Tr. Vol. 3, at 33-34).   Madison also exhibited extreme hyper-religious beliefs and claimed to be anointed by God.   (Doc. 632-4, at 3).   Dr. Ouaou found Madison would become fatigued and incoherent more quickly than in prior evaluations and required more breaks.   (*Id.*).   According to Dr. Ouaou, Madison also had more difficulty recalling his thoughts, and his working memory was noticeably more impaired.   (*Id.*).

With respect to testing, Dr. Ouaou first administered several tests to determine Madison's effort and motivation.   Madison performed within normal limits.   (Doc. 632-4, at 5).

Dr. Ouaou next administered the WAIS-IV test for intellectual functioning, as well as several subtests.[33]   Madison's full-scale IQ was 86, which was in the 18th percentile and the low average range.   (Doc. 632-4, at 5).   His verbal comprehension score was 80 (9th percentile, low average range); his perceptual reasoning score was 98 (45th percentile, average range); his working memory score was 89 (23rd percentile, low average range); and his processing speed score was 89 (23rd percentile, low average range).   (Id.).   Based on these scores, Dr. Ouaou opined that Madison's general cognitive ability was in the low average range of intellectual functioning.   (Id.).   Madison demonstrated intact performances on measures of immediate memory, with his recall of digits and words in the average range.   (Id. at 5-6).   Madison's completion time for tasks requiring motor speed, sequencing, and visual search ranged from the average to high average ranges, but when the tasks became more complex, Madison's performance dropped to the low average range.   (Id. at 6). Madison's processing speed was in the low average range, but his reading and math fluency was severely impaired (less than 1st percentile in reading fluency, and 2nd percentile in math fluency). (Id.).   Madison's working memory was in the low average range.   He was able to repeat a maximum of 5 digits backwards, which was in the average range.   (Id.).   In addition, Madison's verbal comprehension was in the 9th percentile and relatively impaired, his lexical verbal fluency was in the 25th percentile and low average range, and his category fluency was in the 16th percentile and low average range.   (Id. at 7).

---

[33] Because Madison has been subject to such extensive testing over the years, Dr. Ouaou administered alternative cognitive function tests to help ensure that the any practice effects would be ameliorated.   (Tr. Vol. 2, at 259-60).

Madison scored in the superior range on the CVLT-II,[34] and in the average range for non-verbal learning on the WMS-IV.  (*Id.* at 6).  His word list recall was in the average range, and there was no evidence of rapid forgetting of newly learned materials on the CVLT-II, although Dr. Ouaou noted that Madison had completed the CVLT-II multiple times since 2017.  (*Id.* at 6-7).  Madison's visual recall memory on the WMS-IV was in the significantly impaired range, and his recall of complex visual design was in the average range.  (*Id.* at 7).  His word-list recognition on both the CVLT-II and the WMS-III were within expected ranges.  (*Id.*).  Dr. Ouaou also administered the WAIS-IV Block Design test, and Madison's performance was in the average range.  (*Id.*).  Madison's matrix reasoning was also in the average range, and he was able to copy a complex geometric design.  (*Id.*).

Dr. Ouaou administered several tests to measure Madison's reasoning, problem solving, and executive functioning skills, including the Delis-Kaplan Executive Function System ("DKEFS").  (Tr. Vol. 3, at 14).  Madison scored in the impaired range on measures of verbal reasoning and abstraction; his non-verbal reasoning was in the average range, and his ability to switch mental sets varied from the low average to impaired ranges.  (Doc. 632-4, at 7; Tr. Vol. 3, at 14-15).  With respect to his fine motor speed, coordination, and dexterity, Madison was severely impaired in his non-dominant hand, and average in his dominant hand on both Grooved Pegboard manipulation and grip strength.  (Doc. 632-4, at 8; Tr. Vol. 3, at 26-27).  Dr. Ouaou noted that Madison's performance on the DKEFS was in the 36th percentile during the first administration but in 2020 had dropped to the 5th percentile.  (Tr. Vol. 3, at 18).

---

[34] The CVLT-II appears to be a slightly older version of the CVLT-3, although both tests are still widely accepted and used.

As with Dr. Pennuto, there was much discussion during Dr. Ouaou's testimony about the practice effect. (*Id.* at 9-13). According to Dr. Ouaou, the fact that Madison's test scores remained relatively stable and did not increase over multiple administrations of the same tests was actually a sign that his cognitive learning had decreased. (*Id.*). Stated differently, Dr. Ouaou opined that Madison's relatively stable test scores were actually masking a decrease in his cognitive functioning – Madison's test scores dropped but the practice effect "raised" them back to where they were in prior testing. Conversely, Dr. Ouaou would have expected a much greater increase in Madison's test scores based on this practice effect. (*Id.* at 11-13, 20-21). In reaching this conclusion, Dr. Ouaou cited to a textbook titled "A Compendium of Neuropsychological Tests: Administration, Norms, and Commentary" third edition. (*Id.* at 9). According to this Compendium, a practice effect can account for an increase in scores of up to 11 points just with one administration of the WAIS test. (*Id.* at 9-11). Indeed, every time that Madison demonstrated an increase in any test scores, Dr. Ouaou attributed the increase in large part to the practice effect. (*Id.* at 20-22, 89-94).

Based on Madison's test results, Dr. Ouaou drew the following conclusions. Madison put forth maximum effort on all tests, and was not feigning or malingering. (Doc. 632-4, at 8). His intellectual functioning is in the low average range, and Madison exhibited some cognitive deficits typically found in patients with acquired neurological injury or disease. (*Id.*). He had memory deficits, and severe processing speed impairments. (*Id.*). Madison also demonstrated impairments on several measures of executive functioning, which is associated with damage to the frontal lobe of the brain, as well as a pattern of lateralized deficits. (*Id.*). Dr. Ouaou compared Madison's test results to his prior evaluations, and found that Madison continues to demonstrate a pattern consistent with neurodegeneration. (*Id.*). Madison showed declines in processing speed, working memory, verbal fluency, abstract verbal reasoning and problem solving, and left motor functions. (*Id.*; Tr.

Vol. 3, at 19-20, 24-25).   Dr. Ouaou noted that these declines occurred even though there was a possibility of a practice effect on several of these tests.   (*Id.*).   Dr. Ouaou further opined that Madison's declines in functioning are consistent with suspected stroke and cerebrovascular disease, specifically vascular dementia.   (Tr. Vol. 3, at 7, 28-29, 31).[35]

Dr. Ouaou further testified that he utilizes percentiles as opposed to raw test scores to reach his conclusions because percentiles "is the standard in which we present our material as neuropsychologists."   (Tr. Vol. 3, at 8, 17).   Dr. Ouaou criticized Dr. Pennuto for using Madison's raw test scores to characterize his cognitive functions and performance.   (*Id.* at 16-17).[36]   Dr. Ouaou gave the example that while performance in the 9th percentile is considered "low average" it does not take into account the fact that 91 percent of the population performed better, and this fact demonstrates cognitive impairments and a need for remediation.   (*Id.* at 16-18, 71).   Dr. Ouaou also criticized Dr. Pennuto for failing to administer any sensorimotor tests and for omitting test results from her report that showed impairment.   (*Id.* at 33, 45-52).   Dr. Ouaou further challenged the United States' experts' definition of a "delusional belief," and testified that delusions do not have to be odd or bizarre, and a patient can interact with their delusions.   (*Id.* at 36).

With respect to Madison's competency, Dr. Ouaou opined as follows:

It is opined that Mr. Madison continues to lack the ability to adequately disclose to his attorney facts pertinent to the proceedings at issue because of chronic mental disease. He has some factual understanding of the charges in that he can state what he is charged with and the court process. However, he does not have a rational understanding as a result of his impairments. His has significant deficits caused by a

---

[35] Dr. Ouaou testified that vascular dementia is classified as a mental disease or defect listed in the DSM-5.   (Tr. Vol. 3, at 32).

[36] On cross-examination, Dr. Ouaou admitted that raw test scores can correspond to percentiles, which in turn can correspond to the descriptors Dr. Pennuto assigned to those scores. (Tr. Vol. 3, at 64-68, 71-72).   For example, Dr. Ouaou agreed that low percentiles can still correctly be properly characterized as "low average" or "borderline."   Dr. Ouaou further admitted that his 2018 and 2020 reports contained various inconsistencies or typographical errors concerning the descriptors he assigned to Madison's test results.   (*See id.* at 84-85).

psychotic disorder and dementia. It was previously recommended that he receive inpatient psychiatric treatment with medication, which was not followed. He is tangential and likely has a lifelong history of delusions and related distorted perception of reality, as well as magical thinking, that make it nearly impossible to convey counsel with useful information needed to provide mitigation in a complex death penalty case. The presence of a mental disease significantly interferes with his ability to properly assist in his own defense, followed courtroom proceedings, and reason about his case. Further, he appeared more paranoid and grandiose [than] in the past. For example, he stated that he believes his defense team may be "conspiring with the government to kill me". Additionally, since the previous examinations, he demonstrated significant declines in cognitive functions related to chronic cerebrovascular disease. His neurocognitive condition has worsened - as would be expected in individuals suffering from dementia. It is my opinion based on objective neuropsychological testing, record review, and interview with Mr. Madison, that his general mental status has progressively worsened over the past three years and that he be found not Competent to Stand Trial. He has an irreversible neurological condition that will only worsen as he ages and thus his competence is not restorable.

(Doc. 632-4, at 9).

Dr. Ouaou specifically mentioned during his testimony that he does not believe Madison rationally understands the court proceedings, is becoming increasingly paranoid and believes his defense team is working with the prosecution, and his decision-making is askew.  (Tr. Vol. 3, at 41-43).  He further testified that his opinions concerning Madison have not changed since 2017, that Madison's mental state and cognitive functioning is significantly worsening, and his competency has not been restored.  (*Id.* at 33, 37-38, 43-44).  Dr. Ouaou did not administer any legal competency assessments, however he testified that his neuropsychological findings correlate with the brain image findings of Drs. Snyder and Wu.  (*Id.* at 5-6, 8-9, 29).

> 7.    *Dr. Valerie R. McClain*

The defense's fourth witness was Dr. McClain.  Dr. McClain is a licensed clinical psychologist with postdoctoral training in neuropsychology and rehabilitation.  (Doc. 194-6).  She obtained her Bachelors of Science in psychology, Masters of Science in psychology, and Psy.D. in clinical psychology from the Florida Institute of Technology.  (*Id.* at 2; Tr. Vol. 3, at 110).  She is

a prolific author and presenter and has been practicing as a psychologist since 1992.   (Doc. 194-6; Tr. Vol. 3, at 109).   Dr. McClain currently has an independent private practice in Tampa, Florida. She has testified over 1000 times in state and federal courts as an expert witness.   (Tr. Vol. 3, at 111).   Dr. McClain was admitted as an expert in forensic psychology without objection and as an expert in neuropsychology over the objection of the United States.   (*Id.* at 112-14).

Like Dr. Ouaou, Dr. McClain has also been involved in this case since 2017.   (*Id.* at 115). She has examined Madison on at least four prior occasions and prepared an expert report which was considered during the January 2018 competency proceedings.   (*See* Doc. 189).   On August 26, 2020, Dr. McClain conducted a three-hour clinical interview with Madison.   (Doc. 632-3, at 1). She also reviewed a multitude of documents, including the FBI interviews, Madison's criminal, medical, educational, and military records, Dr. Snyder's report, raw data from Dr. Pennuto's report, the December 10, 2018 evaluation by Dr. Demery, and the September 18, 2018 evaluation by Dr. Rigsbee.   (*Id.* at 1-2).   Dr. McClain did not review Dr. Lloyd's report.   (*Id.*).   Dr. McClain also conducted interviews with two of Madison's family members, and administered two tests to Madison:   a Mental Status Exam, and the Rey 15 Item Test.   (*Id.* at 2).     She did not perform any psychological or competency testing.

In addition to summarizing Madison's personal and medical history, Dr. McClain briefly noted that she traveled to Kentucky and interviewed several of Madison's friends and family.   (*Id.* at 2-3).   Dr. McClain clarified at the hearing that these interviews occurred in November 2017, when she interviewed Madison's brother and uncle, and four other family members refused to be interviewed.   (Tr. Vol. 3, at 120-21).   According to Dr. McClain, these individuals "corroborated evidence of [Madison's] paranoid, grandiose, and hyper-religious symptoms and his delusional beliefs, providing evidence of the long-standing nature of his psychiatric symptoms."   (Doc. 632-

3, at 2; *see also* Tr. Vol. 3, at 120-21).   Dr. McClain did not keep any notes from these interviews, rather she testified that she has a clear recollection of the interviews – even though they took place nearly three years prior – and that all of the information relating to those interviews is contained in her report.   (Tr. Vol. 3, at 123, 150-53).[37]

Dr. McClain administered the Rey 15 Item Test, which is used to determine if a subject is malingering.   Madison's scores demonstrated that he was "adequately motivated to participate in the evaluation."   (Doc. 632-3, at 4).   During Dr. McClain's evaluation, Madison exhibited tangential thought processes and required continuous redirection.   (*Id.*).   He was not able to answer questions in a linear manner and became distracted and provided overly detailed responses.   (*Id.*).   Madison had low energy, took long pauses at times while formulating answers to questions, and his speech and language were slowed.   (*Id.*; Tr. Vol. 3, at 126-28).   Madison continued to hold and express beliefs that he is affiliated with both the police and the mafia, and continually referred to and discussed "Mr. B" throughout the interview.   (Doc. 632-3, at 4.)   Dr. McClain considered these beliefs to be delusions because Madison maintains that they are true – specifically that "Mr. B" exists.   (Tr. Vol. 3, at 136, 143, 167).   However, during cross-examination, Dr. McClain admitted that when Madison was pressed about "Mr. B's" involvement with Rachel's death during law enforcement interviews, that Madison would relent.   (*Id.* at 160).   Madison also exhibited religious delusions, indicated that God was going to set him free, and could not focus on evidence that might be relevant to his case.   (*Id.* at 137).   Madison also expressed a desire to testify at his trial, but could not articulate what his testimony would be, only that God would speak through him. (Doc. 632-3, at 4; Tr. Vol. 3, at 133-34).

---

[37] There was some confusion at the hearing, but it appears that the "report" Dr. McClain is referring to is her report admitted during the January 2018 competency proceedings.   (*See* Docs. 194-7, 200).

As part of her evaluation, Dr. McClain also observed Madison interact with his attorneys. (Doc. 632-3, at 4).   Specifically, Dr. McClain found that Madison:

> [R]emained unable to rationally communicate regarding the facts of the case, possible defenses to the evidence the government intends to introduce, and unable to weigh and consider the effect his possible testimony would have, let alone discuss the scope of that testimony or possible cross-examination to which he might be subjected.   Mr. Madison was not able to engage in a rational and factual dialogue with counsel during the time I observed them interact and communicate.

(*Id.*).

According to Dr. McClain, Madison's responses would render it impossible for his defense counsel to help prepare him for cross examination and/or to prevent Madison from incriminating himself on the stand.   (Tr. Vol. 3, at 134-35).   Madison's increased paranoia raised concerns regarding whether Madison would continue to cooperate with his attorneys.   (*Id.* at 135-36).   And Madison's history of tangentiality and derailment suggested that he would have problems testifying in a coherent manner.   (*Id.* at 140-41).

Dr. McClain further evaluated Madison on five competency-related areas.   Dr. McClain rated Madison "marginal" in his ability to appreciate the charges – he can identify the charges and the differences between a felony and a misdemeanor offense, but cannot appreciate that he is charged with forcibly taking his wife without her consent.   (Doc. 632-3, at 5).   She rated Madison "acceptable" as to the appreciation of the range and nature of possibility penalties.   (*Id.*).   Dr. McClain rated Madison "unacceptable" as to his ability to understand the adversarial nature of the legal process because he did not understand the concept of a plea bargain or proceedings in a jury trial.   (*Id.*).   Dr. McClain also rated Madison "unacceptable" in his capacity to disclose pertinent facts to his attorneys, in large part due to his delusional beliefs.   (*Id.*).   Dr. McClain rated Madison as "marginal" in his ability to manifest appropriate courtroom behavior because Dr. McClain believed Madison's medical issues would impact his cognitive and physical stamina, and he would

likely experience difficulty with assisting his attorneys and responding to the demands of a jury trial. (*Id.*; Tr. Vol. 3, at 129-30).   Last, Dr. McClain rated Madison as "unacceptable" in his capacity to testify relevantly – Madison's mental health issues and cognitive deficits in memory and executive functioning will likely make it significantly difficult for Madison to assist his attorneys in a rational manner.[38]   (Doc. 632-3, at 5).

Dr. McClain restated her prior diagnoses of schizoaffective disorder, bipolar type, PTSD, delusional disorder, and major neurocognitive disorder.   (*Id.* at 6; Tr Vol. 3, at 141-42, 144). Based on her review of available records and her evaluation of Madison, Dr. McClain opined that Madison is not competent to proceed to trial, and that he is not restorable to competency due to the progressive and deteriorating nature of his deficits.   (Doc. 632-3, at 6).

8.     *Dr. Bhushan S. Agharkar, M.D.*

Dr. Agharkar was the final witness to testify of behalf of Madison.   Dr. Agharkar completed his Bachelor's degree at Case Western Reserve University.   He received his medical degree from Syracuse University.   (Tr. Vol. 3, at 170).     He completed a four-year residency in adult psychiatry at Emery University School of Medicine, and a one-year fellowship at Emery University School of Medicine in forensic psychiatry.   (*Id.*).   He is board-certified in both adult and forensic psychiatry. (*Id.* at 171).   Dr. Agharkar is on the teaching faculty at Morehouse School of Medicine and Emery School of Medicine, and has been in private practice since 2005.   (Doc. 412, at 123-24; Tr Vol. 3, at 170).   He has testified as an expert in forensic psychiatry approximately 85-90 times in both state and federal court, and has completed well over 1200 competency evaluations.   (Doc. 412, at 124;

---

[38] As has been noted in prior proceedings, the ability to testify relevantly is not a component of the *Dusky* standard.   (*See* Doc. 189, at 19 n.10).

Tr. Vol. 3, at 172-73).   Dr. Agharkar was admitted as an expert in both forensic and clinical psychiatry without objection.   (Tr. Vol. 3, at 173).

Dr. Agharkar first evaluated Madison in July and October of 2018 and participated in the October 2018 competency proceedings.   (*Id.* at 174).   Dr. Agharkar previously opined that Madison most likely suffers from a schizoaffective disorder, bipolar type, and a minor neurocognitive disorder.   (*Id.* at 211).   He found Madison to exhibit delusional beliefs and an extremely tangential thought process, and that Madison had an inability to distinguish between relevant and irrelevant information.   (*See* Doc. 417, at 10).   Dr. Agharkar concluded that Madison was not competent to proceed to trial.   (*See id.* at 11).

Dr. Agharkar evaluated Madison more recently on June 18, 2020 and August 27, 2020 for a total of 3.5 hours.   Madison's counsel were present for the majority of the first interview but were not in attendance during the second.   (Doc. 632-2).   Based on his evaluations, as well as his review of the March 5, 2020 report authored by Dr. Lloyd and Dr. Pennuto, the report from Dr. Snyder,[39] and Madison's medical records from FMC Butner as well as from Madison's July 17, 2020 hospitalization,[40] Dr. Agharkar's prognosis for Madison has not improved.   (*Id.*).   In a report dated

---

[39] Dr. Agharkar agreed with Dr. Snyder's interpretations of Madison's brain images and testified that Dr. Snyder's findings corresponded to Dr. Agharkar's observations and testing of Madison over the years.   (Tr. Vol. 3, at 199-210).

[40] On July 17, 2020, Madison reported numbness and weakness in his left arm, as well as presented with an altered mental state, lethargy, and aphasia.   He was transported to the Orlando Regional Medical Center, where an MRI of the brain was conducted, which was negative for acute intracranial process.   Dr. Snyder reviewed the brain MRI and found that it showed "marked progression in small vessel disease and white matter findings when compared to prior exam," but he did not conclude that Madison suffered a stroke.   (Doc. 632-7, at 5).   Both Dr. McClain and Dr. Agharkar opined that Madison appears to have suffered another transient ischemic attack ("TIA").   (Doc. 632-3, at 2; Doc. 632-2, at 3; Tr. Vol. 3, at 198-200).   Madison's medical records from this event were not admitted into evidence.   And unlike the medical event in September 2018, no expert testified or opined that this medical event has significantly impacted Madison's cognitive functioning and/or competency.   Moreover, Madison's results from cognitive testing administered before and after July 17, 2020 remained largely stable.

August 28, 2020, Dr. Agharkar opined that Madison was "clinically very similar to [his] prior evaluations." (*Id.* at 2). Madison appeared confused, asked the same questions repeatedly, and was not able to identify any witnesses from a list he reviewed with his attorneys. (*Id.*; Tr. Vol. 3, at 175-76). Madison was not able to retain information provided to him from counsel. (Doc. 632-2, at 2). Moreover, Madison's explanation of the evidence he wished to convey to the jury was "convoluted, confusing, and non-sensical." (*Id.*). He also was not able to explain why certain information would be important to a factfinder, and he continued to reference "Mr. B" and continues to believe in "Mr. B's" existence. (*Id.* at 2-3). Madison also remained steadfast in his belief that any records that are inconsistent with his recollection of his life history must have been fabricated. (*Id.* at 3).

Dr. Agharkar observed that Madison had trouble staying on task and exhibited tangential thought processes, which were observed in prior evaluations. (*Id.* at 2). Madison would perseverate on the same stories he had previously relayed to Dr. Agharkar and to his counsel and continues to exhibit hyper-religious beliefs. (*Id.*). He believes he is a vessel for God to speak through, and his beliefs extend beyond what would be considered "normal religious beliefs." (Tr. Vol. 3, at 176-77). Madison also was unable to state what his testimony at trial would be, other than to say that the "Holy Spirit will speak through him." (Doc. 632-2, at 2; *see also* Tr. Vol. 3, at 177). Madison believes that he can control the legal proceedings through God, and that God's wrath will worsen on the world if he is not released. (Doc. 632-2, at 2; Tr. Vol. 3, at 180-81). He believes that hurricanes, plagues, and COVID-19 are the result of his "false imprisonment." (Doc. 632-2, at 2). Madison also relayed that if he is convicted, the jury will go to Hell for false judgment of him, and he compared his prosecution to the persecution of Jesus. (*Id.* at 2-3).

Dr. Agharkar found Madison's beliefs about religion, "Mr. B," and his military record to be long-standing fixed delusions.   (Tr. Vol. 3, at 183-86, 191-92, 218).   And with respect to "Mr. B" in particular, Dr. Agharkar testified that Madison's statements are not self-serving, rather Madison has never abandoned the existence of "Mr. B" and, which is itself delusional.   (*Id.* at 193-95).

With respect to the issue of competency, Dr. Agharkar found that Madison has a general appreciation of the charges against him, but continues to believe it is impossible to kidnap his own wife.  (Doc. 632-2, at 3; Tr. Vol. 3, at 188-89).   He generally understands the roles of the prosecutor, judge, and jury, but struggled with the concept of witnesses.   (Doc. 632-2, at 3; Tr. Vol. 3, at 189-90).   Madison also wanted to ask the judge to send him, if convicted, to Jerusalem.   (Doc. 632-2, at 3).   Madison was aware of the range of possible pleas and sentences he is facing, and understands the difference between of plea of guilty and not guilty.   (*Id.*).   He did not understand the concept of not guilty by reason of insanity, and was not able to retain that information even after it was explained to him.   (*Id.*; Tr. Vol. 3, at 191).   Dr. Agharkar observed Madison's interactions with his attorneys and opined that Madison's ability to assist counsel is "essentially nonexistent." (Tr. Vol. 3, at 179).   Madison cannot "connect the dots," and it would be impossible for him to provide information such as a social history that his defense team could utilize to prepare mitigation evidence.   (*Id.* at 188).   However, Dr. Agharkar did not administer any legal competency tests to Madison.

Dr. Agharkar concluded that Madison remains delusional and brain damaged.   (Doc. 632-2, at 3).   His tangentiality and ability to stay on task has only worsened over time.   (Tr. Vol. 3, at 181-82, 187).   Dr. Agharkar also relied on the test results and opinions from Dr. Ouaou and Dr. Snyder to opine that Madison has suffered cognitive deterioration over the past few years.   (*Id.* at 242-43).   Dr. Agharkar is now "highly concerned that [Madison] has a Major Vascular

Neurocognitive Disorder."   (Doc. 632-2, at 3; *see also* Tr. Vol. 3, at 211-12).   Dr. Agharkar found it challenging to gather a coherent symptom history, and therefore could not conclusively determine whether Madison has an underlying mood or psychotic disorder worsened by a dementia, but if he has a primary major mental illness as well as a dementia, it would be most consistent with schizoaffective disorder.   (Doc. 632-2, at 3-4; Tr. Vol. 3, at 210-11).[41]   Dr. Agharkar disagreed with the Bureau of Prisons' experts' diagnoses of various personality disorders – while Madison may have narcissistic traits, it does not exclude the possibility of also having a psychotic condition. (Tr. Vol. 3, at 214).   He also criticized the failure to administer any psychotropic mediation to Madison while at FMC Butner.   (*Id.* at 216-17).   Last, Dr. Agharkar discounted Madison's prior interviews with the police and the FBI interviews because they do not evidence Madison's present mental state.   (*Id.* at 219-20).

While Dr. Agharkar did not administer any tests during his evaluation of Madison, Dr. Agharkar did review Madison's answers to the ECST-R test that Dr. Lloyd administered.   (*Id.* at 224).   Dr. Agharkar interpreted Madison's responses to demonstrate how he can initially answer a question close to the topic, but then will veer off and require redirection, with moderate success. (*Id.* at 224-25).

Dr. Agharkar opined that Madison suffers from a mental disease or defect and remains incompetent to stand trial.   (Doc. 632-2, at 4).   Specifically:

---

[41] Dr. Agharkar testified that he based his diagnosis of schizoaffective disorder, bipolar type, on Madison's hallucinations, at least one manic episode, delusions, and disorganized thinking.   (Tr. Vol. 3, at 239-40).   However, Dr. Agharkar admitted that he had no records of Madison experiencing any hallucinations, and only Madison's own recitation of a prior manic episode, and Madison is an admittedly poor historian.   (*Id.* at 240-41).   Dr. Agharkar further clarified that his diagnosis is now leaning more towards brain damage, and that Madison's delusions and mood problems stem from his brain damage and not a schizoaffective disorder.   (*Id.* at 241).   Regardless of his diagnosis, Dr. Agharkar remains steadfast in his opinion that Madison suffers from a neurocognitive disorder.   (*Id.* at 246).

His thought processes are tangential and he evidenced grandiose and paranoid delusional beliefs. He cannot maintain a coherent narrative and often derails with open-ended questioning. He loses his train of thought frequently and has to be redirected. He remains a poor historian and is unable to rationally assist in the development of mitigation evidence which might be needed in a potential penalty phase. It is my opinion that this results in a significant impairment in his ability to rationally assist counsel. He would not be able to testify relevantly if called upon to do so. He has stated that any testimony he would give would be "God speaking through me" and not his own words. He would be compelled to talk about any matters that he deems relevant, though his attorneys or the court may disagree. Mr. Madison says he cannot know ahead of time what he would testify to because "it's God speaking." He would voir dire jurors on whether they "serve God or the Devil" because only servants of God can judge him and render an appropriate verdict. He would tell the jury they will go to Hell if they were to convict him. Based on these observations, Mr. Madison does not appear able to rationally assist his counsel in his defense. It is my opinion that his condition has worsened since his last incompetency adjudication.

(*Id.*; *see also* Tr. Vol. 3, at 197-98, 212-14).   Dr. Agharkar reiterated that Madison's condition is progressively declining, and that he has a poor prognosis.   (Tr. Vol. 3, at 212).

## IV.     Analysis

A defendant is incompetent if (1) he is presently suffering from a mental disease or defect that results in his (2) inability to understand the nature and consequences of the proceedings against him or (3) to assist properly in his defense.   18 U.S.C. § 4241(d).   Stated differently, the question is whether, due to a mental disease or defect, "the defendant had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he had 'a rational as well as factual understanding of the proceedings against him.'"   *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986) (quoting *Dusky*, 362 U.S. at 402).

### A.     Mental Disease or Defect

In the prior competency proceedings, there was no dispute that Madison suffered from both a mental disease and a mental defect.   (*See* Docs. 189, 417).   Now, however, the parties do not agree on this first threshold factor.

During the competency restoration hearing, the following diagnoses were offered: Narcissistic Personality Disorder (which is not classified as a mental disease or defect), Delusional Disorder (which is classified as a psychotic disorder and a mental disease or defect), Schizoaffective Disorder, Bipolar Type, PTSD, Major Neurocognitive Disorder, Major Vascular Neurocognitive Disorder, Minor/Mild Neurocognitive Disorder, and Vascular Dementia.   As discussed above, the United States' experts consistently opined that Madison does not suffer from either a mental disease or defect, whereas Madison's experts consistently opined that Madison suffers from both.

In post-hearing briefing, it appears that Madison is now focusing on a diagnosis of brain damage and vascular dementia.   (Doc. S-662, at 17).   And on this point, I find that there is relative agreement between the parties.   It is undisputed that Madison suffers from some degree of brain damage.   Dr. Snyder testified without rebuttal that Madison's brain images show a history of traumatic brain injuries, increased white matter, and decreased metabolism.   Dr. Agharkar and Dr. Ouaou agreed with Dr. Snyder's findings, and Dr. Lloyd and Dr. Pennuto also testified that Madison has suffered some brain damage over time.   The United States also did not refute the expert testimony from both Dr. Ouaou and Dr. Agharkar diagnosing Madison with some form of dementia. Thus, I find that the preponderance of the evidence establishes that Madison does presently suffer from a mental disease or defect in the form of both brain damage and vascular dementia.   But whether that disease or defect renders Madison presently incompetent to stand trial under the *Dusky* standard is another matter.

B.     *Factual and Rational Understanding of the Proceedings*

There is largely no dispute that Madison has a factual understanding of the proceedings against him.   (*See, e.g.*, Doc. 632-1, at 2; Doc. 632-2, at 4; Doc. 632-4, at 9).   The parties disagree, however, over whether Madison possesses a rational understanding.

While the concept of "rational understanding" is difficult to define, it means more than simply being oriented to time and place and having some recollection of events. *Dusky*, 362 U.S. at 402. For example, a competent defendant can make a "reasoned choice" among the alternatives available to him when confronted with decisions such as whether to testify, waive a jury trial, cross-examine witnesses, put on a defense, and the like. *See United States v. Merriweather*, No. 2:07-CR-243-RDP-JEO, 2014 WL 5770213, at *59 (N.D. Ala. Nov. 5, 2014) (citation omitted) ("[R]ationality under the *Dusky* standard requires that a defendant have some ability to confer intelligently, to testify coherently, to follow and evaluate the evidence presented, and have some awareness of the significance of the proceeding and some ability to understand the charges against him, the defenses available to him, and the basic elements of a criminal trial."); *cf. Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1992) ("A defendant lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him.").

Dr. Lloyd and Dr. Zapf both testified that Madison has a rational and factual understanding of the proceedings against him, primarily due to Dr. Lloyd's evaluation of Madison, his responses to the ECST-R test of legal competency, and Madison's prior interviews with law enforcement.[42] On the other hand, Dr. Agharkar opined that Madison does not have a rational understanding because he had a difficult time understanding the role of witnesses in a trial. (Doc. 632-2, at 4). Dr. McClain opined that Madison's abilities in this area were both marginal because he does not

---

[42] Madison argues that his 2016 interviews with law enforcement should be given little to no weight at this stage because they are stale. This argument is not persuasive for two primary reasons. First, Madison himself relies on other arguably stale pieces of evidence – *i.e.,* Dr. McClain's recollection of interviews with Madison's family members in 2017, Dr. Wu's 2017 report, and Dr. Demery's 2018 report. Second, almost every expert agreed that when assessing present competency, it is best to review the entire available history and record evidence, and that is exactly what I have done.

understand how a husband can kidnap his own wife, and unacceptable because he did not understand the concept of plea bargaining or the proceedings in a jury trial. (Doc. 632-3, at 5). And Dr. Ouaou opined that Madison lacks a rational understanding due to his cognitive impairments. (Doc. 632-4, at 9; Tr. Vol. 3, at 42-43). I must therefore determine which of these competing opinions to credit.[43]

Dr. Lloyd was the only professional to administer instruments of legal competency.[44] Madison's scores on the ECST-R were in the normal range in all areas – an increase in his prior scores from 2017 (which were in the normal to mild impairment range).[45] The results demonstrated that Madison was aware that he is facing serious charges that could result in the death penalty. He

---

[43] In his December 2018 report, Dr. Demery opined that Madison possessed both a factual and rational understanding of the proceedings. (Doc. 632-1, at 2).

[44] During the hearing and in Madison's post-hearing briefing, Madison attacked the ECST-R on two bases: (1) that the instrument only assesses factual understanding; and (2) that the ECST-R is utilized to rule out psychotic beliefs and is not the best measure of legal competency. (Tr. Vol. 3, at 224; Doc. S-662, at 23). As to the first point, no defense expert administered any objective testing to prove this theory. I also note that Dr. Demery utilized the ECST-R in his 2018 testing and evaluation, and that Dr. Demery testified that the ESCT-R is a very important tool in assessing legal competency. (Doc, 632-1, at 2; Tr. Vol. 1, at 145). As to the second point, Dr. Lloyd testified that she selected the ECST-R in order to rule out psychotic beliefs due to the prior opinions of defense experts that Madison suffered from delusions. I therefore do not find Madison's attacks on the ECST-R to be persuasive. (*See also* Docs. 189, 225).

[45] Madison also argues in his post-hearing briefing that his competency has not been restored because Dr. Lloyd testified that Madison's competency related abilities remained the same from the day he arrived at FMC Butner, through the day he left. (Doc. S-662, at 1 (citing Tr. Vol. 1, at 221)). And, according to Madison, since he was found incompetent prior to his arrival at FMC Butner, he must therefore still be incompetent under the "law of the case" doctrine. (*See id.* at 5). There is no dispute that Madison was previously found incompetent under 18 U.S.C. § 4241 based on the evidence then presented to the Court. But that was then, and this is now, and the issue I am faced with now is whether, based on a preponderance of the evidence presented during the September 30-October 2, 2020 hearing, Madison's competency has been restored. *See* 18 U.S.C. § 4241(d). If I were to simply adopt the prior findings that Madison is incompetent, it would render § 4241(d) a nullity. Moreover, whether Dr. Lloyd's testimony can be read to imply that she did not believe Madison was incompetent at the time she arrived at FMC Butner is something I have taken into consideration, but it is not dispositive.

also rationalized that even a life sentence would, in essence, be a death sentence given his age and health.   Madison understood the difference between pleading guilty and not guilty, and that his own testimony would be key to his case.   He was aware that he could not be compelled to testify, but that if he chose to, he would have to tell the truth.   Madison understood the concept of a plea bargain, although he was unsure what rights he would lose if he agreed to a plea bargain.   Madison also knew how to behave in court, understood the roles of the prosecutor, defense, judge, and jury, and knew how to notify his attorneys if a witness was lying during trial.

These test results were mirrored in Madison's answers to Dr. Lloyd during various meetings throughout his stay at FMC Butner, and I find that Madison's answers and ECST-R scores provide objective record support for Dr. Lloyd's opinion that Madison has a factual and rational understanding of the proceedings.   I also afford Dr. Lloyd's opinion greater weight because she was in the unique position to observe Madison over the course of a continuous 12-month period, during which his behavior in general, as well as his competency-related abilities, were considered. *See Merriweather*, 2014 WL 5770213, at *43 (finding more credible the opinions of the government experts because they had the greatest ability to observe and monitor the defendant in his daily life over the course of more than one year, and those observations were supported by the continuous observation of defendant by other medical and correctional staff); *United States v. Hoyt*, 200 F. Supp. 2d 790, 794 (N.D. Ohio 2002) (crediting expert in competency proceeding who "was able to observe and treat Defendant . . . for a significantly longer period of time than that which [the Defense expert] treated Defendant" . . . who could "supplement his own observations with those of other members of the nursing and correctional staff").

This same evidence also alleviates Dr. Agharkar's concern that Madison does not understand the roles of witnesses.   Madison knew that witnesses would answer questions posed by the

attorneys about him and his case and identified his ex-wives as potential witnesses who might testify against him, perhaps untruthfully, because they have a grudge against him.   And Madison is aware of how to notify his counsel during trial if a witness testifies untruthfully.   I therefore find other record evidence refutes Dr. Agharkar's opinion on this point.   *See Bradley*, 644 F.3d at 1268 ("[F]aced with diametrically opposite expert testimony, a district court does not clearly err by simply crediting one opinion over another where other record evidence exists to support the conclusion." (quoting *Battle*, 419 F.3d at 1299)).

I also do not give much weight to Dr. McClain's opinions on this prong of the *Dusky* standard.   First, it bears repeating that Dr. McClain did not administer any tests of legal competency to Madison, and her report does not explain how she reached her opinions in this area.[46]   Although Madison has remained steadfast in his belief that a husband cannot kidnap his own wife, I find Dr. Lloyd's explanation more credible – that this is simply an example of a defendant disagreeing with the law, which is neither bizarre nor delusional.   And in discussions with Dr. Lloyd, Madison has exhibited a basic understanding of both jury trial proceedings and the concept of plea bargaining. Thus, record evidence also refutes Dr. McClain's opinions.

Last, Dr. Ouaou opined that Madison lacks a rational understanding of the proceedings due to his cognitive impairments.   (Doc. 632-4, at 9; Tr. Vol. 3, at 42-43).   I also do not find this opinion to be supported for several reasons.   First, Dr. Ouaou did not conduct any tests of legal competency – in other words Dr. Lloyd's ECST-R results remain unrebutted.   Second, Dr. Ouaou did not expand on this opinion or identify, either in his report or in his testimony, which areas of

---

[46] Dr. McClain's report is somewhat confusing as it appears to combine observations from prior interviews in 2017 and 2018, does not provide dates for various interviews and evaluations, and in several places, Dr. McClain appears to simply recite verbatim sections from her prior report. (*Compare* Doc. 194-7, *with* Doc. 632-3).

impairment have impacted Madison's ability to rationally understand court proceedings.   Rather, the majority of Dr. Ouaou's testimony focused on whether Madison is able to rationally assist his counsel.   Third, I do not find the results from Madison's cognitive testing – from either Dr. Pennuto or Dr. Ouoau – establish that Madison lacks a rational understanding of the proceedings.  *See Bradley*, 644 F.3d at 1268.

Dr. Pennuto – whose testing focused on competency-related abilities – found Madison to be of low average intelligence, which has remained stable over time.   Madison performed in the low average to average range or better on tests of executive functioning, learning and memory, language, and visuospatial/constructional skills.   Madison was in the borderline range on more complex oral comprehension skills, but Dr. Pennuto found that result was due to Madison purposefully choosing wrong answers.   And while Madison's reading level is low average, it has remained stable.[47] Thus, Dr. Pennuto's testing and conclusions do not support a finding that Madison is so impaired that he cannot rationally understanding court proceedings.

A review of Dr. Ouaou's own test results further weaken Dr. Ouaou's opinion.   Madison scored in the average to low average range on all intellectual functioning tests, and in the low average to high average ranges on all but one cognitive functioning test.   Madison also scored in the average to superior ranges on all but one learning/memory test, and in the high average to low average ranges on the majority of the spatial analysis and executive functioning tests.   Although Madison scored in the severely impaired category for reading and math fluency, and in the impaired ranges for verbal reasoning and abstraction, Dr. Ouaou did not explain how these scores would prevent Madison from possessing a rational understanding of court proceedings.   To be sure,

---

[47] There was also evidence presented that if a practice effect applied to Madison's scores, the differential would only be a few points, not the nearly 11 (or more) points that Dr. Ouaou suggested.

Madison suffers from low intelligence and some form of brain damage and cognitive deficiencies, but that alone is not sufficient to render him legally incompetent to proceed.  *See Estelle*, 534 F.2d at 612 (low intelligence does not equal mental incompetency); *United States v. Deruiter*, No. 2:14-cr-46-FtM-38MRM, 2017 WL 9360880, at *26 (M.D. Fla. May 16, 2017), *report and recommendation adopted*, 2017 WL 3308967 (M.D. Fla. Aug. 3, 2017) ("[A] review of relevant case law demonstrates that a low IQ does not necessarily render a defendant incompetent to proceed." (citing *United States v. Glover*, 596 F.2d 857, 864–65 (9th Cir. 1979); *Carter*, 2013 WL 6668715, at *13)); *Gutierrez v. United States*, No. 8:11-cr-313-T-30EAJ, 2014 WL 6473743, at *7 (M.D. Fla. Nov. 18, 2014) ("[H]aving a low IQ or mental deficiency does not necessarily mean that [a 2255 petitioner] was incompetent to stand trial." (citing *Medina*, 59 F.3d at 1107 ("[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial."))).  Moreover, to the extent Madison's reading abilities and processing speeds are slower, various accommodations can be provided, such as allowing Madison more time to review documents, having his attorneys explain the documents to him, or allowing Madison more frequent breaks during trial to consult with his attorneys.

I give little weight to Dr. Ouaou's opinions in general with regard to Madison's cognitive functioning.  To begin, Dr. Ouaou's reports contain numerous inconsistencies on key points.  Dr. Ouaou attempted to explain these inconsistencies away as "typographical errors," but I find that explanation lacking, particularly when the inconsistencies relate to the descriptors utilized to identify Madison's level of performance on a particular test.[48]   I also find that Dr. Ouaou's opinions reflected a defense bias.  Dr. Ouaou would acknowledge at first when Madison's test performance

---

[48] At one point, Dr. Ouaou conceded that his reports could be confusing and misleading (depending on "who's reading it") but insisted that was not his intent.  (Tr. Vol. 3, at 84-85).

placed him in a non-impaired category (*i.e.*, average or low average).   However, Dr. Ouaou would then argue that the category should be ignored.   For example, in some instances, a test score in the 9th percentile would be in the low average range.   Dr. Ouaou would instead focus on the fact that 91% of other persons would score higher, and argue that fact alone demonstrates impairment.   In other words, Dr. Ouaou repeatedly attempted to use shock value, as opposed to validated testing theory and analysis, to convince me that Madison was severely cognitively impaired.[49]   Dr. Ouaou further exhibited his defense bias in his analysis of the "practice effect."   Every time Madison demonstrated an increase in any of his cognitive test scores, Dr. Ouaou attributed that increase to the "practice effect," even where the increase was outside any known possible range that could be attributable to such an effect.

In sum, Dr. Lloyd's opinion that Madison has a rational understanding of the proceedings is supported by her subjective observations and objective legal competency testing.[50]   This same objective testing rebuts Dr. Agharkar's and Dr. McClain's opinions on this point.   Dr. Ouaou's opinion is both rebutted by his own objective testing and the testing by Dr. Pennuto and lacks credibility.   I therefore find that the preponderance of the evidence establishes that Madison has a factual and rational understanding of the proceedings against him.[51]

---

[49] Another example was Dr. Ouaou's reliance on the Compendium treatise.   During cross-examination Dr. Ouaou admitted that for various test scores that he considered to be impaired, the Compendium actually rated those scores as non-impaired (such as average, or low average).   (Tr. Vol. 3, at 62-69).   Dr. Ouaou attempted to explain these discrepancies as "semantics."   *Id.*

[50] Madison seeks to paint Dr. Lloyd as a biased, unobjective witness actively working with the United States to find Madison competent.   (Doc. S-662, at 3-4).   I find this argument unpersuasive.   Each expert was permitted to observe the entire three-day hearing, to listen to all testimony and evidence, and to challenge the other side's expert testimony and opinions.

[51] I do not discuss further Dr. Zapf's opinions on Madison's factual and rational understanding of the proceedings because I find that her opinions thereon are entitled to little weight. Although I find, as I did before, that Dr. Zapf's opinions and testimony do not run afoul of *Daubert*, I give her opinion very little weight for two reasons.   First, Dr. Zapf did not interview, evaluate, or conduct any testing on Madison; her opinions are based solely on her review of then-available

C.      *Ability to Assist Properly in His Defense*

The last prong to address is whether Madison "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky*, 362 U.S. at 402. This concerns the ability of a defendant to effectively participate in his defense by communicating effectively with his counsel. *Drope*, 420 U.S. at 171-72, *Cooper*, 517 U.S. at 356-57. "It is worth emphasizing that the *Dusky* standard refers to the *ability* of a defendant to communicate with his attorneys, not his *willingness* to communicate with his attorney." *United States v. Merriweather*, 921 F. Supp. 2d 1265, 1304 (N.D. Ala. 2013). Courts addressing a defendant's sufficient present ability to consult with his lawyer have also considered the following factors:

> 1) the state of the defendant's memory, since he should be able to relate pertinent facts, names and events to his attorneys (although the defendant need not remember every fact that trial might encompass); 2) the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources; 3) an adequate ability to review and evaluate documents and other written evidence bearing on the case; 4) an appreciation of the Government's evidence against him; 5) the ability to consider the wisdom of taking a course other than standing trial on the merits; 6) the ability to decide objectively whether to exercise his constitutional right to take the stand, and if he does take the stand, the ability to testify in an intelligent, coherent and relevant manner; 7) the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony with his attorneys and to postulate questions to the witnesses through counsel.

*See United States v. Giraldo*, No. 2:09-cr-85-FtM-36SPC, 2011 WL 7946037, at *3 (M.D. Fla. Oct. 24, 2011), *report and recommendation adopted*, 2012 WL 1890508 (M.D. Fla. May 23, 2012) (citing *United States v. Derisma*, No. 2:09-cr-64-FtM-36SPC, 2011 WL 3878367, at *3 (M.D. Fla. June 27, 2011)).

---

materials.   Second, Dr. Zapf evidenced a clear bias towards the United States.   She credits almost entirely the report from Dr. Lloyd and discounts all defense experts, to the point where she italicizes sections discussing the reports and findings of the Bureau of Prisons experts but does not use the same formatting when discussing defense expert reports.

Once again, the experts and parties are in stark disagreement.  Relying on her interviews, observations, and competency testing, Dr. Lloyd opined that Madison has the present ability to consult with his attorneys with a reasonable degree of rational understanding.[52]   Madison knows the names of his attorneys, stated that he has confidence in them, understands that he can assist his attorneys by being truthful and providing information about the alleged offense, and has no disagreements in the way his attorneys have handled his case.   Madison understands the concept of attorney-client privilege and has followed his attorneys' advice to date.   He has an awareness of the significance of the proceeding against him, understands the nature of a criminal trial, knows he has a choice to either remain silent or testify at trial and can decide which path to take, and knows the difference between a bench or jury trial.   Madison was also able to identify potential mitigation evidence and identify potential witnesses.   Dr. Pennuto's opinion and testing results demonstrate that Madison's cognitive deficits do not rise to the level of rendering Madison unable to consult with his attorneys and provide further support for Dr. Lloyd's opinions.

On the other hand, Drs. McClain, Ouaou, and Agharkar, all opine that Madison is unable to assist his counsel.[53]   Their opinions are based on the same three rationales:   (1) Madison's tangential thinking and dementia make it impossible for him to rationally assist counsel and to convey information; (2) Madison's delusional beliefs, paranoia, and hyper-religiosity render him unable to testify relevantly and to provide useful information to counsel; and (3) Madison's neurocognitive deficiencies interfere with his ability to assist his counsel, follow courtroom

---

[52] I again assign little to no weight to the opinions of Dr. Zapf on this point.

[53] Dr. Snyder did not provide an opinion on Madison's competency, although I find his testimony and report both credible and unrebutted.  Dr. Demery's testimony and opinions were limited to his 2018 evaluations.  Although I find him to also be a credible witness, I give his testimony and opinions little weight regarding Madison's present competency.

proceedings, and make rational decisions about his case.   (Doc. 632-4; Tr. Vol. 3, at 57-59; Doc.

632-3, at 4; Tr. Vol. 3, at 133-41; Doc. 632-2, at 3-4; Tr. Vol. 3, at 181-90, 210, 212-14).

 With respect to Madison's tangential thinking, while all experts agreed that Madison will

veer off topic and discuss issues unrelated to the question at hand, there was also ample testimony

from each expert that Madison can be redirected.   It may be that Madison requires more frequent

redirection than in the past, but the fact remains that he can be brought back on topic with appropriate

questioning and guidance.   As to Madison's dementia, evidence has been presented both that his

short-term memory is deficient, but also that he can retain information.   For example, Madison was

able to retain and synthesize information concerning whether his attorneys were responsible for

approving medication for him while at FMC Butner.   He was also able to retain information about

the charges and facts of his case.   He performed in the average to low average ranges in his ability

to recall words and numbers, and his learning and memory scores were also in the average to low

average ranges.[54]   *See, e.g.*, *Derisma*, 2011 WL 3878367, at *3 (finding competent defendant

suffering from brain damage and resulting dementia, stating:   "There has been no evidence

presented that [the Defendant's] memories are irretrievable or forever lost such that no review of

documents or other evidence in this case would assist him in formulating his defense with this

attorneys.").[55]

 These three defense experts also opined that Madison will be unable to assist his defense in

preparing mitigation evidence.   I disagree.   Each expert report is replete with a detailed and robust

---

[54]   Although Madison performed in the low average range on cued recall abilities, accommodations such as real time transcripts could be provided during trial to assist Madison.

[55]   In her report, Dr. McClain states that Madison is unable to provide a factual or rational account of the events surrounding his arrest, however she does not explain how being able to recite the events of his *arrest* plays into consulting with counsel, testifying coherently, or understanding the basic elements of a criminal trial.

history of Madison's life, complete with record evidence to refute any inconsistences Madison provides, and several of Madison's friends and family have been located and interviewed.   This is not to say that the materials contained within these reports constitute mitigation evidence, but they weigh against a finding that Madison's defense team will be unable to compile evidence in this case.

The defense experts also point to Madison's delusional beliefs, paranoia, and hyper-religiosity as evidence of Madison's incompetency.   Madison's delusional beliefs – as presented by the evidence and testimony submitted – distill into three categories:   (1) exaggerations regarding his military and educational record and other grandiose beliefs; (2) "Mr. B"; and (3) Madison's extreme religious beliefs, particularly that he is a vessel of God.   To be sure, Madison's statements about his past are bizarre and contradicted by record evidence, however, no expert testified how Madison's exaggerations about his military and educational history relate to the facts of his case, or how they would prevent Madison from assisting counsel (other than with respect to collecting mitigation evidence, which is discussed above).   And Madison has not cited to any authority for the proposition that some delusional thinking would make him *per se* incompetent.   In addition, there was expert testimony that Madison would not bring up his delusional beliefs unless prompted or questioned about them.   *Cf. United States v. Franklin*, No. 7:19-MJ-2-REW-EBA, 2020 WL 748181, at *4 (E.D. Ky. Feb. 14, 2020) (finding defendant incompetent because his delusional beliefs were so pervasive – he would answer every question by referencing his delusional beliefs – that they "distort[ed] his perception of reality and significantly impair[ed] his ability to rationally consider his own circumstances.").   Moreover, experts on both sides testified that when pressed on "Mr. B's" involvement in Rachel's death, Madison backs off of that belief.   *See, e.g., United States v. Debrule*, 822 F.3d 866, 874 (6th Cir. 2016) (considering as persuasive expert testimony that the

defendant's "'delusions were not firmly held' – that is, when confronted with contradictory evidence, [the defendant] would often back away from his apparently delusional claims.").[56]

I also do not find Madison's references to God and to God's will to render him unable to assist his counsel or incompetent to proceed.   Rather, it is undisputed that Madison has always been an extremely religious individual, a self-described evangelical, and his background adds context to his references to God.   I find Dr. Lloyd's explanation more persuasive on this point - that Madison's religious beliefs are a tool he uses to rationalize his current criminal proceedings.   Moreover, the fact that Madison has stated that he will reject his attorneys' advice to remain silent at trial and that he will testify does not establish incompetency.   Defendants reject their attorney's advice all the time; the question is simply whether that decision has been made on some rational basis.[57]   *Cf.* *United States v. Kokoski*, 865 F. Supp. 325, 338 (S.D. W. Va. 1994) ("[Defendant] attempts to manifest his incompetency through the presentation of his idiosyncratic religious beliefs. However, these beliefs do not interfere with his understanding of the court process or his ability to assist his attorney in his defense.").

Last, each expert points to Madison's cognitive deficits as evidence of his incompetency.   I have previously addressed Madison's cognitive functioning, and my findings on that point – in particular that other record evidence exists to refute these opinions, as well as the weight afforded to Dr. Ouaou's opinions in particular – applies equally here.   Both Dr. McClain and Dr. Agharkar relied on Dr. Ouaou's opinions and testing in rendering their opinions, and I therefore give their

---

[56] I note that Dr. Agharkar testified that Madison's delusion is not that "Mr. B" kidnapped Rachel, but rather that "Mr. B" exists.   However, the evidence presented does not show how believing in the existence of "Mr. B" would prevent Madison from assisting his counsel, or from understanding the proceedings.

[57] Dr. Demery testified that choosing to testify in a certain manner that is not consistent with the advice of counsel does not necessarily equate to a delusional belief.   (Tr. Vol. 1, at 164).

conclusions with respect to Madison's cognitive abilities little weight as well.[58]   Moreover, other record evidence – in the form of Dr. Pennuto's testing – demonstrates that Madison's cognitive functioning is not so impaired as to prevent him from assisting counsel.

I further find that Dr. McClain's opinions as a whole are entitled to little weight.   She does not support her findings with any psychological or competency testing, she claims to have total recall of interviews that occurred in November 2017 despite the absence of any notes, and she exhibits a clear defense bias.   She credits entirely the opinions of defense experts while ignoring Dr. Lloyd's testing and report (she does not even mention Dr. Lloyd in her report, but does reference Dr. Pennuto), and her reports appear to combine and conflate findings from 2018 and 2020.

In sum, this is not a case where Madison is unable to communicate with his attorneys, to the contrary he has continuously expressed confidence in them, he has stated that he wants to work with his attorneys and that he will be truthful with them, and he was observed communicating with counsel throughout the competency hearing.   In addition, the record evidence demonstrates that he has an understanding of the proceedings, the decisions he will have to make, and the consequences of making those decisions.   Thus, while both sides presented testimony and reports from highly credentialed experts who expressed sincere beliefs, I find that the preponderance of the evidence supports a finding that Madison is able to assist his counsel with a reasonable degree of rational understanding.[59]   *See Merriweather*, 921 F. Supp. 2d at 1307 n.62 ("The Dusky standard, as

---

[58] I found Dr. Agharkar to be an extremely qualified and compelling witness, and have afforded his testimony concerning Madison's diagnoses of brain damage and vascular dementia great weight.   Where I afford less weight is with respect to Dr. Agharkar's conclusions that Madison's cognitive deficits render him incompetent, in particular based on Dr. Agharkar's exclusive reliance on the neuropsychological testing conducted by Dr. Ouaou, and Dr. Ouaou's opinions related thereto, opinions that I have already found to be less credible.   (*See* Tr. Vol. 3, at 236-37).

[59] In reaching this conclusion I have also considered all of the factors listed in *Giraldo*, which are discussed throughout this Report.   In addition, I have reviewed and considered the

commentators have noted, does not require that a defendant have a high level of ability or performance.   After all, a defendant surely does not have to be as intelligent and reasonable as his lawyers to be competent to stand trial." (citing Note, Incompetency to Stand Trial, 81 Harv. L. Rev. 454, 458 (1967))).   *See also Hogan*, 986 F.2d at 1372 (a finding of competency does not require that defendants "fully comprehend the intricacies of some of the defensive theories offered by their lawyers").

Further supporting my conclusion is my personal observations of Madison during the competency restoration proceedings.   Throughout the three-day hearing, I observed Madison to be alert, he was in frequent communication with his attorneys, and often passed written notes to them.[60] This behavior is contrary to the defense experts' opinions concerning Madison's increased paranoia and statements that his defense team is conspiring against him.   Madison comported himself appropriately while in the courtroom, he was able to communicate when he required a comfort break, and his answers to my occasional questions were coherent and on topic.   He was also able to communicate to counsel when he did not receive his medications on time.   This behavior is consistent with that observed during Madison's 12-month stay at FMC Butner – he was able to navigate the extensive campus without difficulty, attended all appointments save one on time (and the one he missed was not listed on the appointment board), and was an active participant in

---

declarations filed by Todd Doss and Lesley White, which were filed *ex parte* under seal and will not be discussed in detail for those reasons.   However, I find that their observations, the veracity and sincerity of which are not in question, mirror the findings and opinions of Drs. McClain, Ouaou, and Agharkar with respect to Madison's tangentiality, delusional beliefs, and cognitive functions, each of which are discussed above.   And while defense counsel clearly is in a unique position to observe Madison and provide insight, as counsel recognizes, their opinions are not determinative. *See Merriweather*, 921 F. Supp. 2d at 1303 ("[T]he court is not obligated to accept without question the assertions of the lawyers concerning the competence of a defendant.").

[60] Of course I am not privy to the content of those notes and accept fully the description of them provided in the supplemental declaration of Todd Doss.   (Doc. S-661-1).

competency restoration classes.  Notably, Madison also was able to recall that his attorneys had requested the authority to approve any of his medications, and relayed that information to FMC Butner staff.  This behavior is not suggestive of a person who cannot rationally consult with counsel.[61]

## VI.    Conclusion

In summary, there can be no doubt that Madison suffers from various physical ailments, as well as some degree of brain damage and dementia.   He also expresses unique and bizarre beliefs, and there has been significant testimony that such beliefs are delusional in nature.   In short, Madison suffers from a mental defect.   Nevertheless, I find that the preponderance of the evidence demonstrates that these conditions – viewed both individually and in combination – do not establish that Madison lacks a sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding, or that he lacks a factual and rational understanding of the proceedings against him.   *See Medina*, 59 F.3d at 1107 ("[N]either low intelligence and mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetency to stand trial."); *Hogan*, 986 F.2d at 1373 (cognitive degeneration due to Alzheimer's Disease did not render defendant incapable of assisting attorney); *United States v. Deruiter*, No. 2:14-CR-46-FtM-38MRM, 2017 WL 9360880, at *30 (M.D. Fla. May 16, 2017) ("even a combination of deficits does not preclude a finding of competency"), *report and recommendation adopted*, 2017 WL 3308967 (M.D. Fla. Aug. 3, 2017). *see also United States v. Vamos*, 797 F.2d 1146, 1150 (2nd Cir.

---

[61] Dr. McClain opined that Madison's physical and mental stamina is impaired, therefore he would not be able to withstand the rigors of a lengthy trial.   In particular, he would not be able to pay attention for the duration of a trial, and therefore his ability to assist counsel would suffer.   I did not observe such lapses in stamina during the three-day competency hearing.   Moreover, any such issues could be remedied by providing accommodations, *i.e.*, through frequent breaks, shorter trial days, four-day trial weeks, and the like.

1986) ("It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial.").

For these reasons, I **RESPECTFULLY RECOMMEND** that the Court find that Jarvis Wayne Madison's competency has been restored and that he is presently competent to stand trial.[62]

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

**RECOMMENDED** in Orlando, Florida on October 29, 2020.


LESLIE R. HOFFMAN
UNITED STATES MAGISTRATE JUDGE


Copies furnished to:

United States Attorney
Counsel for Defendant
District Judge

---

[62]   Should the Court conclude that Madison's competency has not been restored, I respectfully recommend that the Court commit Madison to the custody of the Attorney General to assess whether Madison is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another."   18 U.S.C. § 4246(b).   At the conclusion of this assessment, the Court must hold a hearing pursuant to 18 U.S.C. § 4246(d).   *See also* Doc. 660.